**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
                                        )
JENNIFER NOSALEK, individually          )
and on behalf of all others            )
similarly situated,                     )
                     Plaintiff,         )
                                        )      Civil Action
v.                                      )      No. 20-cv-12244-PBS
                                        )
MLS PROPERTY INFORMATION NETWORK,       )
INC., REALOGY HOLDINGS CORP.,           )
HOMESERVICES OF AMERICA, INC., BHH      )
AFFILIATES, LLC, HSF AFFILIATES,        )
LLC, RE/MAX, LLC, and KELLER            )
WILLIAMS REALTY, INC.,                  )
                                        )
                     Defendants.        )
_____ )

## MEMORANDUM AND ORDER

December 10, 2021

Saris, D.J.

## INTRODUCTION

Plaintiff brings a putative class action under Section 1 of

the Sherman Act, 15 U.S.C. § 1, against MLS Property Information

Network, Inc. ("MLS PIN") and several large real estate brokers

that require franchisees and agents to participate in Pinergy,

an electronic multiple-listing service owned and operated by MLS

PIN.[1]  Plaintiff alleges that Defendants conspired to

artificially inflate the commissions paid to buyer brokers in

_____

[1] Plaintiff voluntarily dismissed Count II, a related
Massachusetts state law claim.

real estate sales through the Buyer-Broker Commission Rule,
which requires seller brokers posting a property on Pinergy to
offer a blanket commission to any broker who obtains a buyer for
the property.

MLS PIN, Realogy Holdings Corporation ("Realogy"), RE/MAX,
LLC ("RE/MAX"), and related entities HomeServices of America,
Inc., HSF Affiliates, LLC, and BHH Affiliates, LLC (collectively
"HomeServices") have filed an omnibus motion to dismiss for
failure to state a claim based on insufficient allegations of
causation.  HomeServices, Keller Williams Realty, Inc. ("Keller
Williams"), and RE/MAX each separately move to dismiss for
failure to state a claim based on insufficient allegations of
conspiracy.  After hearing, the Court **DENIES** the omnibus motion
to dismiss (Dkt. 37) on the issue of causation and the
individual motions to dismiss by HomeServices, Keller Williams,
and RE/MAX (Dkts. 40, 44, and 42, respectively).

### FACTUAL BACKGROUND

The following facts are taken from the Class Action
Complaint (Dkt. 1) and must be taken as true at this juncture.
See Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71-72 (1st
Cir. 2014).

## I.   Parties

Defendant MLS PIN is an association of realtors with over
41,000 members that owns and operates Pinergy, an electronic

centralized database of properties referred to as a "Multiple

Listing Service" or "MLS."  Dkt. 1 ¶ 9, 35.  Participation in

MLS PIN is open to brokers and salespersons licensed in

Massachusetts, New Hampshire, Connecticut, Rhode Island, Maine,

Vermont, and New York.  Pinergy is one of the largest realtor-

owned multiple listing services in the nation—its database

includes around 29,000 properties for sale, more than 3.7

million off-market listings, and public records for

Massachusetts, Rhode Island, and part of New Hampshire.

Defendant Realogy is the largest real estate brokerage

company in the United States.  It owns, operates, and franchises

brokerage firms, including Century 21, Coldwell Banker,

Sotheby's International Realty, The Corcoran Group, Better Homes

and Garden Real Estate, ZipRealty, ERA Real Estate Citi

Habitats, and Climb Real Estate.

Defendant HomeServices of America, Inc. is the second

largest residential real estate brokerage firm in the United

States.  It is the majority owner of Defendant HSF Affiliates,

LLC.  Defendant BHH Affiliates, LLC is a subsidiary of HSF

Affiliates, LLC.

Defendant RE/MAX is a real estate brokerage franchisor with

approximately 6,800 offices and over 100,000 sales associates.

Defendant Keller Williams is a real estate brokerage franchisor with approximately 700 offices and over 120,000 sales associates.

Gary Bauman, Mary Jane Bauman, and Jennifer Nosalek brought this putative class action.  Gary and Mary Jane Bauman sold their house in Sharon, Massachusetts on August 26, 2020.  The house was listed on Pinergy.  They were represented by Coldwell Banker and the buyer was represented by Keller Williams.  The Baumans' subsequently voluntarily dismissed their claims, leaving Jennifer Nosalek as the sole named plaintiff.  Jennifer Nosalek sold her house in Easton, Massachusetts on January 19, 2018.  The house was listed on Pinergy.  She was represented by Success! Real Estate and the buyer was represented by Keller Williams.

## II.  Real Estate Industry

An MLS allows sellers to reach a broader audience of potential buyers and provides a centralized location for buyers to find available properties.  If a property is not listed on an MLS, many fewer potential buyers will view it.

Sellers usually work with a broker who markets and facilitates the sale of the property (the "listing broker" or "seller broker"), and buyers work with their own agents (the "cooperating broker" or "buyer broker").  The listing broker, rather than the actual seller, lists the property on an MLS.

The seller pays the listing broker a commission pursuant to a Listing Agreement, which typically specifies that a portion of that commission will be used to compensate the buyer's broker. The buyer broker is the buyer's exclusive agent, owing fiduciary duties to the buyer and not to the seller.  After an offer is accepted, the listing broker pays the buyer broker's commission out of the broader commission received from the seller.  Thus the seller effectively pays the commissions of both the listing broker and the buyer broker.

**III.  <u>Alleged Anticompetitive Conduct</u>**

    **A.    The Buyer-Broker Commission Rule**

Section 5 of the MLS PIN Rules ("the Buyer-Broker Commission Rule") requires any broker listing a property on Pinergy to offer compensation to buyer brokers.  It states in part:

> a Listing Broker shall specify, on each Listing Filed with the Service, the compensation offered to other Participants for their services as Cooperating Brokers in the sale, lease or rental of the Listed Property. Such offers shall be unconditional, except that entitlement to compensation shall be conditioned on the Cooperating Broker's performance as the procuring cause of the sale, lease or rental.

Dkt. 1 ¶ 44.  Note 1 to Section 5 of the MLS PIN Rules further states in part:

> In Filing a Listing with the Service, a Participant is deemed to be making blanket unilateral offers of compensation to the other Participants in the Service. The Participant therefore shall specify on each Listing

Filed with the Service the compensation being offered to the other Participants.

Dkt. 1 ¶ 45.  A listing broker may offer a buyer broker a commission different from that indicated on Pinergy only if

> (1) the Listing Broker informs the Participant in writing of such proposed change in compensation in advance of the Participant's producing an offer to purchase . . ., and (2) the change in the listed compensation is not the result of any agreement or other cooperative activity between the Listing Broker and any one or more of the other Participants or Subscribers.

Dkt. 1 ¶ 46.  Buyer-broker commission offers on Pinergy are viewable only by brokers and agents, not by sellers and buyers.

Plaintiff alleges that "by facilitating steering," the Buyer-Broker Commission Rule "prevents rates from falling to competitive levels and enables brokers to avoid doing business with or otherwise retaliate against brokers who attempt to offer materially lower rates."  Dkt. 1 ¶ 80.  Plaintiff asserts that MLS PIN's requirement that the commission be stated as a percentage or dollar amount and its limitations on changing the commission "bolstered" the facilitation of steering.  Dkt. 1 ¶ 84.

**B.   Facilitation by Broker Defendants**

Plaintiff alleges that each of the Broker Defendants joined the conspiracy by requiring its franchisees and agents to participate in MLS PIN and follow its rules.  Moreover, Plaintiff states that representatives of all Broker Defendants, except for Keller Williams, had leadership positions in MLS PIN.

Eight of the fifteen directors on the board of MLS PIN are
realtors for franchises owned by HomeServices, RE/MAX, and
Realogy.  No representatives of Keller Williams are on the board
of MLS PIN.

## IV.   Alleged Impact on Buyer-Broker Commissions

Buyer-broker commissions in the United States have been
stable at 2.5-3%.  Broker commissions are higher in the United
States than countries without this model, where buyers pay and
negotiate the fees for their brokers separately.  Plaintiff
cites an economic study that found that real estate commissions
in the United States are significantly higher than in other
industrialized nations.

## LEGAL STANDARD

A Rule 12(b)(6) motion is used to dismiss complaints that
do not "state a claim upon which relief can be granted." See
Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to
dismiss, the factual allegations in a complaint must "possess
enough heft" to state a claim to relief that is plausible on its
face.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).  In
evaluating the motion, the Court must accept the factual
allegations in the plaintiff's complaint as true, construe
reasonable inferences in the plaintiff's favor, and "determine
whether the factual allegations in the plaintiff's complaint set
forth a plausible claim upon which relief may be granted."

Foley, 772 F.3d at 71 (cleaned up).  On a motion to dismiss, courts generally may consider "only the complaint, documents attached to it, and documents expressly incorporated into it." Id. at 72.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  "In alleging conspiracy, an antitrust plaintiff may present either direct or circumstantial evidence of defendants' conscious commitment to a common scheme designed to achieve an unlawful objective."  Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33, 43 (1st Cir. 2013) (cleaned up).  Allegations of parallel conduct are not enough; "a complaint must at least allege the general contours of when an agreement was made, supporting those allegations with a context that tends to make said agreement plausible."  Id. at 46.  At the pleading stage, the applicable question "is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible."  Anderson News, LLC v. American Media, Inc., 680 F.3d 162, 189 (2d Cir. 2012).

**ANALYSIS**

I.   Omnibus Motion to Dismiss – Causation

Defendants argue that Plaintiff has not adequately alleged that the Buyer-Broker Commission Rule proximately caused "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  Specifically, they contend that Plaintiff has not alleged any facts that, absent the Buyer-Broker Commission Rule, listing brokers would stop offering the same level of commissions to buyer brokers.  In support, they argue that the Buyer-Broker Commission Rule merely codifies an existing practice that would continue to exist absent any requirements from MLS PIN; that underlying economic forces would continue to cause listing brokers to offer buyer brokers compensation absent the rule; and that, contrary to Plaintiff's assertions, other MLS PIN rules do not inflate prices by hiding information and prohibiting negotiation.

A.   **Compensation-Sharing and the Buyer-Broker Rule**

I first address Defendants' assertion that the Buyer-Broker Commission Rule merely codifies an existing practice that would continue to exist absent any requirements from MLS PIN. Defendants assert that "multiple listing services were first created more than 100 years ago as a mechanism for facilitating

9

home sales by enabling cooperation among brokers through the
sharing of commissions."  Dkt. 38 at 14.  According to
Defendants, the "compensation-sharing feature" of the "MLS
structure" has long been a part of the real-estate market.  Dkt.
38 at 14.  See Wells Real Est., Inc. v. Greater Lowell Bd. of
Realtors, 850 F.2d 803, 805-07 (1st Cir. 1988) (describing the
practice of commission-sharing in the 1970s prior to the
adoption of the Buyer-Broker Commission Rule).  Defendants argue
that "[g]iven this long-standing custom and the competitive
advantages the MLS system and its compensation-sharing features
have demonstrated, there is no obvious reason to assume that
eliminating the Rule would cause sellers and their listing
brokers to depart from their historical cooperative practice."
Dkt. 38 at 15.

Plaintiff alleges that the real-estate market has changed
significantly since the Buyer-Broker Commission Rule was
implemented.  The Complaint alleges that the Buyer-Broker
Commission Rule was adopted in the 1990s, when the sub-agency
system—in which brokers working with buyers owed a fiduciary
duty to sellers—collapsed.  Plaintiff alleges that, "[w]ith the
demise of subagency, there is little reason to keep inter-broker
compensation.  There are also affirmative reasons to get rid of
it."  Dkt. 1 ¶ 14 (quoting The End of MLS as We Know It, Inman
(Aug. 15, 2006), https://www.inman.com/2006/08/15/end-mls-we-

know-it).   She contends that the Buyer-Broker Commission Rule

perpetuates a practice that would otherwise have ceased due to

developments in technology.   As Plaintiff alleges:

> One would have expected that an information
> and communication-based industry like real
> estate brokerage, would enjoy tremendous cost
> efficiencies from the development of the
> Internet, Databases, and other communication
> technologies.  Yet it appears that traditional
> brokers generally have not passed on their
> cost savings to consumers in the form of lower
> fees.

Dkt. 1 ¶ 125 (quoting Mark S. Nadel, A Critical Assessment of

the Traditional Residential Real Estate Broker Commission Rate

Structure, 5 Cornell Real Est. Rev. 1, 7 (2007)).   Plaintiff

further alleges that "[t]he stability of broker commissions

stands in stark contrast to the experience in other industries

which have been significantly affected by the internet."   Dkt. 1

¶ 125.

Defendants point to the fact that listing brokers could

offer buyer brokers a nominal sum as a commission under the

Buyer-Broker Commission Rule, but that very few listing brokers

elect to do so.  According to Defendants, the fact that listing

brokers voluntarily offer substantial commissions to buyer

brokers shows that commission-sharing is a voluntary practice,

and not a result of the buyer-broker rule.  But Defendants'

argument fails to account for the fact that the Buyer-Broker

Commission Rule requires listing brokers to specify the

commission amount in their listings.  This requirement could

plausibly force listing brokers to provide for substantial

commissions in order to avoid being screened by buyer brokers.

B.    **Steering and the Buyer-Broker Rule**

I next turn to the question of whether the Buyer-Broker

Commission Rule causes commissions to be artificially inflated.

Plaintiff alleges that the rule causes listing brokers to price

commissions at supracompetitive levels to attract buyer brokers.

Dealing with a similar rule from the National Association of

Realtors (NAR), the court in Sitzer v. Nat'l Ass'n of Realtors,

420 F. Supp. 3d 903 (W.D. Mo. 2019), summarized this theory as

follows: "buyer-brokers can use their access to MLS information

(unavailable to potential homebuyers) to view details about the

offered levels of buyer-broker compensation and dissuade clients

from viewing or purchasing homes with lower buyer-broker

commission offers, thus 'steering' them to properties with

higher-paying commissions."  Id. at 915 n.4.  As a result of

this dynamic, Plaintiff alleges in her Complaint, home sellers

are incentivized "to set a high buyer-broker commission to

induce buyer-brokers to show their homes to prospective home

buyers."  Dkt. 1 ¶ 117.  According to Plaintiff, the members of

the putative class have paid inflated buyer-broker commissions

as a result.

The court in Moehrl v. Nat'l Ass'n of Realtors, 492 F.
Supp. 3d 768 (N.D. Ill. 2020), also considering the NAR rule
discussed in Sitzer, highlighted a second theory under which
commissions could be inflated by the rule.  The Moehrl court
explained that the "seller-broker must list the property with a
blanket offer of some compensation to the buyer-broker" even
though "many prospective homebuyers use online websites like
Zillow to find homes."  Id. at 784.  As such, "if the homebuyer
chooses to buy a home they found by themselves online, the
buyer-broker is entitled to the same blanket buyer-broker
commission offer as a buyer-broker who worked directly with the
prospective homebuyer to initially locate the home."  Id.  Thus,
real estate brokers who do little work in locating homes for
prospective buyers are nevertheless awarded the same fee as
those brokers who have put in more effort or applied more skill
to the process.

The courts in Sitzer and Moehrl concluded that the NAR
Buyer-Broker Commission Rule could plausibly cause steering and
inflated commissions.  See Sitzer, 420 F. Supp. 3d at 915
(explaining that a rule requiring "seller-brokers to present
blanket commission offers to buyer-brokers could plausibly
create a skewed compensation structure within the residential
real estate market, leading to inflated commissions that would
otherwise be lower under competitive market conditions");

<u>Moehrl</u>, 492 F. Supp. 3d at 784 ("When viewing the Buyer-Broker Commission Rules as a whole, it is easy to understand how they could plausibly result in inflated commission rates.").  Based on the allegations in the pleadings, I reach the same conclusion: Plaintiff has plausibly alleged that the Buyer-Broker Commission Rule causes steering, which in turn causes inflated commission.

This plausible theory of causation is supported by several allegations in Plaintiff's Complaint.  For instance, Plaintiff alleges that buyer-broker commissions have remained stable in the United States despite an increase in home prices.  She also cites to a study showing that commission rates are significantly higher in the United States than in industrialized nations with competitive markets.  This study suggested, specifically, that United States brokerage fees would drop from approximately five percent to three percent in a competitive market.  Plaintiff's assertions provide support for her argument that the buyer-broker rule causes commissions to be artificially inflated.[2]

## II. <u>Motions to Dismiss - Conspiracy</u>

Defendants HomeServices, RE/MAX, and Keller Williams have separately moved to dismiss Plaintiff's Complaint for failure to

---

[2] Defendants also challenge Plaintiff's assertion that other MLS PIN rules inhibit sellers and buyers from negotiating commissions and prevent buyers from detecting steering.  In light of the Court's ruling that the Buyer-Broker Rule itself causes commissions to be artificially inflated, I do not address these alternative arguments.

demonstrate that they participated in any conspiracy under Section One of the Sherman Act, 15 U.S.C. § 1.  A conspiracy requires "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 753 (1984) (cleaned up).  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).

Defendants supplemented their individual motions to dismiss after Gary and Mary Jane Bauman voluntarily dismissed their claims, arguing that Ms. Nosalek's claims against Defendants are insufficient on their own to state a claim because Nosalek was represented by Success! Real Estate, which is not a named Defendant.  Plaintiff alleges that even though she was not represented by any of the Defendants, she was still required to participate in the MLS PIN commission system and pay a supracompetitive rate because of the Buyer-Broker Commission Rule.  The buyer's agent, Keller Williams, is one of the named Defendants, and Plaintiff alleges that Keller Williams financially benefitted from the inflated buyer-broker commission in her home transaction.

I conclude that Plaintiff has plausibly alleged that Defendants HomeServices and Keller Williams agreed to

participate in the conspiracy by requiring their franchisees to

join MLS PIN and, consequently, abide by the buyer-broker rule.

The courts in Moerhl and Sitzer reached the same conclusion with

regard to the defendant brokers in those cases.  See Moehrl, 492

F. Supp. 3d at 778 ("[T]he purported anticompetitive restraints

here are a product of written rules issued by the NAR that each

Corporate Defendant expressly imposes upon their franchisees and

realtors. That suggests that each Corporate Defendant has

reviewed, understood, and ultimately agreed to the NAR's rules,

including the Buyer-Broker Commission Rules."); Sitzer, 420 F.

Supp. 3d at 912 (finding that the plaintiffs had plausibly

alleged conspiracy, and noting that the plaintiffs alleged that

"each Corporate Defendant agrees to NAR's anticompetitive

restraint by requiring its subsidiaries, franchisees, and

associated brokerages . . . to join NAR member groups,

participate in the MLS, and adhere to all NAR-imposed listing

rules and policies, including [the NAR Buyer-Broker Rule]").  I

note that the court in Moehrl considered the participation

requirement to be "[p]erhaps most important[]" among its

considerations.  See 492 F. Supp. 3d at 778.

Moreover, HomeServices was represented on the MLS PIN board

of directors by at least one realtor from a related franchise.

The corporate defendants in Moerhl and Sitzer likewise held

seats on the relevant boards and leadership committees.  See

Moehrl, 492 F. Supp. at 778 ("Representatives from the Corporate

Defendants or their franchisees have also served in leadership

roles with the NAR."); Sitzer, 420 F. Supp. 3d at 912

("Plaintiffs allege executives of each Corporate Defendant serve

or served in management and/or leadership positions within NAR

and the local realtor associations governing the Subject MLS.").

HomeServices argues that its membership on the PIN board was

indirect both because the board member associated with it—a

realtor for BHH Affiliates, LLC—is only one of the HomeServices

Defendants, and the Complaint's allegation refers to a franchise

of BHH.  Plaintiff responds that HomeServices' position that

only one of the three defendants within HomeServices holds a

seat on the board is without merit, as the Complaint alleges

that the HomeServices defendants have nested ownership of one

another.  Moreover, Plaintiff alleges that HomeServices requires

its franchisees to join MLS PIN and follow MLS PIN rules.

Plaintiff has plausibly alleged that this board member

represents HomeServices' interests.

    RE/MAX separately argues that it does not have any

contractual relationships with the franchisees in the area

covered by this action, which are instead franchisees of an

independently owned and operated sub-franchisor that is directly

responsible for them.  It thus contends that Plaintiff has not

specifically alleged that RE/MAX required any franchisees in the

covered area to join MLS PIN or implement MLS PIN rules.  It

further avers that the independent franchises that operate in

Massachusetts under the RE/MAX name are not even contractually

related.  The Complaint alleges that, in a form nationally used,

RE/MAX required that its contractors "shall join the local

realtor's association and 'shall abide by . . . the rules and

regulations of each local or regional [MLS].'"  Dkt. 1 ¶ 115.

According to RE/MAX, this requirement was in fact imposed on the

contractors by RE/MAX's subfranchisor.  RE/MAX argues that it is

not the RE/MAX entity responsible for the requirement, and it is

possible that Plaintiff has sued the incorrect entity.  However,

Plaintiff has alleged that RE/MAX requires, through the 2016

RE/MAX Independent Contractor Agreement, that its franchises

join and use MLS PIN in its agreement used nationwide. RE/MAX

attempts to rebut this assertion through the SEC filing of its

parent company, RE/MAX Holdings, Inc.  Whether RE/MAX is correct

that Plaintiff has sued the wrong entity is a question for

discovery.  Plaintiff has plausibly alleged that RE/MAX

participated in the conspiracy to survive the motion to dismiss.

However, discovery will be limited in scope to determine if

RE/MAX is the proper entity for suit.

## ORDER

    For the reasons stated above, the Court **DENIES** the omnibus

motion to dismiss (Dkt. 37) on the issue of causation and the

18

individual motions to dismiss for HomeServices, Keller Williams,

and RE/MAX (Dkts. 40, 44, and 42, respectively).  The parties

shall confer and propose a scheduling order with specific dates.


SO ORDERED.


                                    /s/ PATTI B. SARIS
                                    _____

                                    Hon. Patti B. Saris
                                    United States District Judge

19