UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNIFER NOSALEK, RANDY HIRSCHORN and TRACEY HIRSCHORN, individually and on behalf of all others similarly situated, | No. 1:20-cv-12244-PBS |
| Plaintiffs, | |
| vs. | CLASS ACTION |
| MLS PROPERTY INFORMATION NETWORK, INC., *et al*., | OCTOBER 31, 2023 |
| Defendants. | LEAVE TO FILE GRANTED ON NOVEMBER 13, 2023 |

**PLAINTIFFS' OPPOSITION TO THE
HOMESERVICES DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.     STATEMENT OF TRIABLE MATERIAL FACTS ............................................... 1

     A.     The HSDs Receive Commissions From Franchisees in Massachusetts........ 1

     B.     The HSDs Train Franchisees in Massachusetts on Commission Practices... 3

     C.     HomeServices Requires Its Massachusetts Franchisees to Maintain Membership in MLS PIN ................................................................................ 4

     D.     Section 5 of MLS PIN's Rules and Regulations Mandates Offering Cooperative Compensation ............................................................................ 6

     E.     BHHS' Franchise Agreement Likewise Demands That Massachusetts Franchisees Offer Cooperative Compensation .............................................. 7

     F.     BHHS' Operations Manual Also Imposes Anticompetitive Restraints ........ 8

     G.     The HSDs Engaged in Anticompetitive Cooperation with Other Broker Defendants...................................................................................................... 8

     H.     Specific Denials of the HSDs' SUMF...................................................... 10

II.    LEGAL STANDARD ........................................................................................ 11

III.   ARGUMENT .................................................................................................... 11

     A.     The HSDs' Control Over Massachusetts Franchisees Presents, at Minimum, a Triable Issue of Material Fact................................................................... 12

     B.     The HSDs Fail to Rebut the Evidence of Their Active Agreement to and Enforcement of Anticompetitive Restraints ................................................ 15

IV.   CONCLUSION ................................................................................................ 19

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Shipowners' Ass'n of Pacific Coast*,
   272 U.S. 359 (1926) ................................................................................................ 18

*Burnett v. NAR et al.*,
   No. 19-cv-00332-SRB (W.D. Mo.) .......................................................................... 4

*Burnett v. National Ass'n of Realtors*,
   No. 19-cv-00332-SRB, 2022 WL 17741708 (W.D. Mo. Dec. 16, 2022) ...... 13, 14, 17, 18, 19

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................................ 11

*Chadwick v. WellPoint, Inc.*,
   561 F.3d 38 (1st Cir. 2009) ..................................................................................... 11

*Interstate Cir. v. United States*,
   306 U.S. 208 (1939) ................................................................................................ 17

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ................................................................................................ 17

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
   468 U.S. 85 (1984) .................................................................................................. 19

*Skyview Fin. Co., LLC v. Kearsarge Trading, LLC*,
   616 F. Supp. 3d 152 (D. Mass. 2022) ..................................................................... 11

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................... 11

The HomeServices Defendants' ("HSDs") claim that "Plaintiffs have no evidence of conspiracy as to any HSD to create, implement, or enforce the [Buyer-Broker Commission] Rule" ignores their own Franchise Agreement. *See* HSDs' Memorandum of Law [ECF No. 204] ("HSD Mem.") at 1 (emphasis removed).  That agreement *requires* HSDs' franchisees "proposing to do business in the Commonwealth of Massachusetts" to "comply with the Code of Ethics of the National Association of Realtors and other appropriate organizations" and implement the Buyer-Broker Commission Rule and offer cooperative compensation. Because the plain meaning of HSDs' contractual restraints (as well as other evidence) creates a genuine issue of material fact as to the HSDs' participation in anticompetitive conduct, this Court should deny the HSDs' Motion for Summary Judgment [ECF No. 203] in full.

## I.   STATEMENT OF TRIABLE MATERIAL FACTS[1]

### A.   The HSDs Receive Commissions From Franchisees in Massachusetts

1.      Defendant HSoA[2] is a holding company that indirectly owns Defendant HSF Affiliates, a holding company that in turn owns Defendant BHH Affiliates. BHH Affiliates operates the Berkshire Hathaway HomeServices ("BHHS") real estate franchise network. HSDs' Statement of Undisputed Material Facts ("SUMF") at ¶ 1.

2.      BHHS entered into a form franchise agreement with each of its franchisees "proposing to do business in the Commonwealth of Massachusetts." *See generally* Ex. 1.[3]

---

[1] Consistent with the convention established by movants, this Statement of Triable Material Facts is cited in the Argument section of this brief as "STMF" with a relevant paragraph reference. Unless otherwise indicated, all exhibits cited herein are to the exhibits described and attached to the October 31, 2023 Declaration of Seth R. Klein, filed with this Opposition.

[2] All abbreviations are used as defined in the HSDs' Motion and Memorandum of Law.

[3] All citations to the "Franchise Agreement" herein are to the CRG Franchise Agreement attached to the Klein Declaration as Exhibit 1 and also filed by the HSDs at [ECF No. 204-10]. The Franchise Agreements for the other Massachusetts Franchisees have been produced to Plaintiffs and are materially identical, and are available to be filed at the request of the Court (or the HSDs).

3.      Pursuant to the Franchise Agreement, Massachusetts franchisees pay to BHH Affiliates as a continuing royalty a percentage of all gross revenue derived from their residential real estate transactions. Ex. 1 (Franchise Agreement) at ¶ 5.02; *see also* Ex. 2 (Warner Depo.) at 44:7-18; Ex. 3 (Patsio Depo.) at 26:7-25; Declaration of George Patsio (previously filed at [ECF No. 204-4]) ("Patsio Dec.") at ¶¶ 5-6.[4]

4.      BHH Affiliates receives commissions from its franchisees in Massachusetts regardless of whether the franchisee received those commissions as a buyer-broker or seller-broker. Ex. 3 (Patsio Depo.) at 26:20-27:14.

5.      These commissions flow through BHH Affiliates all the way up the chain to Defendant HSoA. Ex. 2 (Warner Depo.) at 45:9-46:3; Ex. 4 (Peterson Depo.) at 22:17-23:23.[5] As Warren Buffet, Chairperson of Berkshire Hathaway (the HSDs' ultimate corporate parent) explained in a 2018 letter to shareholders, "[t]here are two 'sides' to every transaction," and "if we represent both buyer and seller, the dollar value of the transaction is counted twice." Ex. 5 (shareholder letter).

6.      The commissions that BHH Affiliates receives from a franchisee increase as the franchisee's commission revenues increase and decrease as the franchisee's commission revenues decrease. Ex. 1 (Franchise Agreement) at ¶ 5.02; Ex. 3 (Patsio Depo.) at 28:1-10.

7.      Commissions are the only source of revenue for HSDs' franchisees in MA (and thus the only source of commissions to the HSDs). Ex. 3 (Patsio Depo.) at 24:3-14.

---

[4] Rosalie Warner is Senior Vice President of Network Services at HSF Affiliates, LLC. Ex. 2 (Warner Depo.) at 9:6-9. George Patsio, as set forth in the declaration he provided in conjunction with the HSDs' Motion (*see* [ECF No. 204-4] at ¶ 1), is an owner and a Managing Partner of Commonwealth Realty Group, LLC ("CRG"), a HomeServices franchisee in Massachusetts with 33 different brokerage offices and 850 sales associates.

[5] Brian Peterson was CFO of HSF until April 3, 2020. Ex. 4 (Peterson Depo.) at 9:19-10:11.

**B.**     **The HSDs Train Franchisees in Massachusetts on Commission Practices**

8.     The HSDs create training materials for HSDs' franchisees (including Massachusetts franchisees) and their brokers. *See* Ex. 3 (Patsio Depo.) at 32:1-35:9.

9.     These training materials routinely advise brokers to offer a 6% commission rate. For example, Gino Blefari is CEO of HSoA and Chairman of BHHS.[6]  Mr. Blefari participated in a training video, and his script included the following: "[W]hen homesellers saw that I had written a 6% commission into the contract, and would ask, 'Gino, but aren't commissions negotiable?' I would always answer, 'Yes, commissions are negotiable, but I can only go up from six.'" Ex. 6 (Blefari Training Script) at HSOA-MOe-0000094134.

10.     In a separate training script, Allan Dalton, a senior vice president of BHH Affiliates,[7] similarly states "When home sellers asked me if I would negotiate my commission, I would answer ███████████████████████████████████████████ ████████████████████████████████ Ex. 7 (Dalton Training Script) at HSOA-MOe-000029425; *see generally* Ex. 12 (Watson Depo.) at 33:23-45:13.

11.     These trainings promote a culture that stresses the maintenance of high commission rates. For example, Mr. Dalton went on a podcast to discuss his advice to other brokers as to how to respond when a customer asks the broker to lower the commission. Mr. Dalton advised responding to the customer that "there's no bleeping bleeping way I'm going to cut my bleeping bleeping commission[. W]hat do you think[,] I'm a bleeping bleeping hooker standing outside Lincoln Tunnel at 3 o'clock in the morning[?... I]f you think I'm going to cut

---

[6] Mr. Blefari's LinkedIn page with his job titles is available at https://www.linkedin.com/in/ginoblefari (last visited October 31, 2023).

[7] Mr. Dalton's LinkedIn page with his job titles is available at https://www.linkedin.com/in/allandalton (last visited October 31, 2023).

my bleeping bleeping Commission you can take this home and shove it up your bleeping

bleeping and I know that it will fit right." Ex. 8 (Dalton Podcast Transcript).[8]

### C.   HomeServices Requires Its Massachusetts Franchisees to Maintain Membership in MLS PIN

12.     Membership in MLS PIN is a functional and practical requirement for

HomeServices' Massachusetts franchisees. Indeed, the HSDs expressly acknowledge that

"access to MLS PIN is 'commercially necessary for real estate brokers'" because MLS

membership provides "many benefits … in terms of reaching potentially interested buyers,"

SUMF ¶ 18 (citing Plaintiffs' Second Amended Complaint at ¶ 144).

13.     When George Patsio, a Managing Partner of a large Massachusetts HomeServices

franchise (CRG), was asked whether "***any*** of the agents who work at CRG ever recommend ***not***

listing MLS PIN," Mr. Patsio responded "████████████████████████████████

████████████████████." Ex. 3 (Patsio Decl.)  at 15:6-14 (emphasis added.) Rather, he

said "████████████████████████████████████████████████

█████████████████████████████████████." *Id.* at 11:18-12:16. Mr.

Patsio further explained that brokers recommend their clients "████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████." at 12:17-13:3.

---

[8] Plaintiffs learned of Mr. Dalton's advice on October 25, 2023, after the HSDs moved for a mistrial in *Burnett* based upon the *Burnett* plaintiffs' submission of Mr. Dalton's comments in that case. *See Burnett v. NAR et al.,* No. 19-cv-00332-SRB (W.D. Mo.), at Dkt. No. 1265. The above quote comes from an unofficial transcript submitted by the HSDs as an exhibit to their motion for a mistrial. *Id.* at Dkt. No. 1265-1. The *Burnett* court denied the HSDs' motion for mistrial. *Id.* at Dkt. No. 1272.

14.     The HSDs are not aware of *any* BHHS franchisee that does *not* list properties on its local MLS (such as MLS PIN). *See* Ex. 2 (Warner Depo.) at 59:20-60:1; Ex. 9 (Warner 30(b)(6) Depo.) at 25:21-24.

15.     Consistent with this functional requirement, the form Franchise Agreement requires Massachusetts franchisees to share real estate transaction data with BHH Affiliates by providing an electronic feed of "all real estate listings, including all supporting content, *from the multiple listing service(s) used by Franchisee*:"

**9.14     Listing Feeds.**

  Franchisee agrees to arrange, at Franchisee's sole expense, for Franchisor or its designee to receive one or more direct electronic feed of all real estate listings, including all supporting content, from the multiple listing service(s) used by Franchisee collectively, the "Listings" in compliance with the then-effective and current Virtual Office Website (VOW) standards adopted by the National Association of Realtors®, but only until such time as a VOW feed can be obtained, or such other standards and procedures that Franchisor periodically specifies.

Ex. 1 (Franchise Agreement) at ¶ 9.14 (emphasis added).

16.     By requiring Massachusetts franchisees to make available to BHHS an electronic feed of all real estate "from the multiple listing service(s) used by Franchisee," the Franchise Agreement necessarily forces franchisees to be members of MLS PIN so they can provide the required feed. As Ms. Warner testified:



*See* Ex. 2 (Warner Depo.) at 36:7-14.

**D.    Section 5 of MLS PIN's Rules and Regulations Mandates Offering Cooperative Compensation**

17.    According to Ronald Peltier, Founder and Chairman Emeritus of HSoA,[9] "█████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████" Ex. 10 (Peltier Letter to NAR).

18.    HomeServices' franchisees cannot list on or otherwise use MLS PIN's listing service unless they join MLS PIN and agree to follow MLS PIN's Rules and Regulations. *See* Ex. 11 (MLS PIN Rules) at Section 8.0 ("Confidentiality of Service Information").

19.    At all relevant times,[10] the MLS PIN Rules and Regulations provided that Listing Brokers must offer cooperative compensation to Cooperating (Buyer) Brokers:

> **SECTION 5.0   COOPERATIVE COMPENSATION SPECIFIED ON EACH LISTING:** Except only for Listings of properties offered for lease or rental, for which the Listing Broker (as provided in Section 1.0(c) above) is not obligated to offer compensation to other Participants for their services as Cooperating Brokers, a Listing Broker shall specify, on each Listing Filed with the Service, the compensation offered to other Participants for their services as Cooperating Brokers in the sale, lease or rental of the Listed Property. Such offers shall be unconditional, except that entitlement to compensation shall be conditioned on the Cooperating Broker's performance as the procuring cause of the sale, lease or rental. A Listing Broker's obligation to

---

[9] Mr. Peltier's LinkedIn page with his job titles is available at https://www.linkedin.com/in/ron-peltier-333875133 (last visited October 31, 2023).

[10] Pending final approval, MLS PIN has now eliminated the cooperative compensation requirement pursuant to its Settlement with Plaintiffs. *See* [ECF Nos. 191, 192-1, 221, 222].

Ex. 11 at Section 5.0 (p. 12) (emphasis added).

**E.     BHHS' Franchise Agreement Likewise Demands That Massachusetts Franchisees Offer Cooperative Compensation**

20.     The form Franchise Agreement expressly requires that "Franchisee shall … (e) at all times comply with the Code of Ethics of the National Association of Realtors and other appropriate organizations." Ex. 1 (Franchise Agreement) at ¶ 9.11.

### *"Code of Ethics of the National Association of Realtors"*

21.     Pursuant to the plain language of ¶ 9.11, HomeServices franchisees were required to comply with the NAR Code of Ethics ("NAR Code"). *See* Ex. 2 (Warner Depo.) at 38:2-39:2l; Ex. 9 (Warner 30(b)(6) Depo.) at 30:5-11; Ex. 12 (Watson Depo.) at 21:17-21.[11]

22.     Consistent with the MLS PIN Rules, at all relevant times, the NAR Code has provided as follows:

> • **Standard of Practice 16-15**
> In cooperative transactions REALTORS® shall compensate cooperating REALTORS® (principal brokers) and shall not compensate nor offer to compensate, directly or indirectly, any of the sales licensees employed by or affiliated with other REALTORS® without the prior express knowledge and consent of the cooperating broker.

Ex. 13 (NAR Code of Ethics) (emphasis added).

23.     Accordingly, "a requirement of the National Association of Realtors' Code of Ethics [is] that in cooperative transactions the realtor on the seller's side shall compensate the cooperating realtor on the buyer's side," just as the MLS PIN Rule does. Ex. 9 (Warner 30(b)(6) Depo.) at 29:21-30:4.

---

[11] Robert Watson is Vice President, Global Consulting and Training. Mr. Watson's LinkedIn page with his job titles is available at https://www.linkedin.com/in/thebobwatson (last visited October 31, 2023).

### *"Other Appropriate Organizations"*

24.     Both the HSDs (*see* STMF ¶¶ 12, 14 *supra*) and HomeServices franchisees (*see* STMF ¶ 13 *supra*) recognize the key role that a local MLS plays in residential real estate transactions. Accordingly, and as an HSF Affiliates witness conceded, ██████████████████ ████████████████████████████████████████████████████████████ ██████████████████████. *See* Ex. 2 (Warner Depo.) at 38:2-39:2.[12]

25.     Accordingly, a jury could find that ¶ 9.11 of the Franchise Agreement directly requires compliance with MLS PIN's rules, including Section 5.

**F.     BHHS' Operations Manual Also Imposes Anticompetitive Restraints**

26.     The form Franchise Agreement also requires HomeServices franchisees in Massachusetts to "operate the Franchised Business in accordance with the Operations Manual." Ex. 1 (Franchise Agreement) at ¶ 9.04.

27.     Like the Franchise Agreement itself, the ███████████████ separately requires HomeServices franchisees in Massachusetts to "████████████████████████████ ████████████████████████████████████████████████" including MLS PIN. Ex. 14 (BHHS Operations Manual) at p. 22.

**G.     The HSDs Engaged in Anticompetitive Cooperation with Other Broker Defendants**

28.     Anticompetitive cooperation with other brokers (including the other Broker

---

[12] Despite having signed the Franchise Agreement, Mr. Patsio ██████████████████ ███████████████████████████████████████████ (*see* Ex. 3 (Patsio Depo.) at 28:25-31:10. Plaintiffs note that, although CRG is ***not*** a defendant in this case and the HSDs' entire Motion is premised on the assertion that CRG and other Massachusetts franchisees function wholly independently, ████████████████████████████████ (*see* Ex. 3 at 42:10-15), which may explain his reluctance to take a position on this point. In any event, Plaintiffs respectfully submit that the combination of Ms. Warner's admission and Mr. Patsio's refusal to take a position creates, at minimum, a genuine issue of material fact on this point.

Defendants in this litigation) is fundamental to the HSDs' business practices. In Gino Blefari's training video script discussed in STMF 9 above, he, as CEO of HSoA, explained that the HSDs strategically collaborated with competing brokers in order to "eliminate all competition" and maximize commissions. For example, Mr. Blefari discussed a presentation he had attended:

> Allan [Dalton, discussed above at STMF ¶¶ 10-11] showed on the screen an ad that he was running in New Jersey, where he had his company's sign in the middle of a solar system like circle and all his competitors and their For Sale sings were satellites surrounding the center. It was presented to reinforce that home marker success was connected to a constellation of collaborators…
>
> I loved this approach and used it for many years and added it to my own language.
>
> For example, when a homeseller said something like "Well we are also considering ReMax or Keller Williams etc," rather than predictably explaining how we were better or different, I would just say "ReMax is just one of the many other local brokerages that are already part of my marketing plan. Because I'm sure it doesn't matter to you which company brings the right buyer, and it doesn't matter to me either, as long as we get the best buyer within the entire group of companies…
>
> You see the only way you can eliminate all competition is to include them. By explaining how Real Estate companies all collaborate. It takes all companies out of the equation and leaves the whole decision to what I will do for the homeseller.

Ex. 6 (Blefari Training Script) at HSOA-MOe-0000094140-41.

29. This "constellation of collaborators" is not hypothetical. For example, Rosalie Warner, a Senior Vice President at HSF Affiliates, maintained in her files an "Instructor Version" of a Keller Williams training document. Ex. 15 (Keller Williams Training Document); *see* Ex. 16 (Strandmo 30(b)(6) Depo.) at 130:14-133:6 (explaining provenance of document). That document from a competitor included suggested language for Keller Williams' brokers to persuade homesellers to accept the same 6% transaction commission rate offered in HSDs' own training materials as discussed above. Ex. 15 at HSOA-MOe-0000349838.

30. The HSDs actively coordinated with the other Broker Defendants to address threats to the cooperative compensation system. For example, Dana Strandmo, the Chief Administrative Officer and Senior Vice President at HSoA, sent correspondence to other HSDs' executives ██████████████████████████ in advance of an upcoming Department of Justice / FTC workshop:



Ex. 17 (Strandmo Correspondence re: Realogy) at HSOA-MOe-0000210424.

## H.   Specific Denials of the HSDs' SUMF

For the avoidance of doubt, and without limitation as to Plaintiffs' general denial of other portions of the HSD's SUMF that are contradicted or contravened by Plaintiffs' STMF, Plaintiffs specifically deny that the following paragraphs from the HSDs' SUMF are "undisputed," and refer the Court to the cited contravening paragraphs from Plaintiffs' STMF above.

| SUMF | Contravening STMF |
| --- | --- |
| 10 | 8, 9, 10, 11, 15, 16, 17, 20, 21, 24, 26, 27, 28, 29, 30 |
| 17 | 15, 16 |
| 21 | 12, 14, 15, 16, 20, 24, 25, 26, 27 |
| 29 | Insofar as the phrase "daily operations" is vague, *see* responses to SUMF 10 and 21 above for Plaintiffs' specific denials. |

## II.   <u>LEGAL STANDARD</u>

A party may obtain summary judgment only by "show[ing] that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "It is elementary that at summary judgment a court must view the record in the

light most favorable to the nonmoving party and draw all reasonable inferences in favor of the

same." *Skyview Fin. Co., LLC v. Kearsarge Trading, LLC,* 616 F. Supp. 3d 152, 156-57 (D.

Mass. 2022) (Saris, J.), *quoting Chadwick v. WellPoint, Inc.,* 561 F.3d 38, 41 (1st Cir. 2009). To

defeat summary judgment, the non-moving party need only "show that a trier of fact could

reasonably find in the non-moving party's favor." *Id.* at 157 (citing *Celotex Corp. v. Catrett*, 477

U.S. 317, 324 (1986)).

## III.   <u>ARGUMENT</u>

The HSDs' motion and memorandum disregards the liability theory actually pled in

Plaintiffs' Second Amended Complaint [ECF No. 150] (the "SAC"). In the SAC, Plaintiffs

allege the following:

- That Defendants (including the HSDs) told franchisees and brokers that "[t]hey can participate in the use of [MLS PIN], and gain the benefits provided by the MLS, but only if they agree to adhere to and enforce the anticompetitive restraints set forth in the MLS PIN rules." SAC at ¶ 71.

- That "each Broker Defendant," including the HSDs, has "agreed to participate in, implement, and/or facilitate the conspiracy by imposing the MLS PIN Rules, including the Buyer-Broker Commission Rule, on its franchisees, affiliates and realtors to join and/or participa[te] in MLS PIN and follow the MLS PIN Rules. *Id.* at ¶ 114.

- That each "Broker Defendant requires its Realtors and franchisees to join the local MLS, including MLS PIN, and abide by such MLS's rules, including the MLS PIN Rules, as a condition of doing business with the Broker Defendants, and to secure the benefits of the Broker Defendants' brands, infrastructure, and other resources that support their brokerage operations." *Id.*

- In particular, Plaintiffs allege that "the HomeServices Defendants also require their franchisees and Realtors to join MLS and follow MLS rules." *Id*. at ¶ 116.

- Finally, the SAC alleges that by "enforcing the rule through local realtor association leadership, imposing the rule on local realtor associations and MLSs, and requiring franchisees, realtors, and other affiliates to join local realtor associations and MLSs (including MLS PIN), and comply with their rules (including the MLS PIN Rules), each Broker Defendant has agreed to participate in and implemented and/or facilitated the conspiracy." *Id*. at ¶ 119.

The HSDs ignore these allegations and instead try to pigeonhole Plaintiffs' allegations into three separate claims: vicarious liability, invitation to participate in MLS PIN and participation in MLS PIN's governance. In so doing, HSDs set up a series of strawmen while failing to knock down Plaintiffs' actual claims.[13]

## A.   The HSDs' Control Over Massachusetts Franchisees Presents, at Minimum, a Triable Issue of Material Fact

The HSDs assert that they do not "exert any control over franchisees when it comes to the matters actually at issue in this case." (HSD Mem. at 12.) But the discovery record reveals that the HSDs *do* have such control.

First, ¶ 9.11 of the form Franchise Agreement requires that "[f]ranchisee[s] … shall at all times comply with [i] the Code of Ethics of the National Association of Realtors and [ii] other appropriate organizations." STMF ¶ 20. By incorporating the NAR Code, prong [i] of this provision *expressly requires* that "[i]n cooperative transactions REALTORS *shall compensate cooperating Realtors (principal brokers)*." STMF ¶¶ 21-22 (emphasis added). This language, standing alone, establishes the HSDs' control over franchisees with regard to cooperative compensation. At a minimum, and as the court in the related *Burnett* action found, "a reasonable

---

[13] For example, Plaintiffs have never alleged a claim of vicarious liability. While they alleged participation in MLS PIN as one basis for liability, that is not the core of the Complaint. SAC ¶¶ 108-119. Rather, it is that the HSDs forced their franchisees to participate in MLS PIN and abide by MLS PIN Rules.

jury could find" that the Franchise Agreement's express incorporation of the NAR Code requires HomeServices franchisees to offer cooperative compensation pursuant to the Buyer-Broker Commission Rule. *Burnett v. National Ass'n of Realtors*, No. 19-cv-00332-SRB, 2022 WL 17741708, at *7 n. 11 (W.D. Mo. Dec. 16, 2022) (denying, *inter alia,* HSDs' motion for summary judgment).[14]

Second, the second prong of ¶ 9.11 ("other appropriate organizations") likewise creates a triable issue of material fact as to whether, in addition to requiring cooperative compensation under the NAR Code, the HSDs *also* require Massachusetts franchisees to offer cooperative compensation pursuant to MLS PIN's rules. There is no dispute that Section 5 of the MLS PIN Rules and Regulations imposed the anticompetitive cooperative compensation Rule on MLS PIN's participants. *See* STMF ¶ 19. And Ms. Warner acknowledged ███████████

████████████████████████████████████████████████████████████████

███. STMF ¶ 24. Based on Ms. Warner's testimony alone, not to mention the plain meaning of the Franchise Agreement, a reasonable jury could readily find that MLS PIN is such an "other appropriate organization[]."

Third, the Franchise Agreement requires that franchisees provide to BHHS a "direct electronic feed of all real estate listings … from the multiple listing service(s) used by Franchisee." By requiring franchisees in Massachusetts to provide access to MLS PIN's listing

---

[14] Plaintiffs anticipate that, in their reply brief and then ultimately at trial, the HSDs may dispute the meaning of this language, just as they have done in the related *Burnett* action. As noted above, the *Burnett* Court concluded that the parties' differing interpretation of the NAR Code created a triable issue of fact. The HSDs attempt to distinguish *Burnett* on the grounds that the HSDs do not sit on MLS PIN's board, that the HomeServices franchises are independent (and not owned by the HSDs), and that "MLS PIN is not a NAR MLS." HSD Mem. at 15-17. But none of those arguments undercuts the fact that the Franchise Agreement *requires* even the independent Massachusetts franchisees *to follow the NAR Code of Ethics*, or that, as found by the *Burnett* court, a reasonable jury could find that this requirement included the NAR's cooperative compensation mandate.

feed, the HSDs necessarily require membership in MLS PIN, and thus compliance with MLS PIN's Rules. Without joining MLS PIN, the franchisees could not provide the required "direct electronic feed" from MLS PIN. Thus, a jury could readily conclude that through this provision of the Franchise Agreement, the HSDs are requiring its franchisees to join MLS PIN and to implement Section 5 of MLS PIN's Rules.

Fourth, even if a jury were to conclude that the HSDs do not force Massachusetts franchisees to join or implement MLS PIN's Rules using an executed, ***written requirement,*** the jury could reasonably conclude that the HSDs imposed that requirement as a ***practical*** matter. *See generally* STMF ¶¶ 12-14. Specifically, participation in MLS PIN by Massachusetts franchisees is essential to succeed as an HSD franchisee because of "█████████████████ █████████████████████████████████." STMF ¶ 13. Participation in MLS PIN is so essential that Mr. Patsio could not testify ████████████████████████████ ████████████████████████████████. *Id*. As the *Burnett* court found when it denied the HSDs' motion for summary judgment, "MLS membership is considered essential to brokers," in part because "91% of homes sold [in the United States in 2020] were listed on an MLS." *Burnett*, 2022 WL 17741708, at *2. Accordingly, the HSDs franchisees had to join MLS PIN (and therefore be subject to MLS PIN's Rules) to be an effective franchisee in Massachusetts, regardless of whether the Franchise Agreement formally imposed such a requirement, and ultimately had to funnel anticompetitive commissions up the corporate ladder, and the HSDs knew it. Indeed, a jury could conclude that a franchisee in Massachusetts that did not join MLS PIN and follow MLS PIN Rules and Regulations would not exist because the franchisee would go out of business (or have its franchise terminated). At the very least, a jury

could conclude that the HSDs knew that the franchisees had to join MLS PIN, follow MLS PIN's Rules, and offer cooperative compensation.

The HSDs' motive for exerting control to require their franchisees to abide by the cooperative compensation Rule—whether through requiring adherence to the NAR Code or to MLS PIN's Section 5, or through requiring MLS membership—is clear. Because commissions flow up from the franchisees, the HSD's own commissions depend upon the franchisees' success. As franchisee commissions increased and decreased, so too did the commissions received by the HSDs. STMF ¶ 6; *see generally* ¶¶ 3-7.

The HSDs thus have every incentive to ensure that commission rates remain inflated. For example, the HSDs' management trains brokers to pursue the goal of an anticompetitive 6% commission aggressively—or even profanely. STMF ¶¶ 8-11. And the cooperative compensation Rule is a key tool for maintaining this commission rate. As former HSoA CEO Peltier explained, "" and "                                                                      ." STMF ¶ 17. This incentive is literally doubled when, as Mr. Buffet acknowledged in his shareholder letter, HomeServices brokers are on both sides of the transaction. STMF ¶ 5. The record thus contains ample evidence from which a reasonable juror could infer that the HSDs participated in the anticompetitive conduct alleged in the SAC.

### B.    The HSDs Fail to Rebut the Evidence of Their Active Agreement to and Enforcement of Anticompetitive Restraints

The foregoing evidence at a minimum gives rise to several genuine and triable issues of material fact. As such, the HSDs cannot prevail on their motion for summary judgment.

The HSDs' first argument—that HSDs are not vicariously liable for the conduct of independent franchisees and do not require their franchisees to join MLS PIN (HSD Mem. at 11-12)—is without merit because Plaintiffs do not allege vicarious liability.

As to whether the HSDs required franchisees to join MLS PIN (or follow the functionally equivalent Standard of Practice 16-15 of the NAR Code), that is a highly disputed question of material fact (as discussed throughout Part III.A). For example, the HSDs argue that § 9.14 of the Franchise Agreement "only applies to feeds from MLSs that the franchisee is *already using* and does not constitute a requirement that the franchisee join MLS PIN." HSD Mem. at 12 (emphasis in original). But that is contrary to Plaintiffs' plausible alternative interpretation grounded in the actual language of the Agreement (*see* STMF ¶¶ 15-16).[15] A reasonable jury could readily agree with Plaintiffs that the required feed of all real estate listings received by the HSDs could not occur unless the franchisee remained a member of MLS PIN and continued to follow the MLS PIN Rules.

The HSDs similarly argue that "virtually all Independent Franchisees, CRG included, had already joined MLS PIN prior to any association with the BHHS brand." *Id*. Even if true, those facts are irrelevant. The fact that conspiratorial anticompetitive conduct may have existed prior to the franchisees' "association with the BHHS brand" does not give the HSDs immunity from implementing their own anticompetitive rules and perpetuating and enforcing the anticompetitive conduct. Indeed, if some prior association with MLS PIN was all that was necessary to require HomeServices franchisees to continue to be members of MLS PIN and comply with the MLS PIN Rules in perpetuity, then the HSDs would not have exercised their power to force that

---

[15] To the extent Ms. Warner's current Declaration in support of the HSDs' motion for summary judgment contradicts her prior deposition testimony on this point (*compare* [ECF No. 204-3]) at ¶ 12 *with* STMF ¶ 16 above), that discrepancy reinforces the existence of a disputed issue of material fact.

conduct in the many ways discussed above. A reasonable jury could readily agree with Plaintiffs that HSDs' franchisees had to maintain membership in MLS PIN and comply with MLS PIN Rules (as well as the cooperative compensation requirements of the NAR Code) and use MLS PIN to compete in the market and to funnel commissions to the HSDs. The HSDs, through their Franchise Agreement, at a minimum prohibited franchisees from terminating the conspiracy by prohibiting franchisees from **dis**continuing the practice of offering anticompetitive cooperative compensation. *See* STMF ¶¶ 17-27. The HSDs thus perpetuated and enforced the conspiracy once those franchisees joined BHHS.

While no communications between MLS PIN and the HSDs in which MLS PIN invited the HSDs to join a conspiracy with MLS PIN have been produced (HSD Mem. at 13), that in no way frees the HSDs from liability. The facts discussed above clearly raise at least a triable issue of fact concerning the conspiracy allegations in SAC paragraphs 71, 114, 116 and 119 (as discussed on p. 12 above) alleging that the HSDs participated in an anticompetitive conspiracy with the Broker Defendants (as opposed to MLS PIN). As discussed above, the HSDs completely ignore these allegations and the supporting facts in their Motion. Moreover, there is no need for a written invitation by MLS PIN (or any of the Broker Defendants) to join a conspiracy. "Plaintiffs need not prove a formal agreement existed between the Defendants. *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939). All that is required is 'a conscious commitment to a common scheme designed to achieve an unlawful objective.' *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)." *Burnett,* 2022 WL 17741708, at *7.

In arguing that the HSDs were not invited to, and did not, conspire with MLS PIN, the HSDs raise an argument about independent action. HSD Mem. at 13. As discussed above, the conspiracy was with the other Broker Defendants, not MLS PIN. In any event, "where direct

evidence is used to show the existence of a conspiracy, a plaintiff need not present evidence to rule out independent action" because "'[a] restraint of interstate commerce cannot be justified by the fact that the object of the participants in the combination was to benefit themselves in a way which might have been unobjectionable, in the absence of such restraint." *Burnett,* 2022 WL 17741708, at *8 (*quoting Anderson v. Shipowners' Ass'n of Pacific Coast*, 272 U.S. 359, 363-4 (1926)).[16]

In that regard, discovery remains ongoing in this case, but Plaintiffs already have evidence of collusion to restrain trade that, at a minimum, is sufficient to give rise to a genuine issue of material fact.[17] For example, Gino Blefari, CEO of HSoA, stated in a scripted video for HSD's brokers that the best way to maximize commissions is to be "connected to a constellation of collaborators" that includes other Broker Defendants because "the only way you can eliminate all competition is to include them." STMF ¶ 28. Consistent with this philosophy, a Senior Vice President at HSF Affiliates, who provided a declaration in support of HSDs' motion for summary judgment, had in her possession an "Instructor Version" of a Keller Williams training document that specifically addresses how to maximize commissions by convincing sellers to agree to a 6% commission rate. STMF ¶ 29.

The HSDs may argue that it is pure coincidence that 6% commission rate promoted in Keller Williams' material is the same as the 6% commission rate that HSDs' executives ███████ ███████████████████████████████████. STMF ¶¶ 9-11. But the *Burnett* court has already

---

[16] Once again (*cf.* n. 14 above), none of the HSDs' arguments attempting to distinguish *Burnett* from the present case (*see* HSD Mem. at 15-17) undercuts, or is relevant to, the legal principle that the independent action doctrine is irrelevant in the face of actual evidence of conspiracy.

[17] Even should Plaintiffs and the Anywhere and Re/Max Defendants reach an agreement for Plaintiffs to participate in the settlements those Defendants reached in the *Moehrl* and *Burnett* litigations (*see* [ECF Nos. 235, 236]), those agreements will include cooperation clauses to obtain further relevant discovery from those settling parties.

determined that "evidence that Defendants provided uniform training to Seller-Brokers to obtain 6% commission rates and to split commissions equally with Buyer-Brokers" is "sufficient evidence to create a genuine issue of material fact as to whether Defendants' adoption and enforcement of [the cooperative compensation rule] is a conspiracy to restrain trade, in violation of the Sherman Act." *Burnett,* 2022 WL 17741708, at \*8; *see Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 99 (1984) ("By participating in an association which prevents member institutions from competing against each other on the basis of price," the "member institutions have created a horizontal restraint–an agreement among competitors on the way in which they will compete with one another"). Indeed, the record demonstrates that high-level HomeServices executives were consulting with at least one other Broker Defendant about how to ██████████████████████████████████████." STMF ¶ 30. At a minimum, this undisputed symmetry between the 6% commission rates promoted in both the HSDs' and Keller Williams' training material creates a genuine issue of material fact about collusion.[18]

## IV.    CONCLUSION

For all of the reasons set forth above, Plaintiffs respectfully request that the HSDs' Motion for Summary Judgment be denied.

Dated: October 31, 2023                     Respectfully submitted,

                                    */s/ Robert A. Izard*
                                    Robert A. Izard (*pro hac vice*)
                                    Craig A. Raabe (*pro hac vice*)
                                    Seth R. Klein (*pro hac vice*)
                                    Christopher M. Barrett (*pro hac vice*)

---

[18] Plaintiffs are not pursuing any claim that Mr. Fortin's membership on the MLS PIN Board of Directors itself establishes the HSDs' liability. *See* HSD Mem. at 13-15.

IZARD, KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
(860) 493-6292
(860) 493-6290 fax
dneedham@ikrlaw.com
rizard@ikrlaw.com
craabe@ikrlaw.com
sklein@ikrlaw.com
cbarrett@ikrlaw.com

James Gotz (MA Bar #567157)
HAUSFELD LLP
One Marina Park Drive
Suite 1410
Boston, MA 02210
(617) 207-0600
jgotz@hausfeld.com

Christopher L. Lebsock (*pro hac vice*)
HAUSFELD LLP
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
(415) 633-1908
clebsock@hausfeld.com

Jose Roman Lavergne (*pro hac vice*)
HAUSFELD LLP
888 16th Street, N.W.
Suite 300
Washington, DC 20006
(202) 540-7200
jlavergne@hausfeld.com

***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I, Seth R. Klein, hereby certify that a true copy of the foregoing document has been sent via email to the HomeServices Defendants on October 31, 2023, and will be filed under seal and in redacted form filed through the ECF system in accordance with the Court's order on Plaintiffs' Motion to File Under Seal filed on October 31, 2023 (and sent to all case participants through ECF's electronic system).

*/s/ Seth R. Klein*
Seth R. Klein