# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

JENNIFER NOSALEK, RANDY HIRSCHORN and
TRACEY HIRSCHORN, individually and on behalf
of all others similarly situated,

<em>Plaintiffs</em>,

v.

MLS PROPERTY INFORMATION NETWORK,
INC., ANYWHERE REAL ESTATE INC. (F/K/A
REALOGY HOLDINGS CORP.), CENTURY 21
REAL ESTATE LLC, COLDWELL BANKER
REAL ESTATE LLC, SOTHEBY'S
INTERNATIONAL REALTY AFFILIATES LLC,
BETTER HOMES AND GARDENS REAL
ESTATE LLC, ERA FRANCHISE SYSTEMS LLC,
HOMESERVICES OF AMERICA, INC., BHH
AFFILIATES, LLC, HSF AFFILIATES, LLC,
RE/MAX LLC, POLZLER & SCHNEIDER
HOLDINGS CORPORATION, INTEGRA
ENTERPRISES CORPORATION, RE/MAX OF
NEW ENGLAND, INC., RE/MAX INTEGRATED
REGIONS, LLC, AND KELLER WILLIAMS
REALTY, INC.,

<em>Defendants</em>.

No. 1:20-cv-12244-PBS

Judge Patti B. Saris

## STATEMENT OF INTEREST OF THE UNITED STATES

This is one of many cases alleging that buyer-broker commission rules stymie
competition and raise prices for home sellers and buyers through artificially inflated real-estate
broker commissions. In seeking approval for their proposed settlement, the Settling Parties assert
that it will "eliminate . . . the allegedly anticompetitive rule at the heart of this Action." Dkt. 191
at 11. That is not accurate. Far from curing the rule's defects, the proposed settlement
perpetuates the very same competitive concerns that trouble the current rule. Because the
proposed settlement is not "fair, reasonable, and adequate" and would mandate a rule that raises

its own antitrust concerns, the Court should deny preliminary approval. *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 345 (1st Cir. 2022).

First, the only guaranteed "benefit" to class members under the settlement is an injunction mandating certain changes to MLS PIN's buyer-broker commission rule. These changes, however, would not create competition or reduce commissions. Instead, the settlement merely prescribes cosmetic changes, authorizing sellers to offer zero-dollar commissions, instead of the current minimum of one cent. But virtually no one will exercise that option for the same reason that they don't offer one cent now:  The modified rule still gives *sellers* and their *listing brokers* a role in setting compensation for *buyers'* brokers.

As long as sellers can make buyer-broker commission offers, they will continue to offer "customary" commissions out of fear that buyer brokers will direct buyers away from listings with lower commissions—a well-documented phenomenon known as steering. When sellers make such offers, buyer brokers need not compete on price to attract buyers. The settlement does not ameliorate these dynamics at the heart of Plaintiffs' complaint. As a result, commissions on home sales will remain inflated, reducing the net amount the seller receives for the home and driving up the purchase price paid by the buyer. The proposed rule therefore raises serious antitrust concerns in its own right.

Worse still, the proposed injunction *mandates* that MLS PIN maintain the modified rule for at least three years. *See* Dkt. 268-1 (Second Amended Stipulation and Settlement Agreement) at 20. As a result, approving this settlement could unnecessarily interfere with the ability of the United States, other government enforcers, and private parties to "unfetter a market from anticompetitive conduct and 'pry open to competition a market that has been closed.'" *Ford Motor Co. v. United States*, 405 U.S. 562, 577-78 (1972) (quoting *Int'l Salt Co. v. United States*,

332 U.S. 392, 401 (1947)).

Second, the inadequacy of this settlement agreement is not for want of alternatives that would better serve the class. Attorneys representing a class of former home sellers need not pursue injunctive relief instead of monetary compensation. But when they do, the proposed injunctive relief must provide adequate benefits to the class. As noted above, the problem with the proposal here is that it makes cosmetic changes while authorizing the seller to continue to set compensation for the buyer's broker. Instead, the parties could propose an injunction that would *prohibit* sellers from making commission offers to buyer brokers at all. That injunction would promote competition by empowering buyers to negotiate directly with their own brokers.

And third, the settlement will release class members' claims in exchange for this inadequate relief without providing them with any opportunity to opt out. Instead of seeking to certify under Rule 23(b)(3), Plaintiffs seek to certify the settlement class only under Rules 23(b)(1) and 23(b)(2). Under these rules, class members cannot opt out to pursue their own claims for damages and will not know for years whether they will receive any payment from the MLS PIN settlement at all. Where class members are given no choice, the Court should be particularly wary about blessing a settlement that entrenches, rather than remediates, a system that harms home sellers and buyers.

## I.    INTEREST OF THE UNITED STATES

Purchasing a home is often the most expensive transaction of Americans' lives, and homeownership is an important vehicle for wealth accumulation. Yet despite the advent of the Internet and the popularity of services like Zillow and Redfin, which allow potential home buyers to search online for homes, real-estate broker commissions have barely budged from the

5–6% charged for decades—two to three times more than in other developed economies.[1] The vast majority of home sales in the United States involve real-estate brokers, costing home sellers and buyers some $100 billion in broker fees annually.[2] Broker-members of MLS PIN likely collected more than $2 billion in fees in 2022 for residential real estate in Massachusetts.[3]

These stubbornly high broker fees owe in large part to rules and practices perpetuated by multiple listing services like MLS PIN. As private entities composed of competing brokers, these associations "have economic incentives to restrain competition and . . . standards set by such associations have a serious potential for anticompetitive harm." *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 500 (1988). Over the years, such rules and practices have included price lists for real-estate agents, *United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 489 (1950), rules permitting brokers to exclude prospective homebuyers represented by virtual brokers from competing for a home sale, *United States v. Nat'l Ass'n of Realtors*, No. 05-cv-5140 (N.D. Ill., filed Sept. 8, 2005), and excluding listings by discount brokerages from multiple listing services, *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 822 (6th Cir. 2011). For decades, the Department of Justice's Antitrust Division (along with the Federal Trade Commission) has fought to inject competition in residential real-estate markets. The United States has a strong

---

[1] *See, e.g.*, Dkt. 150 (Second Amended Complaint) at 30, ¶ 124; *Time to take a wrecking ball to realtors' fees in America*, The Economist (Nov. 8, 2023), https://www.economist.com/leaders/2023/11/08/time-to-take-a-wrecking-ball-to-realtors-fees-in-america.

[2] *See Research on More than 10,000 Home Sales Reveals that Buyer Agent Commission Rates Are Highly Uniform*, Consumer Federation (Nov. 30, 2021), https://consumerfed.org/press_release/research-on-more-than-10000-home-sales-reveals-that-buyer-agent-commission-rates-are-highly-uniform/.

[3] *See Annual Report on the MLS PIN Housing Market*, MLS PIN (2022), at 3-4, https://files.constantcontact.com/5ccaefd8001/7cf2c37f-76df-47a3-b48f-756bb529d3ee.pdf.

interest in protecting American home sellers and buyers and ensuring that private class-action settlement agreements do not perpetuate serious competitive concerns.

In addition, Congress authorized the Attorney General to send "any officer of the Department of Justice . . . to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States." 28 U.S.C. § 517. The Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711–15 ("CAFA"), further requires class-action defendants to notify the Attorney General and state officials of proposed class action settlements. 28 U.S.C. § 1715. While the CAFA notice provision does not impose any obligation on federal officials, 28 U.S.C. § 1715(f), Congress intended the notice provision to enable public officials to "voice concerns if they believe that the class action settlement is not in the best interest of their citizens." *The Class Action Fairness Act of 2005*, S. Rep. No. 109-14, at 5 (2005). Congress expected that CAFA notifications would "provide a check against inequitable settlements" and "deter . . . settlements that do not benefit injured parties." *Id*. at 35. The United States' participation in this suit furthers those aims.

On December 18, 2023, the United States requested to file a Statement of Interest in response to Plaintiffs' preliminary settlement with MLS PIN. *See* Dkt. 261. The Court granted the United States' request on December 19, 2023. *See* Dkt. 263.

## II.    BACKGROUND

### A.  The Real-Estate Broker Industry

Real-estate brokers, typically called buyer brokers or buyer agents on the buyer side and seller's brokers or listing agents on the seller side, earn commissions in return for representing buyers or sellers in residential real-estate transactions. *See* Dkt. 150 at ¶¶ 27-36. Instead of billing buyers and sellers separately for their services, real-estate brokers typically collect a

percentage of the sale price. *Id.* at ¶¶ 30, 35. The cost of both the buyer's and the seller's broker is therefore embedded in the purchase price of a home. Higher real-estate commissions harm home sellers (who receive less of the proceeds from the home sale) and buyers (who end up paying through higher home purchase prices).

Multiple listing services, such as MLS PIN, operate databases of real-estate listings in particular regions. *See*, *e.g.*, Dkt. 150 at 10–11, ¶¶ 38–45; *United States v. Nat'l Ass'n of Realtors*, No. 05-cv-5140, 2006 WL 3434263, at *1 (N.D. Ill. Nov. 27, 2006). In their current form, MLSs are private, geographically localized organizations that are owned and maintained by competing local real-estate professionals. *Id*. MLS databases facilitate the sharing of information on properties listed for sale, including information related to past and current home listings in the area, and enable searching of nearly all of the listed properties in an area. *Id*. Membership in the local MLS is critically important for any broker seeking to serve clients efficiently, and MLS access is key to being a successful broker. Because MLS PIN lists "the vast majority" of available properties in its region, "nearly all" real-estate brokers in MLS PIN's region are members. *See* Dkt. 150 at ¶¶ 21, 39–40, 134–135.

As a condition of obtaining access to the MLS, brokers must abide by the MLS's rules. These rules are promulgated by MLS leadership, which consists of competing brokers in the region. *See, e.g.*, Dkt. 51 at 9. Thus, through their control of MLSs, brokers effectively dictate many of the terms on which most residential-property transactions occur.

### B.  The Industry's History of Resisting Commission Competition

When MLS systems first rose to prominence in the early 1900s, they shared not only property information but also cooperative compensation agreements between brokers. Local real-estate associations later required their members to use fee schedules with fixed commission rates.

In 1939, the National Association of Real Estate Boards—the predecessor to the National Association of Realtors ("NAR")—formed a "Uniform Commission Committee," which campaigned to "standardize commission rates across the country," and by 1950 the 5% commission rate was "an industry standard" with "calls for 6 percent soon follow[ing]." *See Roots of Real Estate Models*, Chicago Agent Magazine (July 16, 2012), https://chicagoagentmagazine.com/2012/07/16/roots-of-real-estate-models/.

The Supreme Court ruled in 1950 that the adoption by a local real-estate board—the Washington Real Estate Board—of standard rates of commission for its members was illegal. *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485 (1950). Yet it took nearly two more decades of litigation to bring an end to standard rate lists at the local levels of broker associations across the country. *See, e.g.*, *United States v. Prince George's Cnty. Bd. of Realtors*, No. CIV. A. 21545, 1970 WL 546 (D. Md. Dec. 28, 1970); *United States v. Long Island Bd. of Realtors*, No. 70-cv-1418, 1972 WL 584 (E.D.N.Y. Aug. 1, 1972); *United States v. L.A. Realty Bd.*, No. CIV. A. 70-2855, 1973 WL 767 (C.D. Cal. Mar. 19, 1973); *United States v. Metro MLS, Inc.*, No. CIV. A. 210-73-N, 1974 WL 894 (E.D. Va. Aug. 5, 1974).

Nonetheless, local real-estate boards continued to suppress competition from non-traditional broker services that could lower the "industry standard" commission rates. *See, e.g.*, *United States v. Nat'l Ass'n of Realtors*, No. 05-cv-5140, 2008 WL 5411637 (N.D. Ill. Nov. 18, 2008); *United States v. Multiple Listing Service of Hilton Head Island*, No. 07-cv-3435 (D.S.C. May 28, 2008), Dkt. 16; *United States v. Consolidated Multiple Listing Service*, No. 08-cv-1786, 2009 WL 3150388 (D.S.C. Aug. 27, 2009); *United States v. Nat'l Ass'n of Realtors*, No. 20-cv-3356 (D.D.C., filed Nov. 19, 2020). In fact, until NAR banned the practice in 2022, buyer brokers would represent to buyers that their services were "free or available at no cost" because

their commissions were (and continue to be) paid by the seller rather than directly by the buyer.[4] But any suggestion that buyer-broker services are "free or available at no cost" is inaccurate and misleading. The buyer-broker commission has a very real cost to homebuyers, who ultimately pay through higher purchase prices. Even now, buyer brokers often tell clients that sellers pay the cost of their services,[5] which perpetuates the inaccuracy that buyer-broker commissions are provided at no cost to the homebuyer.

### C.  MLS PIN's Buyer-Broker Commission Rule

As alleged, MLS PIN's Buyer-Broker Commission Rule (the "Rule") is another attempt to suppress price competition among brokers. The Rule currently requires the listing broker to make an "unconditional" and "blanket unilateral offer[] of compensation to" the buyer broker, which the buyer broker knows "prior to initiating any sales effort[.]" *See* Dkt. 39 at 17-18 (Sec. 5 and Note 1 of MLS PIN Rules and Regulations). Under MLS PIN's current rules, the offer could theoretically be as low as one penny. *See* Dkt. 38 at 15. Nonetheless, "[t]he Rule creates tremendous pressure on sellers to offer the 'standard' supra-competitive commission" because "[s]eller-brokers know that if the published, blanket offer is less than the 'standard' commission, many buyer brokers will 'steer' home buyers to the residential properties that provide the higher standard commission." Dkt. 150 at ¶ 77.

The Rule, Plaintiffs contend, "diminish[es] price competition and stabiliz[es] and fix[es] the buyer broker charges imposed on home sellers at or near the 'standard real [e]state commission' level." *Id*. at ¶ 94. The seller's offer of compensation to buyer brokers is set

---

[4] *See* Melissa Tracey, *Why You Should Tell Clients How You're Compensated*, REALTOR Magazine (Sept. 14, 2022), https://www.nar.realtor/magazine/real-estate-news/sales-marketing/why-you-should-tell-clients-how-youre-compensated.
[5] *See, e.g.*, Kevin Vitali, *Do I Need A Buyer's Agent When Buying a Home?*, https://merrimackvalleymarealestate.com/buyers-agent-buying-home/.

"without regard to the experience of the buyer-broker or the services or value they are providing[.]" *Id*. at ¶ 75.

Numerous lawsuits across the country are challenging buyer-broker commission rules akin to MLS PIN's Rule. *See In re: Real Estate Commission Antitrust Litig.*, MDL No. 3100, Dkt. 196. On October 31, 2023, a jury found such a rule anticompetitive and awarded pre-trebled damages of $1.785 billion to a class of home sellers in Missouri. *See Burnett v. Nat'l Ass'n of Realtors*, No. 19-cv-0332 (W.D. Mo.), Dkt. 1294 (Verdict Form).

### D.  The Pending Class Certification and Settlement Proposals

The Settling Parties filed their original proposed settlement agreement on June 30, 2023 (*see* Dkt. 190-193), a first amended agreement on September 5, 2023 (*see* Dkt. 221-223), and a second amended stipulation and settlement agreement on January 5, 2024 (*see* Dkt. 268-1). After three filed versions, however, the settlement remains essentially the same.[6]

The $3 million in compensation, which the Settling Parties have renamed as the "Settlement Fund," will be held in reserve for the purpose of paying attorneys' fees and litigation expenses as awarded by the Court. Dkt. 268-1 at ¶ 9(c). None of the $3 million is specifically allocated to injured class members, and no money will be distributed to any class members (apart from the named plaintiffs) until, at earliest, the conclusion of litigation against all other defendants. *See* Dkt. 223 (Exhibit F – amended proposed press release) at 8-10.

---

[6] In response to the United States' concerns, the Settling Parties modified the settlement agreement to stipulate that *Noerr-Pennington* immunity does not apply and to carve the United States expressly out of the class definition.  These changes, unfortunately, do not alleviate the United States' concerns.

Instead of guaranteeing any monetary relief, the settlement purports to benefit class members primarily through an injunction. As detailed in Appendix A, that injunction makes eleven "changes" to the Rule, *see* Dkt. 222 at 57 (Exhibit 3a), which fall into three categories:

- First, the revised Rule states that the seller, not the listing broker, makes any offer of cooperative compensation, and an offer of compensation to the buyer broker may be 0¢, whereas before the offer had to be at least 1¢. *See* Dkt. 222 at 58 (Ex. 3a, "Change #2").

- Second, the revised Rule states that buyer-broker commission offers are negotiable. *See* Dkt. 222 at 59-60 (Ex. 3a, "Change #2"). But MLS PIN's Rule never prohibited the negotiation of buyer-broker commission offers (*see* Dkt. 38 at 17-18), as Plaintiffs recognize in their complaint (*see* Dkt. 150 at ¶ 95).

- Third, the revised Rule requires listing brokers to certify in the MLS platform that they "notified" the seller that an offer of compensation is not required and a buyer broker's request for compensation need not be granted. *See* Dkt. 222 at 58 (Ex. 3a, "Change #1").

In return for this injunction, class members "shall have, fully, finally, and forever waived, released, relinquished, and discharged all Released Claims against each of the Released Parties[.]" Dkt. 268-1 at ¶ 8(b)(i). The settlement defines "Released Claims" broadly to include not only equitable relief, but also "any obligations of any kind whatsoever," including "damages" and "liabilities of any nature whatsoever." Dkt. 268-1 at ¶ 2(z). The term "Released Parties," in turn, covers not just MLS PIN itself, but also associated parties, such as past or present shareholders. Dkt. 268-1 at ¶ 2(aa). While the release excepts the national franchise brokerages named as defendants, it nonetheless includes monetary claims against the various *local* franchises that own shares in MLS PIN, some of whom were officers and directors of MLS PIN while the Rule was in place. Even though this language seemingly releases class members' damages claims, the Settling Parties seek to certify the settlement class under Rule 23(b)(2)— and now Rule 23(b)(1) too. Neither provision guarantees class members a right to opt out, *see* Fed. R. Civ. P. 23(c)(2), and the Settling Parties have not proposed one.

10

To date, the Settling Parties have not sought preliminary approval of the latest iteration of the settlement. Nonetheless, the United States submits this Statement of Interest to assist the Court in evaluating a future motion for preliminary approval of the Second Amended Settlement.

## III.   ARGUMENT

### A.   Legal Standard for Preliminary Settlement Approval

Preliminary approval of a proposed class settlement is appropriate only if the Court finds it "will likely be able to" (1) determine that the settlement is fair, reasonable, and adequate, and (2) certify the class. Fed. R. Civ. P. 23(e)(1)(B). This standard in Rule 23(e)(1)(B) "requires courts to conduct a 'searching,' 'careful,' and 'rigorous' inquiry before preliminarily approving a settlement." *Grenier v. Granite State Credit Union*, 344 F.R.D. 356, 362 (D.N.H. 2023) (quoting *Rapuano v. Trs. of Dartmouth Coll.*, 334 F.R.D. 637, 643 (D.N.H. 2020)).[7]

When proposed relief is primarily equitable, courts should "[q]uestion whether injunctive relief will truly benefit class members." Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges*, Federal Judicial Center (3d ed. 2010), at 21. Key questions in this inquiry include: (1) "How much is the injunction worth to the class as a practical matter?"; (2) "What is the dollar value the relief might yield?"; and (3) "Might an emphasis on injunctive relief and proposed certification of a Rule 23(b)(2) class amount to a tactical move to avoid more stringent certification requirements and opt-out rights associated with a damages class under Rule 23(b)(3)?" *Id*. at 22.

---

[7] *See also* Adv. Commt. Notes, 2018 Amend. ("The decision to give notice of a proposed settlement to the class is an important event. It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object.").

Where, as here, the parties will seek simultaneous class certification and settlement approval, courts should be "'even more scrupulous than usual' when they examine the fairness of the proposed settlement." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 317 (3d Cir. 1998) (quoting *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 805 (3d Cir. 1995)). "[D]istrict courts must apply a more searching legal standard '[w]here . . . the parties negotiate a settlement agreement before the class has been certified.'" *Saucillo v. Peck*, 25 F.4th 1118, 1133 (9th Cir. 2022) (quoting *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019)). This rule is "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Id.* at 1131 (quoting *Roes*, 994 F.3d at 1049).

## B. The Proposed Injunction Fails to Provide Any Meaningful Relief to Class Members

Here, the settlement is not fair, reasonable, or adequate, because it provides no meaningful benefit to class members. It makes insignificant and largely cosmetic changes to the Rule, while perpetuating the existing structure that drives supra-competitive commissions. There is no reason to believe that the settlement will reduce broker commissions for the class. To the contrary, several current cases allege that analogous rules are anticompetitive for the same reasons that the current Rule is, and analogous rule changes reflect no meaningful benefit for home sellers or buyers.

### 1. The Settlement Preserves the Core Concern with MLS PIN's Rule

The proposed settlement would preserve the core concern with MLS PIN's buyer-broker commission rule. Under the settlement, like the current Rule, the listing broker "shall specify, on each Listing Filed with the Service," any compensation, and that such compensation must be "unconditional, except that entitlement to compensation shall be conditioned on the Cooperating

Broker's performance as the procuring cause of the sale." *See* Dkt. 222 at 58 (Ex. 3a, "Change #2"). The rule thereby gives decision-making authority for setting *buyer*-broker commissions to *sellers*, and it rewards buyer brokers a fixed amount regardless of the services buyers actually receive.

When sellers set buyer-broker compensation, they "know that if the published, blanket offer is less than the 'standard' commission, many buyer-brokers will 'steer' home buyers to the residential properties that provide the higher standard commission." Dkt. 150 at ¶ 77; *see also* Dkt. 51 at 22. Buyer brokers can steer their clients in several ways:  They can decide which properties to show, they can discourage or encourage bids on particular properties, and they can decide how vigorously to pursue a property on behalf of a client. The Rule thus "creates tremendous pressure on sellers to offer the 'standard' supra-competitive commission that has long been maintained in this industry." Dkt. 150 at ¶¶ 77, 89. For sellers, refusing to offer a "customary" commission can come at the expense of views, bids, and offers on their property. This remains true whether a seller is hypothetically allowed to offer "one cent" or "zero cents." The critical issue is not *how much* a seller should offer a buyer broker, but whether a seller should set buyer-broker compensation at all.

This is not a theoretical concern. As the complaint alleges, "[t]he prevalence of such steering has been widely reported in government reports, economic research and the trade press[.]" *Id*. at ¶ 78; *see id*. at ¶¶ 79–85 & nn. 12-17; *id*. at ¶ 93 & n. 18; *id*. at ¶ 98. One published economic analysis analyzed the effect of steering on commissions using market data from the Greater Boston Area from 1998 to 2011. *See* Panle Jia Barwick, Parag A. Pathak, & Maisy Wong, *Conflicts of Interest and Steering in Residential Brokerage*, 9 Am. Econ. J.: Applied Econ. 191 (2017), www.aeaweb.org/articles?id=10.1257/app.20160214. The authors

concluded that properties listed with lower commissions were less likely to sell and took longer to sell. *Id*. Another recent study reached similar conclusions. *See*, Jordan M. Barry, Will Fried, & John William Hatfield, *Et Tu, Agent? Commission-Based Steering in Residential Real Estate*, USC CLASS Research Paper No. 24-7 (Oct. 9, 2023), https://ssrn.com/abstract=4596391. As one court recently recognized, "[c]ommon sense suggests that a buyer-broker is highly unlikely to show their client a home when the seller is offering a penny in commission." *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 784 (N.D. Ill. 2020); *see also Moehrl*, No. 19-cv-1610, Dkt. 324-4 at 10-16 (declaration analyzing 602 phone transcripts in which buyer brokers refused to show a property after learning the seller was not offering a pre-set buyer-broker commission).

### 2. The Settlement Makes No Meaningful Changes to MLS PIN's Rule

Instead of addressing this core concern, the proposed settlement makes a few superficial tweaks and restates existing policy. None of the proposed changes, either individually or together, would meaningfully address the competitive concern alleged in Plaintiffs' complaint.

*First*, the primary proposed change allows cooperative offers of compensation to buyer brokers to be zero, rather than the current minimum offer of a penny. *See* Dkt. 38 (Defs.' Mem. in Supp. of Mot. to Dismiss) at 15 ("[S]ellers can comply with the Rule by offering any compensation amount they desire, even as low as $0.01."). A rule change that merely expands the theoretical range of allowable buyer-broker commission offers by *one cent* is unlikely to reduce broker commission rates. If virtually no sellers make one-cent offers of compensation to buyer brokers now, they are unlikely to make zero-cent offers under the new Rule.

*Second*, the revised Rule states that home sellers and buyers, as well as their brokers, can negotiate compensation different from the offer of compensation made through the multiple listing service. But this is not a new rule at all. MLS PIN already interprets its current Rule to

permit this kind of negotiation, and the theoretical potential for negotiation has not driven down commissions. *See, e.g.*, *id.* at 18.[8]

*Third*, the revised Rule requires the listing broker to check a box in the MLS platform certifying that the seller was notified that (1) no offer of buyer-broker compensation is technically required, and (2) a buyer broker's request for compensation can be rejected. Dkt. 222 at 58 (Section 1.0(c) redline). While it is certainly appropriate for listing brokers to inform their clients of the relevant rules, this formal notification requirement does little to alter the status quo. Listing brokers must already secure agreement from the home seller regarding the overall broker commission, and often the offer of compensation to the buyer broker as well, and a seller was never obligated to accept a request for a different compensation amount put forward by a buyer broker. Even if there was reason to believe that seller notification would be more than a pro forma exercise, this check-the-box requirement would not mark a significant change.

All told, these proposed changes will not alter the structure alleged in the complaint that currently drives sellers to offer the "customary" commission to avoid the threat of steering. MLS PIN itself concedes that the proposed rule changes would merely perpetuate the problem. In their motion to dismiss, the defendants argued that as long as "sellers are permitted to offer compensation to buyer brokers (and Plaintiffs do not contend that it should be otherwise) and buyer brokers can see differences in the compensation offered, the steering risk will continue to

---

[8] *See also* Dkt. 38 at 17 ("The PIN rules do not prohibit buyers, sellers or brokers from negotiating buyer commissions downward."); *id.* at 18 ("[I]f the Listing Broker wants to offer a lesser commission to Buyer Broker A, he can do so if such decision is not the result of cooperative activity between the Listing Broker and Brokers B, C, D, etc."). To the extent Plaintiffs have argued that some brokers understood the rule differently, MLS PIN has now publicly clarified that negotiations are permitted under MLS PIN's interpretation of its own rule.

exist, whether the Rule is in effect or not." Dkt. 38 (Defs.' Mem. in Supp. of Mot. to Dismiss) at

16, n. 7. And after the proposed settlement was announced, one broker put it even more bluntly:

> If the Court approves the settlement, we expect that listing brokers will bury their notification requirement in the fine print. If a seller questions why they should pay the buyer's broker fee, we have no doubt that listing agents will pull out the same old canned sales script. Sellers will be terrified that their property will be blackballed by the realtor community – it's a mild form of extortion.

*See* Andrew Haigney, *Buyer Broker Commission Rule – MLS Blinks*, Batterymarch Insider (July

21, 2023), www.batterymarchgroup.com/p/buyer-broker-commission-rule-mls.

### 3. Evidence Demonstrates that the Proposed Rule Will Not Change Market Participants' Conduct or Lower Commissions

Recent experience confirms that the proposed injunction would not limit steering or

reduce buyer-broker commissions. For example, in October 2019 and October 2022, the

dominant MLS in the state of Washington, NWMLS, made two sets of changes to its buyer-

broker commission rule that mirror the proposed settlement here. In October 2019, NWMLS

removed the requirement that a seller make a minimum offer of compensation when listing a

property for sale. Then, in October 2022, NWMLS made another rule change, purportedly "to

ensure that the buyer understands the buyer brokerage firm compensation and to create an

opportunity for discussion and negotiation."[9]

Neither revision appears to have led to a decrease in buyer-broker commissions.

Academic and media reports show that the 2019 rule change had no apparent effect on either the

---

[9] NWMLS revised its Rule 101(a)(i) in October 2022 to provide that "[t]he buyer [broker's] compensation shall be paid (1) as published in the listing if accepted by the buyer on behalf of the buyer [broker] in the purchase and sale agreement; or (2) as modified by the buyer, the buyer [broker], and the seller in the purchase and sale agreement." According to NWMLS, "[t]he purpose of this revision is to ensure that the buyer understands the buyer brokerage firm compensation and to create an opportunity for discussion and negotiation." *See Frequently Asked Questions: October 3, 2022 Revisions*, NWMLS, at 2, https://members.nwmls.com/wp-content/uploads/2022/06/NWMLS_FAQ_June2022-2.pdf.

portion of listings for which a buyer-broker commission offer was made or in the number of

offers with zero compensation.[10] Indeed, NWMLS itself expected "business as usual" after that

change.[11] The Antitrust Division's own analysis of buyer-broker prices in large metropolitan

areas in NWMLS's region shows that the October 2022 change likewise had no meaningful

effect. If that revision promoted buyer-broker competition, buyer-broker prices in large

metropolitan areas in NWMLS's region should have declined relative to buyer-broker prices in

other large metropolitan areas where there were no similar changes to MLS rules. The Antitrust

Division's analysis, however, found no meaningful difference between the change in buyer-

broker prices in large metropolitan areas in NWMLS's region and the change in buyer-broker

prices in other large metropolitan areas in the period after the October 2022 rule change.[12]

---

[10] *See, e.g.*, Barry, Fried, and Hatfield, *Et Tu, Agent?*, *supra*, at 82, § V.A.1 ("If the minimum commission requirement is not driving sellers' current behavior, eliminating the requirement is likely to have little effect on sellers' future behavior; the Seattle experience illustrates this well. To significantly change sellers' behavior, policy must influence the underlying factors that are motivating that behavior."); Andria Brambila, *Bright MLS breaks with NAR policy on commissions*, Inman (July 20, 2023), https://www.inman.com/2023/07/20/bright-mls-breaks-with-nar-policy-on-commissions/ ("At NWMLS, between October 2019 (when offering commissions to buyer brokers became optional) and March 2022, 99.2 percent of NWMLS listings continued to offer a buyer broker commission (flat from 99.3 percent before the rule was eliminated). Virtually all, 94.5 percent, offered a cooperative commission above 2 percent."); Stephen Brobeck, *Real Estate Brokerage Class Action Lawsuits: How to Effectively Separate ('Decouple') Listing and Buyer Broker Commissions*, Consumer Federation of America (Sept. 2023), at 3, https://consumerfed.org/wp-content/uploads/2023/10/13realestateHowtoDecoupleFormatted.pdf; *Moehrl*, 19-cv-1610 (N.D. Ill.), Dkt. 372 (August 22, 2022 Expert Class Certification Rebuttal Report of Professor Einer Elhauge) at ¶ 47.
[11] *See Modernization of SOC Rules, Effective October 1, 2019* video presentation by NWMLS's General Counsel Justin Haag, at 7:00, https://vimeo.com/580495026 ("Does Northwest MLS expect significant changes in business practices on October 1st? Generally no. Northwest MLS expects business as usual. There may be more brokers using the buyer agency agreement and there may be a handful of listings where the seller decides not to offer compensation to the buyer's broker but generally speaking Northwest MLS expects member business practices to generally remain the same.").
[12] *See* concurrently filed Declaration of Erik A. Schmalbach.

As NWMLS's experience reflects, MLS PIN could voluntarily adopt the settlement's proposed changes without meaningfully altering commission-setting practices or increasing competition. Indeed, many MLSs have voluntarily adopted analogous changes to their own buyer-broker commission rules. *See* Appendix B (illustrating widespread adoption of zero-compensation Buyer-Broker MLS rules across the country). On October 6, 2023, NAR issued a reinterpretation of its buyer-broker commission rule, which governs approximately 600 affiliated MLSs, to allow $0 commissions.[13] That many MLSs have recently allowed zero-compensation offers unilaterally—without receiving any release of claims from injured home sellers or buyers—confirms that the proposed injunction provides little benefit. It also calls into question Plaintiffs' assertion that "[w]ithout this Settlement, it could be several years at best before the substantive rule change embodied in the Settlement would be implemented, even assuming Plaintiffs win at trial." Dkt. 191 at 22-23.

### 4. The Proposed Settlement Raises the Same Anticompetitive Concerns as the Prior Rule and Creates a Risk of Conflicting Orders

By perpetuating the same commission-setting system, MLS PIN's proposed rule raises serious antitrust concerns and may independently violate the law.[14] Indeed, several pending cases

---

[13] *See* Andrea Brambila, *In 'sudden' reversal, NAR says listing brokers can offer 0%*, Inman (Oct. 6, 2023), https://www.inman.com/2023/10/06/in-sudden-reversal-nar-says-listing-brokers-can-offer-0/, quoting NAR ("So long as cooperating brokers are aware of the offers made by listing brokers, that purpose is achieved. NAR has long said listing brokers and their clients are the ones who determine the amount and makeup of the offer to cooperating brokers. Practically speaking, the difference between one penny and $0 is negligible, and regardless, those offers are always negotiable.").

[14] The Eleventh Circuit recently held that a district court did not abuse its discretion in approving an antitrust settlement where the conduct allowed under the settlement was not a per se violation of the antitrust laws. *See In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1089-90 (11th Cir. 2023). In this posture, the United States takes no position on the merits of the Eleventh Circuit's decision or whether MLS PIN's modified rule would constitute a per se violation. Here, the proposed injunction would not provide adequate relief to the class precisely because the new rules raise the same anticompetitive concerns as the current Rule. Thus,

allege that rules authorizing zero-compensation buyer-broker commission offers are anticompetitive. *See, e.g.*, *Spring Way Center v. West Penn Multi-List*, No. 23-cv-2061 (W.D. Pa.), Dkt. 30 at ¶ 92 ("[T]he option to list zero dollars as the buyer broker's commission is little more than a smokescreen, giving the appearance that actors in the market are free to negotiate and compete on price, when in fact they are not."); *Latham v. MetroList Services*, No. 24-cv-0067 (E.D. Cal.), Dkt. 1 at ¶ 94 ("These amendments [allowing offers of zero] fail to address or resolve the core anticompetitive effects of [the Buyer-Broker Commission Rule]."). These cases suggest that MLS PIN's proposed rule could be subject to a credible challenge.

While raising serious competitive concerns, the proposed settlement would complicate any attempt for injured home sellers and buyers to obtain relief. As discussed later, the settlement does not allow class members to opt out and would force them to release any future claims to the modified rule. If future home sellers and buyers outside the class definition challenged the proposed rule, MLS PIN may argue that any relief would conflict with the obligation in the injunction to maintain the modified rule.

The court need not wade into the contested merits of the proposed new rules. Instead, the parties could simply agree to an injunction blocking the challenged rules without mandating how MLS PIN institutes a replacement rule. MLS PIN could then decide for itself whether to adopt a zero-compensation rule despite the legal risk. While this approach could yield the same disappointing result, it would at least avoid the risk that a Court-approved settlement would chill challenges to MLS PIN's proposed zero-compensation rule. A prohibitory injunction would

---

regardless of which mode of antitrust analysis would apply to the new rules, the court should not accept a settlement that fails to remedy the problem.

allow whatever new Rule MLS PIN adopted to be judged on its own merits if it were challenged as anticompetitive, including by current class members.

### C. An Alternative Injunction Would Better Serve the Class

To address the competitive problem alleged by Plaintiffs, the Settling Parties could agree to an injunction that *prohibits* offers of buyer-broker compensation by MLS PIN participants.[15]

If MLS PIN rules prohibited sellers and listing brokers from deciding what buyer brokers would be paid, sellers would be responsible for determining only the compensation of their own broker in the listing contract, while buyers would be responsible for determining the compensation of their own broker in a buyer-broker representation contract.

---

[15] Many industry commentators have assessed similar remedies. *See, e.g.*, Keefe, Bruyette & Woods, *Commission Impossible: Will Litigation Reshape the Housing Market?* (Oct. 4, 2023), at 9 ("The lawsuits seek to ban cooperative compensation in the MLS."); Barry, Fried, and Hatfield, *Et Tu, Agent?*, *supra*, at § V.A.4 ("Prohibit Sellers from Offering Compensation to Buyer Agents"); Goodman, Tozer, & Alexandrov, *More Competition in Real Estate Broker Commission Negotiations Will Lower Costs for All*, Urban Institute (Nov. 14, 2023), www.urban.org/urban-wire/more-competition-real-estate-broker-commission-negotiations-will-lower-costs-all; Stephen Brobeck, *The Relationship of Residential Real Estate Commission Rates to Industry Structure and Culture*, Consumer Federation of America, (Nov. 2021), at 2, https://consumerfed.org/wp-content/uploads/2022/03/Real-Estate-Commission-Rates-Uniformity-and-Industry-Structure-Report-11-30-21.pdf ("The report concludes by recommending that Federal agencies and the courts seek to prohibit the coupling (or tying) of listing agent and buyer agent commissions so that buyers can negotiate buyer agent compensation rather than having it set and paid by listing agents (and sellers). This uncoupling would increase competition in broker fees (now at least $100 billion annually), align agent compensation to a much greater extent with agent service, and increase value received by consumers."); Rob Hahn & Greg Robertson interviewing Ed Zorn (VP & General Counsel at California Regional MLS), *Burnett v. NAR: The Lawsuit That Could Upend the Housing Market*, Industry Relations (Oct. 18, 2023), starting at 43:40, www.youtube.com/watch?v=pw39NB3w_0o&t=11s ("You do realize under this system (of the seller paying the buyer's agent directly inside the contract) you do realize a closing statement at a title company or an escrow company looks 100% identical as it does today. With both commissions on the seller side. Nothing changes. The only thing that changes is the number that shows up for the buyer's agent in that closing statement was negotiated between the buyer directly and the buyer's agent and had nothing to do with the seller or the listing agent. That's the one thing that's different.").

Preventing sellers and listing agents from setting buyer-broker commissions would promote greater price competition and innovation in the market for brokers' services. If buyers set the compensation for their own brokers directly, some buyer brokers might choose to offer flat fees or hourly rates in lieu of percentage commissions, since the amount of time and effort required by a buyer broker has a weak correlation, if any, to the ultimate sales price of the house. And most, if not all, buyers would likely prefer a fee structure that does not reward their broker for helping them to pay *more* for a home.

A change that makes it the buyer's responsibility to negotiate broker commissions directly with her buyer broker would not force buyers to pay those commissions out of pocket. While some buyers might choose to pay their buyer brokers out of pocket, other buyers might request in an offer that the seller pay a specified amount to the buyer broker from the proceeds of the home sale. Thus, the current practice could continue, where the seller factors the commissions into the offer the seller is willing to accept. If a buyer requests in an offer that the seller pay her buyer broker from the proceeds of the home sale, it would be straightforward for a seller to compare offers that include a request for the seller to pay the buyer's broker (e.g., an offer to pay $700,000 for a home with the seller paying $14,000 to the buyer's broker, resulting in a net price of $686,000)[16] with offers that do not include such a request (e.g., an offer to pay $680,000 for the home and no payment to the buyer broker). A seller only has to compare net dollar amounts. This type of "conditional" offer is already permitted under federal government lending programs. Those programs do not require buyers to come up with additional funds at

---

[16] The average home price in MLS PIN in 2022 was $696,318. *See Annual Report on the MLS PIN Housing Market*, MLS PIN (2022), at 4, https://files.constantcontact.com/5ccaefd8001/7cf2c37f-76df-47a3-b48f-756bb529d3ee.pdf?rdr=true.

closing in order to compensate their brokers in these types of "conditional" offers. Buyers therefore would not need to come up with additional funds at closing in order to compensate their brokers. Instead, they and other buyers would benefit from increased competition between buyer brokers.

Unlike the proposed settlement, a rule removing sellers and their brokers from the determination of buyer-broker compensation would help address the anticompetitive conduct alleged in the complaint. Buyers have a wide variety of needs and circumstances, and they are best positioned to assess the quality, services, price, and value that a particular buyer broker offers to them. Such relief would likely increase competition for buyer-broker services—the competition Plaintiffs allege has been broken by the Rule—to the benefit of home sellers and buyers alike.

### D. The Proposed Settlement Merits Heightened Scrutiny Because Class Members Cannot Opt Out and Are Not Guaranteed Any Monetary Relief

Careful judicial scrutiny of the proposed settlement is particularly important in this case because Plaintiffs intend to seek class certification under Rules 23(b)(1) and 23(b)(2). A Rule 23(b)(1) settlement is appropriate when individual actions would create the risk of establishing "incompatible standards of conduct for the party opposing the class." *See* Fed. R. Civ. P. 23(b)(1)(A). A Rule 23(b)(2) settlement provides collective relief for the class when monetary damages are "incidental" to the injunctive relief. *Savage v. Springfield*, 2022 WL 2758475, at *14-15 (D. Mass. July 14, 2022) (citing *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 360, 367 (2011)). Unlike Rule 23(b)(3), neither provision guarantees class members receive the ability to opt out, and the Settling Parties do not propose such a right here. Yet the settlement would release all their claims against MLS PIN "relating in any way to any conduct alleged or that could have been alleged in and that arise from the factual predicate of the Action." Dkt. 222 at

12. Where class members have no ability to opt out, courts have repeatedly rejected such broad releases "in exchange for worthless injunctive relief." *Koby v. ARS Nat'l Servs.*, 846 F.3d 1071, 1081 (9th Cir. 2017).[17]

Careful evaluation of the true value of the injunction to the class—which Plaintiffs' counsel has not attempted to estimate in proposing its fee award—is particularly important here because the settlement proposal does not guarantee that the class members will *ever* receive monetary relief. The Settling Parties originally proposed creating a "Litigation Fund" for what remained of the $3 million settlement after Plaintiffs' counsel was allocated $900,000, a small fee was paid to the named Plaintiffs, and class notices were sent. They have now restyled it as a "Settlement Fund," but there is still no guarantee how much—if any—of the fund will actually go to the injured class members, nor when the class would be paid. During the initial hearing on the preliminary settlement, Plaintiffs' counsel suggested that the amount of money to each class member ($3–$5) was too small to feasibly distribute. *See* Dkt. 213, Tr. 11 (Aug. 9, 2023).

Even if class members stand to receive only $3-$5,[18] similar amounts have been distributed to class members in other cases. *See, e.g.*, *O'Hara v. Diageo North America*, No. 15-cv-14139 (D. Mass.), Dkt. 148-1 at Exhibit 2a (class action cash award of $0.50 per six-pack up

---

[17] Plaintiffs' counsel has not explained how certification under Rule 23(b)(1) could comport with *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 864 (1999), and no circuit has allowed a release of individual damages under Rule 23(b)(2) since *Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011). *See, e.g.*, *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 329-30 (3d Cir. 2019); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 234 (2d Cir. 2016).

[18] Plaintiffs' counsel has not offered a detailed accounting of how much of the $3 million might ultimately be distributed to class members, or how much distribution of funds would cost. Counsel's back-of-the-envelope math appears to assume class counsel is awarded 30% of the $3 million (i.e., $900,000 for attorneys' fees), expense reimbursements are $200,000, claims administration costs are $250,000, and named plaintiffs are awarded $7,500, leaving a remaining balance of $1,642,500. With an estimated 280,000 putative class members (*see* Dkt. 268 at ¶ 8), the per-class-member distribution appears to be about $5.87 before reasonable distribution costs.

to $10.00 per household without proof of purchase, and $0.50 per six-pack up to $20.00 per household with proof of purchase); Dkt. 85-2 at 3 ("During the Class Period, Diageo sold 471,237 cases to its distributors in Massachusetts.").

More to the point, however, if the Settlement Fund is intended to "hold" MLS PIN's monetary settlement so it can be distributed more efficiently with subsequent settlements, there is no reason not to say *now* how much of those funds—which are simply sitting in an account until the litigation has concluded—will go to the class members. As it stands, Plaintiffs' counsel has not committed to distribute any portion of the $3 million to class members. Without any such commitment, Plaintiffs' counsel could seek, after deductions for costs and expenses, the remaining *85 percent* of the $3 million settlement for attorneys' fees.[19]

Under those circumstances, it is doubtful whether Plaintiffs' counsel's $900,000 fee request is properly characterized as 30% of the $3 million MLS PIN settlement. The unlikelihood that the proposed injunction will lower broker commissions further calls into question whether the proposed settlement is fair and reasonable for the class. *See Coutin v. Young & Rubicam P.R.*, 124 F.3d 331, 338 (1st Cir. 1997) ("[T]he Supreme Court has identified results obtained as a preeminent consideration in the fee-adjustment process.") (citing *Hensley v. Eckerhart*, 461 U.S. 424, 432, 440 (1983)).

## IV.   CONCLUSION

For the foregoing reasons, this Court should deny preliminary approval of the proposed settlement in this action.

Dated: February 15, 2024                         Respectfully submitted,

---

[19] $3 million - $200,000 of incurred costs and expenses - $250,000 for claims notices - $7,500 to class representatives = $2.54 million. $2.54 million / $3 million = 85%.

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

MICHAEL B. KADES
*Deputy Assistant Attorney General*

HETAL J. DOSHI
*Deputy Assistant Attorney General*

MIRIAM R. VISHIO
*Deputy Director of Civil Enforcement*

MARKUS A. BRAZILL
*Counsel to the Assistant Attorney General*

DANIEL GUARNERA
*Chief, Civil Conduct Task Force*

TIMOTHY LONGMAN
*Acting Assistant Chief, Civil Conduct Task Force*

JESSICA N. LEAL
JACK LERNER
JOHN SULLIVAN
RACHEL L. ZWOLINSKI
*Trial Attorneys*

*/s/ Jessica N. Leal*
JESSICA N. LEAL (CA Bar No. 267232)

U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Telephone: (202) 598-2221
Email: jessica.leal@usdoj.gov

*Counsel for the United States of America*

## **<u>Certificate of Service</u>**

I hereby certify that the foregoing document, which was filed with the Court through the

CM/ECF system, will be sent electronically to all registered participants.


Dated: February 15, 2024                         *<u>/s/ Jessica N. Leal</u>*
                                                 JESSICA N. LEAL

**Appendix A**

**Language of Current MLS PIN Rules v. Proposed Settlement Comparison**

- First, the revised Rule states that the seller, not the listing broker, makes any offer of cooperative compensation, and an offer of compensation to the buyer broker may be 0¢, whereas before the offer had to be at least 1¢. *See* Dkt. 222 at 58 (Ex. 3a, "Change #2").

| *CURRENTLY IN* Section 1.0(c) | *PROPOSED CHANGES IN* Section 1.0(c) |
|---|---|
| (c)  ACCEPTANCE OF LISTINGS. Except as specifically set forth in the next sentence of this Section 1.0(c), the Service will accept for Filing only those Listings that make it possible for the Listing Broker to offer cooperation, with accompanying compensation, to Cooperating Brokers, as and in the manner provided for in Article V below. Notwithstanding the foregoing, the Service will accept for Filing Listings of properties for lease or rent that make it possible for the Listing Broker to offer cooperation to Cooperating Brokers, even if those Listings do not offer accompanying compensation. | (c)  ACCEPTANCE OF LISTINGS. ~~Except as specifically set forth in the next sentence of this Section 1.0(c), t~~The Service will accept for Filing only those Listings that make it possible for the Listing Broker to offer cooperation, ~~with accompanying compensation,~~ to Cooperating Brokers~~, as and in the manner provided for in Article V below~~.  In the context of this Section 1.0(c) and of Section 5.0 below, "cooperation" shall be defined as the ability of a Cooperating Broker to assist its client or customer in the purchase, lease, or rental of a Listed Property. ~~Notwithstanding the foregoing, the Service will accept for Filing Listings of properties for lease or rent that make it possible for the Listing Broker to offer cooperation to Cooperating Brokers, even if those Listings do not offer accompanying compensation.~~ |
| *CURRENTLY IN* Section 5.0 | *PROPOSED CHANGES IN* Section 5.0 |
| SECTION 5.0 COOPERATIVE COMPENSATION SPECIFIED ON EACH LISTING: Except only for Listings of properties offered for lease or rental, for which the Listing Broker (as provided in Section 1.0(c) above) is not obligated to offer compensation to other Participants for their services as Cooperating Brokers, a Listing Broker shall specify, on each Listing Filed with the Service, the compensation offered to other Participants for their services as Cooperating Brokers in the sale, lease or rental of the Listed Property. Such offers shall be unconditional, except that entitlement to compensation shall be conditioned on the Cooperating Broker's performance as the procuring cause of the sale, lease or rental.

…

Note 1:   In Filing a Listing with the Service, a Participant is deemed to be making blanket unilateral offers of compensation to the other Participants in the Service. The Participant therefore shall specify on each Listing Filed with the Service the compensation being offered to the other Participants, as a Cooperating Broker has the right to know, prior to initiating any | SECTION 5.0  COOPERATIVE COMPENSATION SPECIFIED ON EACH LISTING: ~~Except only for Listings of properties offered for lease or rental, for which the Listing Broker (as provided in Section 1.0(c) above) is not obligated to offer compensation to other Participants for their services as Cooperating Brokers, a~~The Listing Broker shall specify, on each Listing Filed with the Service, ~~the~~ any compensation offered by the Seller to other Participants for their services as Cooperating Brokers in the sale, lease or rental of the Listed Property. Such offers shall be unconditional, except that entitlement to compensation shall be conditioned on the Cooperating Broker's performance as the procuring cause of the sale, lease or rental.

…

Note 1:   ~~In Filing a Listing with the Service, a Participant is deemed to be making blanket unilateral offers of compensation to the other Participants in the Service. The Participant therefore shall specify on each Listing Filed with the Service the compensation being offered to the other Participants, as a Cooperating Broker has the right to know, prior to initiating any sales effort, what its compensation might be for that~~ |

| sales effort, what its compensation might be for that effort.<br><br>The Listing Broker has the right to determine the amount of compensation to be offered to a Cooperating Broker. The compensation offered by a Listing Broker to a subagent, to a buyer's agent or to any other appropriately licensed facilitator in the process of selling a Listed Property, whether or not the facilitator is acting in an agency capacity, may,<br>but need not be, the same. | effort. Subject to the second paragraph of Section 1.0(c) above, the Listing Broker must obtain the Seller's prior authorization (1) for the Seller to offer compensation with respect to a Listing, and (2) for any amount of compensation to be offered by the Seller with respect to a Listing.<br><br>The Listing Broker has the right to determine the amount of compensation to be offered to a Cooperating Broker. The compensation offered by a Listing Broker to a subagent, to a buyer's agent or to any other appropriately licensed facilitator in the process of selling a Listed Property, whether or not the facilitator is acting in an agency capacity, may, but need not be, the same. |
|---|---|

- Second, the revised Rule states that buyer-broker commission offers are negotiable. *See* Dkt. 222 at 59-60 (Ex. 3a, "Change #2"). But MLS PIN's Rule never prohibited the negotiation of buyer-broker commission offers (*see* Dkt. 38 at 17-18), as Plaintiffs recognize in their complaint (*see* Dkt. 150 at ¶ 95).

| *CURRENTLY IN* Section 5.0 | *PROPOSED CHANGES IN* Section 5.0 |
|---|---|
| A Listing Broker's obligation to compensate any Cooperating Broker as the procuring cause of a sale, lease or rental may be excused only by agreement between the Listing Broker and the Cooperating Broker or by determination through arbitration or other legal process. Notwithstanding any agreement between the Listing Broker and the Seller of a Listed Property with respect to the compensation of a Cooperating Broker for the sale, lease or rental of the Listed Property, the ultimate responsibility and liability for compensating the Cooperating Broker shall remain with the Listing<br>Broker. If a Listing Broker for a property offered for lease or rental elects to offer compensation to other Participants for their services as Cooperating Brokers, that Listing Broker is subject to the same requirements regarding cooperative compensation hereunder as a Listing Broker for a property offered for sale. | A Listing Broker's obligation to compensate any Cooperating Broker as the procuring cause of a sale, lease or rental may be excused only by agreement between the Listing Broker and the Cooperating Broker or by determination through arbitration or other legal process. Notwithstanding any agreement between the Listing Broker and the Seller of a Listed Property with respect to the compensation of a Cooperating Broker for the sale, lease or rental of the Listed Property, the ultimate responsibility and liability for compensating the Cooperating Broker shall remain with the Listing Broker. If a Listing Broker for a property offered for lease or rental elects to offer compensation to other Participants for their services as Cooperating Brokers, that Listing Broker is subject to the same requirements regarding cooperative compensation hereunder as a Listing Broker for a property offered for sale. If a Listing does not contain such an offer of compensation, the Cooperating Broker may request compensation from the Seller in lieu of requesting from the prospective purchaser all or a portion of any compensation to which the Cooperating Broker and prospective purchaser may have agreed for the Cooperating Broker's services to that prospective purchaser.  The Service does not require the Seller to accede to such a request. |
| *CURRENTLY IN* Section 5.0 | *PROPOSED CHANGES IN* Section 5.0 |
| Note 1: … Nothing in Section 1.0 of Article I above or in this Article V shall preclude a Listing Broker from | Note 1: … Subject to the provisions set forth in the third paragraph of Section 1.0(c) above, nNothing in |

| | |
|---|---|
| offering a Participant compensation different from the compensation indicated on any Listing Filed with the Service, provided that (1) the Listing Broker informs the Participant in writing of such proposed change in compensation in advance of the Participant's producing an offer to purchase or, in the case of an Auction Listing, in advance of the participant's registering a prospective bidder for participation in the Auction, and (2) the change in the listed compensation is not the result of any agreement or other cooperative activity between the Listing Broker and any one or more of the other Participants or Subscribers. Any superseding offer of compensation must be expressed in the same manner that the original offer of compensation was required to be expressed under this Note 1. | ~~Section 1.0 of Article I above or~~ in this Section 5.0 ~~Article V~~ shall preclude a Seller Listing Broker from offering a Participant compensation different from the compensation indicated on any Listing Filed with the Service, provided that (1) the Listing Broker informs the Participant in writing of such proposed change in compensation (a) in advance of the Participant's producing an offer to purchase, ~~or,~~ (b) in the case of an Auction Listing, in advance of the Participant's registering a prospective bidder for participation in the Auction, provided, however, that in either case the Service does not prohibit the Participants, the Seller, and the prospective purchaser, following the production of an offer to purchase, from negotiating and agreeing upon some compensation different from the compensation indicated on the Listing Filed with the Service; and (2) the change in the listed compensation is not the result of any agreement ~~or other cooperative activity~~ between the Listing Broker and any one or more of the other Participants or Subscribers. Any superseding offer of compensation must be expressed in the same of compensation was required to be expressed under this Note 1. |
| … | … |
| Note 2: A Listing Broker, from time to time, may adjust (i) the compensation offered to all other Participants for their services as Cooperating Brokers with respect to any Listing and/or (ii) anything of value that may be offered to other Participants for such services in addition to the compensation. Any such adjustment shall be effected by Filing with the Service a notice of such adjusted compensation and/or other adjusted offering. The notice of adjustment shall be Filed with the Service in advance of the production of any offer to purchase the Listed Property so that all Participants can be advised of such adjustment or adjustments through the Service Compilation. The adjusted compensation and/or other adjusted offering shall be effective from and after the time at which the notice of adjustment is Filed with the Service. | Note 2: If the Seller elects to ~~A Listing Broker, from time to time, may~~ adjust (i) the compensation offered to all other Participants for their services as Cooperating Brokers with respect to any Listing and/or (ii) anything of value that may be offered to other Participants for such services in addition to the compensation. ~~A, a~~ny such adjustment shall be effected by the Listing Broker's Filing with the Service a notice of such adjusted compensation and/or other adjusted offering. The notice of adjustment shall be Filed with the Service in advance of the production of any offer to purchase the Listed Property so that all Participants and prospective purchasers can be advised of such adjustment or adjustments through the Service Compilation, provided, however, that the Service does not prohibit a Listing Broker, a Cooperating Broker, a Seller, and a prospective purchaser, following the production of an offer to purchase, from negotiating and agreeing upon some compensation different from the compensation indicated on the Listing Filed with the Service. The adjusted compensation and/or other adjusted offering shall b at which the notice of adjustment is Filed with the Service. |
| ***CURRENTLY IN* Section 13.0** | ***PROPOSED CHANGES IN* Section 13.0** |
| **Listing Agreement -** Shall mean a signed written agreement between a Seller and a broker which constitutes either an Exclusive Agency, an Exclusive Right To Sell, an Exclusive Right to Sell at Auction, an Exclusive Right To Sell With Dual Rate of Commission, an Exclusive Right To Sell With Named | **Listing Agreement -** Shall mean a signed written agreement between a Seller and a broker which constitutes either an Exclusive Agency, an Exclusive Right To Sell, an Exclusive Right to Sell at Auction, an Exclusive Right To Sell With Dual Rate of Commission, an Exclusive Right To Sell With Named |

| | |
|---|---|
| Exclusion, an Exclusive Right To Sell With Variable Rate Of Commission, a Facilitation/Exclusive, a Facilitation/Exclusive Right To Sell Listing, a Facilitation/Exclusive Right To Sell With Dual Rate of Commission, a Facilitation/Exclusive Right To Sell With Named Exclusion, a Facilitation/Exclusive Right To Sell With Variable Rate Of Commission or an Exclusive Right to Rent. A Listing Agreement must include the Seller's written authorization to the Listing Broker to submit the Listing Agreement to the Service and to File the Listing at such time and upon satisfaction of such conditions as shall be specified therein. | Exclusion, an Exclusive Right To Sell With Variable Rate Of Commission, a Facilitation/Exclusive, a Facilitation/Exclusive Right To Sell Listing, a Facilitation/Exclusive Right To Sell With Dual Rate of Commission, a Facilitation/Exclusive Right To Sell With Named Exclusion, a Facilitation/Exclusive Right To Sell With Variable Rate Of Commission or an Exclusive Right to Rent. A Listing Agreement must include (i) the Seller's written authorization to the Listing Broker to submit the Listing Agreement to the Service and to File the Listing at such time and upon satisfaction of such conditions as shall be specified therein; (ii) all of the required notifications specified in the second paragraph of Section 1.0(c) of these Rules and Regulations; and (iii) if the Seller elects to offer compensation to Cooperating Brokers, the Seller's written acknowledgment that the Cooperating Broker is an intended third-party beneficiary of the Listing Agreement with the right to enforce the same. |

- Third, the revised Rule requires listing brokers to certify in the MLS platform that they "notified" the seller that an offer of compensation is not required and a buyer broker's request for compensation need not be granted. *See* Dkt. 222 at 58 (Ex. 3a, "Change #1").

| _**CURRENTLY IN**_ Section 1.0(c) | _**PROPOSED CHANGES IN**_ Section 1.0(c) |
|---|---|
| If the Service becomes aware of any proposed Listing or any existing Listing that, in the sole and exclusive determination of the Service, may not comply with all fair housing and other laws and regulations that may be applicable to the sale, lease or rental of the proposed or existing Listing, the Service may refuse to accept the proposed Listing for Filing and may remove the existing Listing from the Service Compilation. Any such determination and action by the Service shall be final, and neither the Service, nor any of its employees or agents, shall have an liability or responsibility of any kind, nor shall any Participant or Subscriber have or assert any claim against the Service, or against any of its employees or agents, arising out of (i) such determination or action by the Service, (ii) the Service's failure for any reason to make any determination or take any such action or (iii) the Service's failure for any reason to become aware of a proposed or existing Listing's possible non-compliance with any fair housing or other law or regulation. | The Service will accept for Filing a Listing only if the Listing Broker has first certified, through the appropriate key, code or symbol on the Property Data Form as specified by the Service, that the Listing Broker, before entering into the Listing Agreement with respect to that Listing, notified the Seller (i) that the Service does not require the Seller to offer compensation to Cooperating Brokers, and (ii) that, while a Cooperating Broker may request compensation from the Seller in lieu of requesting from the prospective purchaser all or a portion of any compensation to which the Cooperating Broker and prospective purchaser may agree for the Cooperating Broker's service that prospective purchaser, the Service does not require the Seller to accede to such a request.

If the Service becomes aware of any proposed Listing or any existing Listing that, in the sole and exclusive determination of the Service, may not comply with all fair housing and other laws and regulations that may be applicable to the sale, lease or rental of the proposed or existing Listing, the Service may refuse to accept the proposed Listing for Filing and may remove the existing Listing from the Service Compilation. Any such determination and action by the Service shall be final, and neither the Service, nor any of its employees or agents, shall have an liability or responsibility of any |

| | kind, nor shall any Participant or Subscriber have or assert any claim against the Service, or against any of its employees or agents, arising out of (i) such determination or action by the Service, (ii) the Service's failure for any reason to make any such determination or take any such action or (iii) the Service's failure for any reason to become aware of a proposed or existing Listing's possible non-compliance with any fair housing or other law or regulation. |
| --- | --- |

**Appendix B**

**Adoption of Zero-Compensation Buyer-Broker MLS Rules**

- On August 9, 2023, Bright MLS announced updates to its system "allowing users to enter any amount in a listing's cooperative compensation fields, from zero and up." *See Update to Listing Entry Cooperative Compensation Fields*, Bright MLS (Aug. 9, 2023), www.brightmls.com/article/update-to-listing-entry-cooperative-compensation-fields.

- Effective November 14, 2023, "[a]ny amount zero or higher will be allowed in system and in MLS Rules/Regulations" of Stellar MLS. *See* Merri Jo Cowen (Stellar MLS CEO), *The Current MLS Landscape Straight Talk* (Oct. 31, 2023), at 17, https://www.orlandorealtors.org/clientuploads/ORRA-Townhall-Meeting/2023/Merri-Jo-Cowen-MLS-Landscape-for-LSC.pdf.

- As of at least August 1, 2022, First MLS references offers of compensation "*if mentioned* in a listing entered into the FMLS Database." *See* FMLS *Rules and Regulations*, First MLS (Effective Aug. 1st, 2022), at Rule 10.2, https://firstmls.com/wp-content/uploads/2023/01/Rules_And_Regulations_8.1.2022.pdf (emphasis added).

- Revised October 11, 2023, Garden State MLS's Rules and Regulations added: "In the event compensation is not being offered to subagents and/or transaction brokers and/or buyer brokers, specifying "$0" in the applicable field(s)." *See Rules and Regulations of NEWMLS, L.L.C. d/b/a Garden State Multiple Listing Service, L.L.C.*, https://forms.gsmls.com/Rules/RulesRegs.pdf.

- On September 26, 2023, the State-Wide MLS Board of Directors voted to allow listing brokers to input $0 in the cooperative compensation field effective December 1, 2023. *See Compensation Policy Change*, RI Realtors, https://www.rirealtors.org/mls/compensation-policy-change ("Cooperative Compensation will remain a 'mandatory' field in Matrix and if a value greater than 0 is entered, then that offer must be unconditional and paid to the cooperating broker who is the procuring cause, as required by long-standing MLS rules and policies.").

- On October 19, 2023, BeachesMLS announced "the listing entry system will be updated on October 31, 2023 to allow users to enter any amount in a listing's cooperative compensation fields, including zero." *See Cooperative Compensation Rule Change* (Oct. 19, 2023), https://rworld.com/blog/compensation.

- As of at least October 2022, NWMLS Rules and Regulations stated: "The buyer brokerage firm's compensation must be published in each listing and must be expressed as a percentage of the sale price or a flat dollar amount. If the listing does not contain an offer of compensation for the buyer brokerage firm, the buyer and buyer brokerage firm may negotiate for buyer brokerage firm compensation with the seller as part of the buyer's offer to purchase the property." *See Rules and Regulations*, NWMLS (Oct. 2022), https://members.nwmls.com/wp-content/uploads/2022/06/NWMLSRules-1.pdf.

- On October 15, 2023, Arizona Regional MLS announced: "Starting 11/8/2023, the Comp to Buyer/Broker field allows a value of zero (0) or greater." *See FLEXMLS Now Allows Cooperative Compensation To Be Zero*, ARMLS (Oct. 15, 2023), https://armls.com/flexmls-now-allows-cooperative-compensation-to-be-zero (emphasis removed).

- On November 9, 2023, Miami MLS made changes to its rules "to reinforce Participants/Subscribers' ability to engage in transparent negotiations with customers and prospective buyers by allowing Participants/Subscribers to enter ANY amount in a listing's cooperative compensation fields, from $0 and up." *See* Evian De Leon, *Change to Listing Entry Cooperative Compensation Fields*, Miami Realtors (Nov. 13, 2023), https://www.miamirealtors.com/2023/11/13/change-to-listing-entry-cooperative-compensation-fields/.

- Effective January 1, 2024, the Real Estate Board of New York (REBNY) will "require offers of compensation to the buyside broker to originate from the Seller/Owner….Article IV of the UCBA is revised to include the Seller's offer of compensation, *if any*, to the buyside broker." *See 2024 UCBA Changes*, REBNY (Oct. 10, 2023), https://www.rebny.com/articles/2024-ucba-changes/ (emphasis added). "In cases where the seller does not offer compensation to the buyer's broker, the buyer's broker may negotiate their potential compensation from the buyer[.]" *See Decoupling Commissions FAQ*, REBNY (Oct. 10, 2023), https://www.rebny.com/articles/decoupling-commissions-faq/.

- On May 19, 2023, Midwest Real Estate Data stated: "Given that legal environment in the industry, MRED's Board of Managers determined that MRED will test allowing users to start entering $0 or 0% in the compensation field in Private-status listings. Of course, a seller's agent will maintain the option to enter the compensation amount they choose and continue to negotiate compensation with their clients and buyer's brokers." *See Offers of Compensation FAQs*, MRED (May 19, 2023), https://www.mredllc.com/comms/resources/MREDPrivateListingCompensationFAQs.pdf.