UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNIFER NOSALECK, RANDY HIRSCHORN and TRACEY HIRSCHORN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MLS PROPERTY INFORMATION NETWORK, INC., et al.<br><br>Defendants. | No. 1:20-cv-12244-PBS<br><br>CLASS ACTION<br><br>***AMICUS CURIAE* BRIEF OF NORTHWEST MULTIPLE LISTING SERVICE**<br><br>**LEAVE TO FILE GRANTED ON APRIL 4, 2024** |

The antidote to steering is transparency. The Department of Justice's ("DOJ") ill-informed, ill-supported critique of Northwest Multiple Listing Service's ("NWMLS") rules and forms changes fails to acknowledge this. NWMLS submits this *amicus curiae* brief to explain the nature and context of NWMLS's rule changes inaccurately described in DOJ's Statement of Interest filed in this case (the "SOI"). DOJ obscures, or misses altogether, the purpose and impact of NWMLS's changes, which ushered in ahead-of-their-time enhancements to transparency, consumer choice, and opportunities for negotiation. Additionally, DOJ's critique of NWMLS is based on a highly flawed analysis of woefully incomplete data.

## I. Introduction

NWMLS is a not-for-profit Washington corporation owned by the more than 2,200 real estate brokerage firms comprising its membership. (Concurrently filed Declaration of Justin D. Haag ("Haag Dec.") at ¶ 2.) It is an independent multiple listing service, not affiliated with the National Association of Realtors or any state or local association of Realtors. (*Id.*) It provides multiple listing services to approximately 33,000 real estate brokers and appraisers across most of Washington State. (*Id.* at ¶ 3.) In addition to multiple listing services, NWMLS creates and

1

publishes transaction forms used to list and sell properties. (*Id*.) Use of NWMLS forms is not required, but the forms are used in most transactions in Washington. (*Id*.)

**II. NWMLS Rules Give Consumers Control of Their Brokers' Compensation.**

Prior to 2019, almost every MLS in the country, including NWMLS, had a rule requiring listings to include an offer of compensation to a broker representing a buyer. Another ubiquitous rule precluded publication of such offers of compensation by brokers to consumers on their websites – limiting a buyer's ability to determine the compensation the listing firm offered the buyer's broker. Recognizing the need and desire of consumers for greater transparency regarding broker compensation, NWMLS eliminated these rules in October, 2019. (*Id*. at ¶ 4.) DOJ's account of these rule changes is incomplete and inaccurate.

  A. <u>NWMLS's 2019 Rules Revisions Increased Transparency and Eliminated the Potential for "Steering."</u>

Eliminating the mandatory compensation rule meant that sellers, through their listing brokers, were no longer required to offer compensation to the buyer's broker. If a listing did not contain an offer of compensation, the revised rule allowed the buyer and the buyer's broker, as part of the buyer's offer, to negotiate for compensation for the buyer's broker. (*Id*.) The change enabled greater flexibility and choice for sellers when listing a property and gave buyers and buyers' brokers a vehicle for negotiating for compensation when making an offer to purchase. (*Id*.)

Eliminating the restriction on publishing offers of compensation meant that offers of compensation to buyers' brokers were widely available to the public on NWMLS's member firms' and brokers' websites and also available through listings provided to consumers by brokers via NWMLS's systems. (*Id*.) The SOI lacks any reference to this NWMLS rule change.

While DOJ claims to be concerned about brokers' "steering" of buyers to higher commission listings, it ignores entirely NWMLS's rule change that made information about sellers' offers readily available to consumers. DOJ invokes consumers' access to real estate information when it serves DOJ's rhetorical purposes (*see, e.g.*, Dkt. 290 at 3-4 (noting the popularity of real estate sites like Redfin and Zillow)), and yet it ignores NWMLS's concrete actions putting compensation information directly into the hands of consumers.

Notably, DOJ, at one time, agreed with the importance of transparency for consumers and endorsed NWMLS's rule changes. In a November 2020 proposed settlement with the National Association of Realtors, DOJ required "MLSs to repeal any Rule that prohibits, discourages, or recommends against an MLS or MLS Participant publishing or displaying to consumers any MLS database field specifying compensation offered to other MLS Participants." *United States v. Nat'l Ass'n of Realtors*, No. 20-cv-3356 (D.D.C. 2020), Dkt. 2-1 ([Proposed] Final Judgment).[1] DOJ's apparent change of heart in its SOI in this case is striking.

### B. The 2022 NWMLS Rule Revisions "De-Coupled" Broker Compensation and Created Additional Opportunities for Negotiation.

Following the 2019 changes, NWMLS continued analyzing potential changes to its rules and forms regarding broker compensation. In October of 2022, NWMLS revised its rules and forms to "de-couple" broker compensation, change the seller's unilateral offer of compensation

---

[1] DOJ's press release similarly supported such transparency. *See* Press Release, DOJ, Justice Department Files Antitrust Case and Simultaneous Settlement Requiring National Association of Realtors to Repeal and Modify Certain Anticompetitive Rules (Nov. 19, 2020), https://www.justice.gov/opa/pr/justice-department-files-antitrust-case-and-simultaneous-settlement-requiring-national ("'Buying a home is one of life's biggest and most important financial decisions,' said Assistant Attorney General Makan Delrahim of the Justice Department's Antitrust Division. 'Home buyers and sellers should be aware of all the broker fees they are paying. Today's settlement prevents traditional brokers from impeding competition – including by internet-based methods of home buying and selling – by providing greater transparency to consumers about broker fees. This will increase price competition among brokers and lead to better quality of services for American home buyers and sellers.'").

to a bilateral agreement between the parties, ensure transparency of compensation for buyers, and create additional opportunities for both sellers and buyers to negotiate broker compensation:

- The listing agreement clearly separates the seller's compensation of the listing firm from any compensation the seller might choose to offer to the buyer's broker. (Haag. Dec. at ¶ 5.)
- Any compensation offered to the buyer's broker is determined and offered solely by the seller – rather than "commission sharing" between the brokerage firms. Any offer of compensation from the seller to a buyer's broker was converted by the revisions from a unilateral offer, accepted by performance by the buyer's broker, into a bilateral contract. (*Id.*)
- Buyer broker compensation is paid as offered in the listing if accepted by the *buyer* on behalf of the broker in the purchase and sale agreement, or as modified by the parties in the purchase and sale agreement. (*Id.*)
- Buyer broker compensation is a term prominently displayed on the first page of the purchase and sale agreement, to be negotiated by the buyer and seller like any other contract term such as the purchase price. NWMLS also prepared an addendum to the purchase and sale agreement giving the parties various options for negotiating any buyer broker compensation. (*Id.*)
- NWMLS revised its buyer representation agreement to include alternatives for buyers and their brokers for compensation that depend on the terms of the listing. (*Id.*)

DOJ passingly describes these 2022 rule changes, relegating the discussion to a footnote, and questions the authenticity of NWMLS's stated objectives for the changes. (*See* Dkt. 290 at

16 (labeling NWMLS's stated objective of ensuring understanding, discussion, and negotiation of compensation as merely a "purported" purpose of the changes).) The suggestion that NWMLS, which invests substantial resources in development, implementation, training, and enforcement of its rules and forms (Haag. Dec. at ¶ 3), engaged in performative policy change is unfounded and incorrect.

        C.      <u>NWMLS Supported Changes in Washington Law That Complement Its Rule and Form Revisions</u>.

NWMLS supported amendment of Washington's real estate agency law (the "Agency Law") effective January 1, 2024, to require brokers to enter written contracts to represent buyers, in addition to sellers. (*Id*. at ¶ 6.) All such contracts must comprehensively address the brokers' compensation and the scope of representation. (*Id*.) The amended Agency Law also requires written disclosure of any terms of compensation offered by a party or a real estate firm to a real estate firm representing another party, to further ensure transparency. (*Id*.)

NWMLS's 2019 changes and the 2022 changes, together with the revised Agency Law, have created a new market landscape where buyers agree how to compensate their own broker from the beginning of their relationship, and buyers can then negotiate with the seller to help cover that cost as part of the purchase. (*Id*. at ¶ 7.) Likewise, sellers decide how much to compensate their broker and also decide how much, if any, compensation to offer the buyer to pay the buyer's broker. (*Id*.) In addition, all of NWMLS's listing agreements and buyer representation agreement forms make clear that broker compensation is negotiable and the seller is not required to offer compensation to the buyer's broker. (*Id*.)

5

> D.     <u>DOJ Ignores the Consumer-Empowering Effect of the Revised Rules and Mischaracterizes NWMLS's Messaging</u>.

DOJ's myopia allows for no criteria other than "decreased buyer broker commissions" to evaluate competition and innovation.[2] Transparency and the expansion of informed consumer choice are the guiding principles of NWMLS's revised rules. Providing consumers with more information in turn promotes competition and lowers prices.

In revising the rules, NWMLS created a more open and free market for consumers of brokerage services. NWMLS made no assumptions about how the revised rules might affect pricing, only that more transparency and better-informed consumer decision making was better for the market. (*Id*. at ¶ 8.)[3] NWMLS's revised rules broaden, not limit, consumer choice and therefore do not promote any specific brokerage service model, compensation structure, or compensation amount. They give sellers and buyers, as well as brokers, information and choices to allow the market to operate unimpeded by MLS rules. (*Id*.)

DOJ also cynically mischaracterizes NWMLS's description of its rule changes to eliminate mandatory compensation and permit publication of offers of compensation. In an eight-minute video describing the 2019 rule changes, NWMLS reassured members that their business providing brokerage services will continue as usual. DOJ takes this comment out of context, without acknowledging the balance of the video explaining the purpose and significance of the rule changes for brokers and consumers alike, including greater flexibility, transparency, and innovation. (*Id*. at ¶ 14.) NWMLS also describes in the video associated changes to several

---

[2] Even if DOJ were correct that decreased buyer broker compensation is the one true benchmark for evaluating whether NWMLS's rule changes have increased competition, for the reasons explained in Section III below, DOJ marshals insufficient and incomplete data to support its claim.

[3] In fact, NWMLS does not analyze levels of compensation offered by its members, much less the amounts of compensation actually received by buyers' brokers after negotiations between parties. (Haag Dec. at ¶ 8.)

NWMLS forms, including NWMLS's buyer representation agreement forms, which NWMLS predicts will be used more often. DOJ likewise ignores NWMLS's 2022 training materials that emphasize discussion and negotiation of compensation, various compensation options for brokers and consumers, and enhanced transparency and flexibility. (*Id.*) To the contrary, DOJ positions its discussion of the 2019 training video alongside its discussion of the 2022 changes (*see* Dkt. 290 at 17), creating the inference that NWMLS expected de-coupled compensation to have no benefit for consumers. Those changes, of course, were made *after* the 2019 training video.

DOJ ignores that a de-coupled compensation system, in which buyers agree at the outset of the brokerage relationship how their broker will be compensated, eliminates the concerns for steering and buyers' ability to reduce buyer broker commissions that animate its SOI. In fact, DOJ's preferred system, in which there is literally no opportunity for compensation transparency in the MLS, invites brokers to make deals in secret, creating opportunities for deceptive practices, discrimination, and unfair housing.

Depriving buyers of information also risks harming buyers who are already financially disadvantaged. This especially includes some first-time homebuyers and veteran buyers using VA financing, which precludes the use of loan proceeds to pay brokerage fees. A buyer whose loan proceeds may not be used for brokerage fees and who lacks independent resources to pay their broker therefore relies heavily on offers of buyer broker compensation from sellers. DOJ's preferred system would harm such buyers by requiring them to enter the home buying process lacking critical information, or encourage them to engage in the biggest financial event of their lives without a broker who is tasked with representing the buyer's interests.

**III. DOJ's Data Analysis Is Vague and Flawed.**

DOJ claims that NWMLS's "[r]ecent experience confirms" that the proposed settlement will not limit steering or reduce buyer broker compensation. (Dkt. 290 at 16.) DOJ derives "confirmation" from the Declaration of Erik A. Schmalbach ("Schmalbach Dec."), a data scientist employed by DOJ. (Schmalbach Dec. at ¶ 1.)[4] Schmalbach analyzed data of an undisclosed national real estate firm operating in NWMLS's service area and concludes that, after the rule revisions, buyer broker compensation rates did not decrease faster within NWMLS's service area than they did outside the area. DOJ urges a conclusion that the rule revisions were ineffective because buyer broker compensation did not decrease at a faster rate, but provides no support for such conclusion. DOJ assumes that the compensation rates Schmalbach observed are not in line with the market, but DOJ fails to provide any evidence for this. Further, for reasons never stated, Schmalbach ignores plentiful data that was available to him. Compounding that omission, critical aspects of Schmalbach's methodology are undefined and unexplained.

      A.    <u>Critical Terms Are Undefined, and Modes of Analysis Are Unexplained</u>.

Schmalbach's self-described purpose is to analyze how buyer brokerage compensation was impacted by the revised rules, but fails to define essential terms used throughout his analysis, starting with his term "buyer-broker prices" itself. Does this refer to the amount paid to the buyer broker for its services? Or does it refer to the amount actually retained by the buyer broker after rebates paid to the buyer or other concessions? Or is it the amount offered by the

---

[4] DOJ also cites media stories from Inman and the Consumer Federation of America in support of its data analysis. (*See* Dkt. 290 at 17 n.10.) NWMLS has never provided data to either of those sources (or any other media outlet for that matter), so any purported conclusion concerning compensation rates based on those sources is unreliable and invalid. (Haag Dec. at ¶ 13.)

seller or listing agent? It appears perhaps to be the second (*see, e.g.*, *id.* at ¶ 2 (referring to "prices paid for buyer brokerage")), but Schmalbach is hardly clear even though this is the cornerstone of his analysis.

Further, because Schmalbach never addresses the difference between compensation offered, compensation paid, and compensation received, he does not attempt to account for or even recognize how the difference between the three could impact his analysis. For instance, what if data showed a material difference between compensation offered and compensation paid before and after the rule revisions? The difference could subvert DOJ's conclusion about the impact of the rule revisions.

Schmalbach's analysis excludes certain transactions for no reason. First, he excludes transactions in which the brokerage firm acted as a dual agent, i.e., where the firm represented both the buyer and the seller. (*Id.* at ¶ 8(b).) Schmalbach says that this "limited the set of transactions to those in which the brokerage firm acted only as the buyer broker, which is what is relevant for assessing buyer broker commissions." (*Id.*) That statement provides no explanation for the exclusion. No one would dispute that acting as a buyer broker is relevant for assessing buyer broker compensation. But there is no coherent reason for excluding transactions in which the firm also acted as a listing broker. (This exclusion broadly applies to transactions in which the *firm* represented both sides. In other words, Schmalbach excludes transactions in which different brokers represented the buyer and seller solely because the two brokers were both associated with the firm.) Schmalbach does not say that some aspect of the data made it impossible to distinguish buyer broker compensation and listing broker compensation in a dual

9

agency transaction. Unlike some of his other exclusions, Schmalbach does not offer explanation of the effect of this exclusion on his analysis or conclusions.

Second, Schmalbach excludes "outliers involving extreme values of buyer-broker commission rates or closing prices." (*Id.* at ¶ 8(c).) Schmalbach never explains what constitutes an "extreme value." Further, even though this "extreme value" exclusion also pertains to "closing prices" (which is itself undefined), Schmalbach sheds no light on how an "extreme value" closing price impacts the validity of the analysis of buyer broker compensation. The "outliers" could indeed be relevant to the overall analysis insofar as they may reflect negotiated buyer broker compensation rates. But only DOJ's expert knows for sure.

### B. DOJ's Entire Analysis Is Based on a Single Anonymous Source.

More than 2,200 brokerage firms operate in the NWMLS service area. (Haag Dec. at ¶ 2.) And yet, DOJ's assessment of the rule revisions' impact on buyer broker compensation relies entirely on Schmalbach's analysis of a *single unidentified firm*. This is by DOJ's choice – DOJ had practically unfettered access to the data, resources, and information from NWMLS. Specifically, DOJ had the benefit of full responses from NWMLS to two different Civil Investigative Demands ("CIDs") in 2019 and 2023, as well as its voluntary production of documents in response to an informal request from DOJ in 2022, consistent with NWMLS's on-going offer to cooperate. (*Id.* at ¶¶ 9-11.) In connection with each of these productions, NWMLS engaged in robust and lengthy discussions with DOJ's attorneys and economists. At all times, NWMLS cooperated with DOJ and provided all non-privileged information and documents requested by DOJ. (*Id.*)

But, DOJ chose to use none of this information in connection with its SOI. Moreover, NWMLS understands that DOJ served CIDs to other real estate firms in NWMLS's service area, but chose not to use information from these additional resources. (*See id*. at ¶ 11.) DOJ elected instead to have Schmalbach base his analysis on a single undisclosed firm and thus only a small fraction of the transactions occurring in NWMLS. Assuming that the term "buyer broker price" in the SOI means amount of compensation paid, as opposed to offered or received, the identity of the firm matters immensely. There are significant differences between firms that operate in NWMLS (*id*. at ¶ 12), and those differences impact the data one could expect to see regarding buyer broker compensation. Without knowing which of the following factors are present, no one can lodge a truly informed critique of DOJ's data analysis.

- Broker affiliation: Whether brokers are employees or independent contractors. The former can be tightly controlled by firmwide policy; the latter cannot.
- Central national ownership vs. franchise: Centrally owned national firms can establish nationwide policies and uniform pricing modes, whereas franchisors are extremely limited in the degree of control they exercise over franchisees.
- Differing compensation models: Firms offer consumers a variety of compensation models, including rebates (where a buyer is rebated back a portion of the firm's compensation), flat fees (in lieu of a percentage-of-sale compensation formula), a la carte services (where a consumer can choose from a menu of brokerage services with an associated cost structure), or a hybrid of any of the above.

- <u>Differing pricing models</u>: Some firms negotiate prices for buyer brokerage services with buyers, while others generally accept the compensation offered by the seller or listing firm.

Without knowing any of these attributes applicable to DOJ's data source, analysis of Schmalbach's report is impossible.

      C.      <u>DOJ's Data Analysis Covers Too Short a Period of Time.</u>

Despite having data from the anonymous real estate firm dating back to January of 2016, Schmalbach uses only a fraction of that data for his analysis of "difference-in-differences" of buyer broker compensation. The period subject to Schmalbach's analysis begins on January 1, 2020, and ends sometime in late 2023.[5] Schmalbach compared buyer broker compensation between January 1, 2020, and October 1, 2022 (which he defines as "before") to buyer broker compensation in transactions on or after October 1, 2022 (which he defines as "after"). Schmalbach disregarded four years of data between January of 2016, and January of 2020, without explanation.

Additionally, Schmalbach's "after" sample is too small to inform any reliable analysis. As described above, NWMLS's forms and rules were revised in October of 2022, to de-couple buyer broker compensation from listing-broker compensation. Schmalbach's definition of "before" and "after" treats that date as a clear line between the two sets of rules and practices. It is not. Rather, many of the transactions that closed in the 30 to 90 days after the changes became

---

[5] The cutoff date of data analyzed by DOJ is unclear. Schmalbach states that he received an initial data set covering transactions between January 2016 and November 2023. (Schmalbach Dec. at ¶ 4.) He then reports that "someone" (he does not say who) told him that a different data set, which DOJ received on December 28, 2023, is "analogous" to the initial data set and that it "cover[s] a longer time period." (*Id.*) He does not state what that longer time period is. The date range is unknown.

12

effective on October 3, 2022, would have been based on contracts entered prior to October 3, 2022, meaning the transactions were governed by the "old" rules and forms. It would have taken at least two months for a significant volume of transactions under the new forms to close, meaning that there is less than a year of actual comparison data in the set of transactions Schmalbach refers to as "after." Given the dynamic nature of NWMLS, this is far too small a period to yield worthwhile analysis. This timeframe also coincides with a period of low transaction volume (Haag Dec. at ¶ 12), rendering the data analysis even less relevant. Moreover, the notion that the residential real estate brokerage industry "turns on a dime" and reacts to new rules and forms immediately is almost silly.

**IV. Conclusion**

NWMLS's rules and forms revisions deliver a platform that provides consumers with transparency, choice, and the opportunity to negotiate. NWMLS's rules and forms do not favor any particular business or pricing model and accordingly support brokerage firm innovation. Unfortunately, DOJ demands immediate impact from NWMLS' changes, and then using limited data from a single brokerage firm in a very short time period, DOJ declares NWMLS's changes to be ineffective. Evolution takes time. As the Consumer Federation of America observed regarding the recent settlement by the National Association of Realtors of claims similar to this case, the impact of significant rule changes takes time, "perhaps several years," to be processed, but over time, innovation of compensation models and a more transparent marketplace will greatly benefit consumers. *See* Press Release, Consumer Federation of America, CFA Comment on the Settlement of Major Lawsuits by the National Association of Realtors (Mar. 19, 2024), https://consumerfed.org/press_release/cfa-comment-on-the-settlement-of-major-lawsuits-by-the-

national-association-of-realtors/. One of the plaintiffs' lawyers involved in that settlement agrees that change will not be immediate, stating this week that "it's going to take some time for the market to shift after the settlement and that's to be expected." Andrea Brambila, *Moehrl attorney: Market shift after NAR settlement 'will take time,'* Inman (Mar. 25, 2024), https://www.inman.com/2024/03/25/moehrl-attorney-market-shift-after-nar-settlement-will-take-time/.

NWMLS's changes are significant advancements for a transparent and consumer-friendly marketplace. As a dynamic multiple listing service, NWMLS has, and will continue, to take every opportunity to enhance the quality of real estate brokerage services in the Northwest.

Respectfully submitted,

NORTHWEST MULTIPLE LISTING SERVICE,

By its Attorneys,

/s/ Robert Clark Corrente
Robert Clark Corrente (BBO# 544593)
WHELAN CORRENTE & FLANDERS LLP
100 Westminster Street, Suite 710
Providence, RI 02903
Tel. (401) 270-4500
Fax (401) 270-3760
rcorrente@whelancorrente.com

/s/ Christopher R. Osborn
Christopher R. Osborn, Esq. *(Pro Hac Vice Pending)*
Andrew L. Mathews, Esq. *(Pro Hac Vice Pending)*
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA  98101
Tel: (206) 624-0900
chris.osborn@stoel.com

Dated: April 5, 2024            andrew.mathews@stoel.com

00101419.DOCX