**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| JENNIFER NOSALEK, RANDY HIRSCHORN and TRACEY HIRSCHORN, individually and on behalf of all others similarly situated,<br><br>          *Plaintiffs*,<br><br>v.<br><br>MLS PROPERTY INFORMATION NETWORK, INC., ANYWHERE REAL ESTATE INC. (F/K/A REALOGY HOLDINGS CORP.), CENTURY 21 REAL ESTATE LLC, COLDWELL BANKER REAL ESTATE LLC, SOTHEBY'S INTERNATIONAL REALTY AFFILIATES LLC, BETTER HOMES AND GARDENS REAL ESTATE LLC, ERA FRANCHISE SYSTEMS LLC, HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, POLZLER & SCHNEIDER HOLDINGS CORPORATION, INTEGRA ENTERPRISES CORPORATION, RE/MAX OF NEW ENGLAND, INC., RE/MAX INTEGRATED REGIONS, LLC, AND KELLER WILLIAMS REALTY, INC.,<br><br>          *Defendants*. | No. 1:20-cv-12244-PBS<br><br>Leave to File Granted on April 4, 2024 |

**MEMORANDUM OF AMICUS CURIAE**
**COUNCIL OF MULTIPLE LISTING SERVICES IN RESPONSE TO**
**THE STATEMENT OF INTEREST OF THE UNITED STATES**

**TABLE OF CONTENTS**

I.   INTRODUCTION .......................................................................................................... 1

II.  INTEREST OF AMICUS ............................................................................................ 1

III. ARGUMENT ............................................................................................................... 3

    *A.*   *DOJ lacks empirical evidence for its criticism of the Proposed Settlement Policies and for its policy preference.* .......................................................................... *6*

        1.   Timing is everything in evaluating the effects of the NWMLS rule changes. ......... 8

        2.   The Barwick and Barry studies are inapposite to evaluation of the effects of the NWMLS rule changes. ............................................................................................ 9

        3.   The internal DOJ analysis the SOI cites fails to assess the likely effects of the Proposed Settlement Policies. ............................................................................... 10

        4.   Evidence from the Northwest Multiple Listing Service shows the probable positive effects of the rule changes in the Proposed Settlement Policies. ............ 12

    *B.*   *DOJ's policy preference violates principles of the Sherman Act.* .............................. *15*

        1.   Offers of compensation to buyer brokers are lawful. ............................................. 16

        2.   MLSs engage in anticompetitive restraints of trade when unnecessarily prohibiting brokers from engaging in lawful business practices. ......................... 16

        3.   DOJ's policy preference would require MLSs to impose restraints on brokers not necessary to advance MLSs' procompetitive purposes. ................................. 18

    *C.*   *DOJ's policy preference has practical implications for consumers that DOJ does not address.* ................................................................................................................. *18*

IV.  CONCLUSION ............................................................................................................ 23

## I.      INTRODUCTION

The Statement of Interest of the United States (SOI) proposes that the settlement between the parties to this dispute should include "an injunction that *prohibits* offers of buyer-broker compensation by MLS PIN participants."[1] The Council of Multiple Listing Services (CMLS) takes the extraordinary step of filing an amicus curiae brief before this Court to oppose this effort of the Antitrust Division (DOJ) to impose a policy preference on the U.S. residential real estate market that lacks empirical support, conflicts with principles of the Sherman Act, and has negative practical implications for consumers which DOJ has not taken into account.

## II.      INTEREST OF AMICUS

The Council of Multiple Listing Services (CMLS) is an association of over 225 multiple listing services (MLSs) in North America—including Defendant MLS Property Information Network, Inc. (MLS PIN) of Shrewsbury, Massachusetts—committed to high standards of professionalism and performance.[2] CMLS's business-technology partners include the leading technology firms in the residential real estate marketplace.[3] The information in databases of CMLS's MLS members is available to over 1.7 million subscribers (brokers, salespeople, and appraisers) and the home buyers and sellers they represent. Buyers around the country (and the

---

[1] Statement of Interest of the United States 20, ECF No. 290 [hereinafter SOI] (emphasis in original).

[2] Council of Multiple Listing Services, *CMLS Member Organizations as of June 1, 2023*, https://cdn.ymaws.com/members.councilofmls.org/resource/resmgr/cmls_members_6.1.23.pdf [https://perma.cc/W59J-MJ8X] (last visited Mar. 26, 2024).

[3] *Id.*

world) can also access MLS data through online services like Zillow, Redfin, and Homes.com, which share MLS data with millions of American consumers.

MLSs combine information about current listings and past home sales into regional electronic databases that provide *complete*, *accurate*, and *timely* information—creating a real estate information resource of unmatched **transparency**. MLS databases are *complete* in that each MLSs compiles a list of practically every home for sale and previously for sale in the region;[4] *timely* in that each MLS requires that brokers enter and update listings, often within twenty-four hours of any status change;[5] *accurate* in that each MLS has rules imposing penalties on participating brokers who do not put accurate information into the service, creating a powerful incentive to share accurate information.[6] The utility of MLSs and the consumer benefits they provide are the product of deliberate efforts and of data governance rules the MLSs implement and maintain. CMLS leads MLSs to adopt the highest standards of

---

[4] *Cf.* Fed. Trade Comm'n & Dept. of Justice, Competition in the Real Estate Brokerage Industry 10 (Apr. 2007), https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf [https://perma.cc/NH7R-XEX9] (noting that the databases may exclude new construction and for-sale-by-owner properties).

[5] For example, one federal court of appeals has noted that "[t]he near-perfect market information created by [the MLS] is the result of a requirement that members place all listings in the MLS within five days." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006). Since this 2006 case, many MLSs have reduced that five-day period for listings to twenty-four hours or the next business day.

[6] *See, e.g.*, Transcript, What's New in Residential Real Estate Brokerage Competition—An FTC–DOJ Workshop (June 5, 2018), https://www.ftc.gov/system/files/documents/public_events/1361534/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_1.pdf [https://perma.cc/AQJ7-KSLE] (MLS executive Art Carter explaining that "when a listing enters into our system, we are, as MLSs across this country, very keenly interested in making sure that that listing adheres to a wide variety of rules, and making sure that it fits into the data models that each MLS has set up," and that the MLS "mak[es] sure that the listing has met all of its obligations to the rules and regulations that it is subject to" before entering it into the MLS).

professionalism and offers guides to best practices—including compliance with antitrust and competition laws—for MLSs.[7]

CMLS's interest in the proposed settlement stems from the fact, as DOJ highlights, that "several pending cases" are adjudicating MLSs' adoption of the mandatory-compensation rule of the National Association of REALTORS® or similar policies.[8] The SOI represents the Department of Justice Antitrust Division's policy statement about how it would prefer every residential real estate market in the United States to function. Given that CMLS's members help those real estate markets function, CMLS is duty bound and uniquely situated to advise this Court about operational implications of the Second Amended Stipulation and Settlement Agreement (Proposed Settlement)[9] in this matter—and implications of the national policy preference DOJ expresses in the SOI.[10]

### III.    ARGUMENT

The Court should evaluate the Proposed Settlement without reference to the SOI. "When—as in this case—'the parties negotiated at arm's length and conducted sufficient discovery, the district court must presume the settlement is reasonable.' A party seeking to

---

[7] Council of Multiple Listing Services, *Resources*, https://www.councilofmls.org/resources [https://perma.cc/H78J-4S6E] (last visited March 26, 2024).

[8] *See* SOI 18–19; Notice of Related Action, Attach. 2: Proof of Service, ECF No. 483 (Mar. 5, 2024), *In re Real Estate Comm'n Antitrust Litig.*, MDL No. 3100 (2023) (naming more than twenty related actions as of the date of filing).

[9] Second Am. Stipulation & Settlement Agreement, ECF No. 268-1 [hereinafter Proposed Settlement].

[10] See *Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund*, 582 F.3d 30, 42 (1st Cir. 2009) (holding "impacted non-parties can seek to intervene or otherwise express their views in litigation that may affect their practical interests" and "the fairness hearing required by Rule 23(e)(2) provides just such a mechanism").

overcome such a presumption faces a steep uphill climb."[11] The SOI "does not scale those heights."[12]

The Proposed Settlement includes two key categories of policy change (Proposed Settlement Policies). First, MLS PIN agrees to change its rule for acceptance of listings from participating brokers by requiring them to obtain certifications that their seller clients understand: (a) MLS PIN does not require sellers to offer compensation to buyer brokers; and (b) though buyers may seek compensation from sellers for their buyer brokers in an agreement of purchase, sellers are not required to compensate buyer brokers (Proposed Certification Rule).[13] Second, MLS PIN agrees to change its rule regarding cooperative compensation so that the listing broker need not express any offer of compensation on a listing, and that any offer made comes from the seller and is entirely at the seller's discretion (Proposed Compensation Rule).[14] The SOI attacks these two Proposed Settlement Policies, arguing they would not deliver value to consumers of real estate brokerage services, relying in part on a comparison to similar policies adopted in 2019 and 2022 by the Northwest Multiple Listing Service (NWMLS) in Washington State.[15] The Court should not credit DOJ's arguments because they suffer from three critical flaws:

---

[11] *Cohen v. Brown Univ.*, 16 F.4th 935, 951 (1st Cir. 2021) (citations omitted) (quoting *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 32-33 (1st Cir. 2009); *see also National Ass'n of Chain Drug Stores*, 582 F.3d at 44 (citations omitted) ("[T]he ultimate decision by the judge involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement."); *Durrett v. Housing Auth.*, 896 F.2d 600, 604 (1st Cir.1990) ("[T]he district court's discretion is restrained by 'the clear policy in favor of encouraging settlements . . . .'") (quoting *Metro. Housing Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir.1980)).

[12] *Cohen v. Brown Univ.*, 16 F.4th at 951.

[13] Proposed Settlement, Exhibit 3a, "Change #2: Section 5.0."

[14] Proposed Settlement, Exhibit 3a, "Change #1: Section 1.0(c)."

[15] SOI 16–18.

*First*, the timing of those NWMLS rule changes exposes the inability of DOJ's empirical evidence[16] to evaluate the changes. Instead, data that is or could have been readily available to DOJ show that the NWMLS 2019 rule change caused commission offers in NWMLS to decrease faster than they had in the prior two decades.

*Second*, though DOJ rejects the Proposed Settlement Policies, its own policy preference would undermine the competition-enhancing principles of the Sherman Act. The SOI proposes that MLS PIN should prohibit a wide swath of brokerage business practices—offers of compensation from sellers and brokers to buyer brokers[17]—that are lawful throughout the MLS PIN service area. MLSs have historically faced antitrust litigation when they have adopted restrictions on lawful brokerage practices.

*Third*, DOJ's policy preference will potentially create significant negative effects for tens of thousands of consumer transactions just in the MLS PIN service area, and on millions of transactions in the nationally critical residential real estate industry, because it assumes a smooth transition to the model the SOI proposes among the many thousands of third-party businesses and entities involved in real estate in transactions. DOJ incorrectly predicts a glitchless transition without accounting for the complexity of the real estate transaction (and without citing any sources).[18]

For these reasons, the Court should evaluate the Proposed Settlement based on its merits, not DOJ's unsupported arguments and its incongruous recommendation from a federal antitrust enforcement agency that an MLS impose restrictions which could be held to violate the antitrust laws. The balance of this argument explores each of the three flaws in turn.

---

[16] *See* Decl. of Erik A. Schmalbach, ECF No. 290-1 [hereinafter Schmalbach Decl.].

[17] SOI 20.

[18] SOI 21–22.

A.   **DOJ lacks empirical evidence for its criticism of the Proposed Settlement Policies and for its policy preference.**

An objection to a settlement "must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them."[19] As a preliminary matter, the SOI makes a number of empirical claims that it sources only to the popular media;[20] to blog or podcast posts;[21] to the press releases of lobbying groups;[22] and to pleadings in this case, allegations that the plaintiffs here have not yet proved.[23] None of these "authorities" is evidence on the record in this case (or any other), and the Court should not accept them as evidence.

When DOJ does rely on learned studies and other quantitative evidence to criticize the Proposed Settlement Policies and to advance its own policy preference, it offers three arguably systematic empirical studies: a published paper in an economics journal titled "Conflicts of Interest and Steering in Residential Brokerage (the Barwick study);[24] an unpublished paper entitled "Et Tu, Agent? Commission-Based Steering in Residential Real Estate" (the Barry study);[25] and the "Antitrust Division's own analysis of buyer-broker prices in large

---

[19] *Ponzio v. Pinon*, 87 F.4th 487, 500 (11th Cir. 2023) (quoting Fed. R. Civ. P. 23(e)(5)(A), Advisory Comm.'s Note to 2018 Amend.); *see, e.g.*, *1988 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 521 (4th Cir. 2022) ("The showing necessary to prevent an objection from derailing a settlement will, of course, vary with the strength of the objection itself; frivolous objections may need very little to overcome them, while weightier objections will require more.").

[20] *See, e.g.*, SOI 4 n.1, 17 n.10.

[21] *See, e.g.*, *id.* at 8 n.4, 16, 20 n.15.

[22] *See, e.g.*, *id.* at 4 n.2, 17 n.10.

[23] *See, e.g.*, *id.* at 4 n.1, 13.

[24] Panle Jia Barwick, Parag A. Pathak, & Maisy Wong, *Conflicts of Interest and Steering in Residential Brokerage*, 9 Am. Econ. J.: Applied Econ. 191 (2017), https://doi.org/10.1257/app.20160214 [hereinafter Barwick et al., *Conflicts*].

[25] Jordan M. Barry, Will Fried, & John William Hatfield, *Et Tu, Agent? Commission-Based Steering in Residential Real Estate* (USC Ctr. for L. & Soc. Sci. Rsch. Paper Series, Paper No. 24-7, Jan. 12, 2024), https://ssrn.com/abstract=4596391 [hereinafter Barry et al., *Et Tu*]. Note that the SOI cites the October 9, 2023, version of this paper. SOI 14.

metropolitan areas in NWMLS's region"[26] (the Schmalbach Declaration). These studies, however, fail to assess the likely effects of the Proposed Settlement Policies. Meanwhile, more comprehensive evidence from NWMLS that CMLS's economists have analyzed demonstrates probable positive effects for consumers from the rule changes in the Proposed Settlement Policies.[27]

CMLS offers the report of its economists on the record here in the Declaration of John H. Johnson, IV, and Michael Kheyfets, filed concurrently with this brief. As explained further below, the Johnson/Kheyfets Declaration demonstrates that the Barwick study and Barry study are inapposite to analysis of the Proposed Settlement; and that the internal DOJ study suffers from conceptual and methodological problems and does not provide sufficient information for the Court to evaluate its claims. The empirical study offered on the record in the Johnson/Kheyfets Declaration, by contrast, applies appropriate methods and shows that the NWMLS rule changes have resulted in significant decreases in the compensation offered to buyer brokers in the NWMLS service area, reducing such offers by $1,000 per transaction, on average, since NWMLS adopted the rules.

This Court's analysis of DOJ's concerns will benefit first from consideration of the importance of timing in assessing NWMLS's rule changes.

---

[26] SOI 17 (citing Schmalbach Decl.).

[27] *See* concurrently filed Declaration of John H. Johnson, IV, and Michael Kheyfets [hereinafter Johnson/Kheyfets Decl.].

**1.      Timing is everything in evaluating the effects of the NWMLS rule changes.**

DOJ opposes the Proposed Settlement Policies by focusing its criticism on the effect of rule changes in NWMLS that "mirror the proposed settlement here."[28] The timing of NWMLS's rule changes is important for the Court's understanding of DOJ's argument:

- "In October 2019, NWMLS removed the requirement that a seller make a minimum offer of compensation when listing a property for sale."[29] This NWMLS 2019 rule change closely corresponds to the Proposed Compensation Rule.

- "Then, in October 2022, NWMLS made another rule change, purportedly 'to ensure that the buyer understands the buyer brokerage firm compensation and to create an opportunity for discussion and negotiation.'"[30] This NWMLS 2022 rule change closely corresponds to the Proposed Certification Rule.

The timing is critical because the gravamen of the plaintiffs' claims in this case is that MLS PIN *required* listing brokers to make a non-zero offer of compensation to buyer brokers.[31] The NWMLS 2019 rule change eliminated that requirement for the Seattle-based MLS, while allowing sellers to make offers of compensation if they chose, as would the Proposed Compensation Rule here. The NWMLS 2022 Rule Change required additional efforts from the listing broker to ensure that sellers understand their options, as would the Proposed Certification Rule here.

---

[28] SOI 16.

[29] *Id.*

[30] *Id.*

[31] Second Am. Compl. ¶¶ 36, 69, 72–74, 76–77, 81, 83, 89, 103, ECF No. 150.

2. **The Barwick and Barry studies are inapposite to evaluation of the effects of the NWMLS rule changes.**

Neither the Barwick nor the Barry study examined effects of the NWMLS 2019 and 2022 rule changes. The Barwick study "analyzed the effect of steering on commissions using market data from the Greater Boston Area from 1998 to 2011."[32] The Barry study analyzed data from twenty-two metropolitan areas (including Seattle), "assembled by scraping all active listings on Redfin within a set of specified ZIP codes on a weekly basis between June 12, 2021, and February 3, 2022."[33] Given these time ranges, these studies cannot be used to assess what buyer-broker commission offers were *before* the October 2019 NWMLS rule change or whether those offers declined *after* the rule change.[34] The Barwick study is particularly inapposite to claims about the NWMLS rule changes, as the study did not even evaluate the Washington State market in the context of any rule or policy applicable to the Proposed Settlement.[35]

The SOI refers to the Barry study for the proposition that "the Seattle experience" supposedly suggests that "the minimum commission requirement is not driving sellers' current behavior."[36] However, the Barry study observes only that the data set they compiled reflects relatively few offers of compensation below 2.5%, and the authors there merely theorize that NWMLS's 2019 rule change "*seems* to have had little impact on buyer agent commissions"[37] without analyzing this proposition.[38] As for their observation that Seattle remains like other

---

[32] SOI 13, citing Barwick et al., *Conflicts.*

[33] Barry et al., *Et Tu*, at 24.

[34] Johnson/Kheyfets Decl. ¶¶ 31–32.

[35] Johnson/Kheyfets Decl. ¶ 18.

[36] SOI 17 n.10, citing Barry et al., *Et Tu*, at 82.

[37] Barry et al., *Et Tu*, at 81 (emphasis added).

[38] Johnson/Kheyfets Decl. ¶ 13.

markets in that the bulk of commission offers was at the "going rate,"[39] the very definition the Barry study imposed on the term "going rate" fore-ordained that it would be the largest category of listings.[40]

The Barwick and Barry studies did not assess any change in the NWMLS commission rates before or after the 2019 or 2022 rule changes, and they made no effort to isolate the effects of the NWMLS rule changes. They are therefore neither relevant nor insightful for assessing whether the proposed rule changes here will lead to the outcome (i.e., lower commission rates) that DOJ seeks.

> **3.    The internal DOJ analysis the SOI cites fails to assess the likely effects of the Proposed Settlement Policies.**

As the Johnson/Kheyfets Declaration shows, DOJ's internal analysis suffers from even greater reliability issues than the other studies. First, DOJ's analysis does not disclose several critical pieces of information necessary for the Court to rely on the analysis.[41] It is missing, for example, any data about average prices or commissions; who the single real estate broker was that it used for analysis; how representative that broker's experiences are of brokerage firms generally; which thirty-one other markets DOJ analyzed; or how many transactions were analyzed in any market at any time.[42] These shortcomings make it impossible to assess the

---

[39] Barry et al., *Et Tu*, at 81.

[40] *Id.* at 28. Interestingly, the study defined "going rate" in such a way that all higher-commission listings were grouped with the most-common-commission listings, meaning there could be no such thing as a commission that is *higher* than the going-rate, a counter-intuitive definition for "going rate," and one that might be useful for the Barry et al. study but that yields no information about the effect of the NWMLS rule changes.

[41] *See In re Pharma. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 85–86 (D. Mass. 2007) ("[T]he court may reject testimony for which the data relied upon is flawed or the methodology used is 'internally inconsistent or unreliable.'") (quoting *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 260 (1st Cir.1997)).

[42] Johnson/Kheyfets Decl. ¶ 29.

Schmalbach Declaration's external validity, that is, whether the results "can be used to draw any general conclusions about the effects of the NWMLS policy change, rather than the alleged experience of one particular broker being analyzed in a specific part of Washington."[43] For example, an analysis of all NWMLS listings between January 2016 and November 2023 combined with the Schmalbach Declaration's data restrictions suggests that DOJ's analysis may have included as little as 3% of the NWMLS listings during that period.[44]

Worse, like the Barry study, the empirical evidence that the SOI offers does not compare the situation in Washington State *before* and *after* the NWMLS 2019 rule change. Instead, it compares commission offers in the NWMLS market to other markets only after that change, assuming that the markets are the same for the proposes of analysis, what the analysis refers to as a "difference-in-differences analysis."[45] But the gist of a difference-in-differences analysis is that the analyst treats the NWMLS market as having received a treatment and the other markets as a control.[46] Of course, such an analysis works only if one assumes that the markets are all otherwise the same.[47]

DOJ's analysis indeed assumes all real estate markets are the same, but ample evidence shows that they are not. In fact there is "substantial variation in economic trends in residential

---

[43] Johnson/Kheyfets Decl. ¶ 30.

[44] Johnson/Kheyfets Decl. ¶¶ 42–44, fig. 4 (citing Schmalbach Decl. ¶¶ 2, 8d, 9).

[45] Schmalbach Decl. ¶ 3.

[46] *E.g.*, *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 817 (7th Cir. 2012) (explaining that the expert's difference-in-differences analysis "would compare prices at Northshore's hospitals with prices at a control group of comparable area hospitals not party to the merger but otherwise presumably subject to the same market forces affecting prices in hospitals.").

[47] For example, if you took thirty people of different weights, activity levels, health quality, and age, treated one of them with a diet medication and did not treat the others, you could not be confident that any change in weight in the treatment case was due to the medication as opposed to one of the many other differences among the subjects. *See* Johnson/Kheyfets Decl. ¶¶ 22–23 (further discussing these design matters).

real estate markets across the United States" during the applicable period.[48] For example, the

Seattle housing price index has a markedly different trend line than the national average.[49]

County-level home values changed differently in Seattle than in other markets.[50] And housing

starts in Seattle followed a different trend line than the rest of the country.[51] Consequently,

DOJ's failure to perform a robust difference-in-differences analysis that compares NWMLS

with a proper control market means it cannot isolate the effect of any NWMLS rule change

from any other factors in the residential real estate industry. This flaw renders DOJ's empirical

work unworthy of the Court's reliance.[52]

   In short, the SOI purports to provide empirical evidence to support its claims, but the

Court should credit none of it; all of it is either not empirical evidence at all, chronologically or

geographically inapposite, or methodologically flawed.

### 4.    Evidence from the Northwest Multiple Listing Service shows the probable positive effects of the rule changes in the Proposed Settlement Policies.

   DOJ's choice of the difference-in-differences method is surprising, especially given that

it had data from its single broker from "between January 2016 and November 2023,"[53] and

therefore could have compared the NWMLS data from three years *before* the NWMLS 2019

rule change and with data from four years *after* it. CMLS's economists have looked at a full set

of data—consisting of all listings from NWMLS in Washington and Oregon sold since 2000—

---

[48] *Johnson/Kheyfets Decl.* ¶ 36.

[49] *Id.* ¶ 37, fig. 1.

[50] *Id.* ¶ 38, fig. 2.

[51] *Id.* ¶ 39, fig. 3.

[52] *Massachusetts Mut. Life Ins. v. Residential Funding Co.*, 989 F. Supp. 2d 165, 171 (D. Mass. 2013) ("*Daubert* . . . demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.") (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

[53] Schmalbach Decl. ¶ 4.

to reveal the likely effects of the Proposed Settlement Policies. As CMLS's analysis reveals, those effects are desirable for the plaintiffs here and consumers like them.

First, the Johnson/Kheyfets Declaration demonstrates that cooperative compensation offers have been declining in NWMLS since 2000, but they have declined markedly faster since the NWMLS 2019 Rule Change. "Buyer-broker compensation rates through NWMLS were declining at an average of 0.4% per year from 2000 to 2019. After the 2019 rule change, the decline increased to an average of 1.5% per year."[54] The following figure illustrates the trends.[55]



**Average Buyer-Broker Commission Rate for Residential Properties Sold Through NWMLS, January 2000 – December 2023**

---

[54] Johnson/Kheyfets Decl. ¶ 45.

[55] *Id.* fig. 5.

Second, using an econometric statistical-regression model, the Johnson/Kheyfets Declaration presents an assessment of the effect of both NWMLS rule changes, controlling for a large variety of other variables.[56] The results of this model are statistically significant at the 95% level.[57] Based on the model's results, the NWMLS 2019 rule change has led to a decline in commission offers of 0.118% (e.g., 2.382% instead of 2.500%), and the NWMLS 2022 Rule Change has led to a further decline of 0.021%.[58] These declines are on top of the declines in rates that were already in progress.[59] The data thus support a reasonable estimate that the buyer's broker received an average reduction in commission on the sale of a $750,000 home (the average sale price in NWMLS) of more than $1,000 (e.g., $17,708 instead of $18,750) *as a result of the NWMLS rule changes*.

The more rapid decline in buyer broker commission rates since the NWMLS 2019 rule change offers a reasonable preview of the likely effects of the more significant of the Proposed Settlement Policies in this case, the Proposed Compensation Rule. The regression model prepared by CMLS's economists shows the NWMLS 2019 and 2022 rule changes reduced

---

[56] Johnson/Kheyfets Decl. ¶ 49 (noting that model controls for "(i) property characteristics, such as location, number of bedrooms and bathrooms, square footage, lot size, property type, and property age; (ii) transaction characteristics, such as month of sale, whether the property was sold at auction, a short sale, or was bank-owned, as well as whether the same brokerage represented both buyer and seller; (iii) macroeconomic factors, such as mortgage rates and statewide housing starts; (iv) brokerage/agent-specific factors measuring quality and experience, such as agent's past sales in NWMLS, brokerage firm size, and share of broker's listings successfully sold; and (v) the overall declining trend in compensation of buyer brokers since 2000").

[57] Johnson/Kheyfets Decl. ¶ 51 n.45. *See Jones v. City of Boston*, 752 F.3d 38, 43 (1st Cir. 2014) (A "finding of statistical significance means that the data casts serious doubt on the assumption that the disparity was caused by chance.") (citing David H. Kaye & David A Freedman, *Reference Guide on Statistics, in Reference Manual on Scientific Evidence* 211, 251 (Fed. Jud. Ctr. & Nat'l Rsch. Council of the Nat'l Acads. eds., 3d ed. 2011)) .

[58] Johnson/Kheyfets Decl. ¶ 45 (referring to the reduction in terms of "basis points" which are 1/100th of a percent).

[59] *Id.* ¶ 49 (explaining that the model accounted for the preexisting "declining trend in compensation of buyer brokers").

buyer broker commissions by more than $1,000 on an average transaction in NWMLS. Given the average home price in MLS PIN today is in the same range as those in NWMLS,[60] consumers buying through MLS PIN under the Proposed Settlement Policies are likely to experience similar savings.

**B.      DOJ's policy preference violates principles of the Sherman Act.**

DOJ's policy preference—stated late in the SOI—is that the Court should issue "an injunction that *prohibits* offers of buyer-broker compensation by MLS PIN participants."[61] Such a rule, if an MLS adopted it, would violate the competition-enhancing principles of the Sherman Act, because it would mean that competitors—brokers who participate and operate the MLS—would be agreeing to dictate that competing seller brokers cannot engage in lawful marketing of property.

If MLS PIN were to adopt DOJ's policy preference, it would likely fail a rule-of-reason analysis, the "means for distinguishing between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."[62] Where the burden imposed by the restraint would have "substantial anticompetitive effect," the restraint's proponent must "show a procompetitive rationale for the restraint," but this showing is undermined if "the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."[63] Given the anticompetitive effects of MLSs restraining brokers' lawful business practices, the unquestionable lawfulness of listing brokers and sellers offering to pay buyers' brokers, the uncertain rationale for DOJ's position, and the fact that the

---

[60] *See* SOI 21 n.16.
[61] SOI 20 (emphasis in original).
[62] *Nat'l Collegiate Athletic Assn. v. Alston*, 594 U.S. 69, 96 (2021) (citations and quotations omitted).
[63] *Id.* at 96–97.

SOI's policy proposal is not tailored to achieve the results DOJ seeks, this Court should not adopt DOJ's policy preference as part of any approved settlement in this matter.

### 1. Offers of compensation to buyer brokers are lawful.

As a preliminary matter, offers of compensation between brokers and from sellers to buyers' brokers are lawful in Massachusetts and all other jurisdictions relevant to this suit. DOJ has offered no authority or evidence to support any claim that it is unlawful for listing brokers and sellers to offer compensation to buyer brokers. Moreover, the SOI concedes that sellers may do so during purchase-agreement negotiations if DOJ's policy preference is adopted.[64] A review of the statutes and case law of Massachusetts, Connecticut, Maine, New Hampshire, New York, Rhode Island, and Vermont reveals that these practices are lawful.

### 2. MLSs engage in anticompetitive restraints of trade when unnecessarily prohibiting brokers from engaging in lawful business practices.

MLSs have faced antitrust challenges when they attempt to regulate lawful business practices of brokers that are not closely related to the MLSs' procompetitive business purpose.[65] This is a common thread of antitrust cases involving MLSs that the SOI cites.[66] Associations of competitors, such as MLSs, may adopt policies with anticompetitive effects if necessary for them to achieve their procompetitive purposes.[67] But MLSs that attempt to adopt policies that control lawful broker conduct outside the narrow purposes of the MLS have come

---

[64] SOI 21.

[65] Though the SOI characterizes the "industry" as having a "history of resisting commission competition," SOI 6, that claim unfairly paints all modern MLSs with a brush consisting of cases that are more than fifty years old or represent the practices of a small number of industry actors. *See* SOI 7. Given the number and ubiquity of MLSs, real estate brokers, and the transactions in which they are involved, it is a testament to the professionalism of the industry that such cases have been and are—and will likely continue to be—rare.

[66] *Id. See, e.g.*, Am. Compl. ¶ 29, *United States v. Nat'l Ass'n of Realtors*, No. 05-cv-5140 (N.D. Ill. Oct. 5, 2005) (alluding to alleged suppression of lawful but allegedly disfavored "'referral' business model" as anticompetitive effect of NAR policy).

[67] *Nat'l Collegiate Athletic Assn.*, 594 U.S. at 96.

repeatedly come under antitrust scrutiny. For example, the Fourth Circuit held that class action plaintiffs who purchased brokerage services alleged a plausible Sherman Act section 1 claim where the MLS required, among other things, that its participants maintain a physical office in the area and use only a standard, pre-approved contract form.[68] Similarly, the Sixth Circuit held that the FTC was justified in finding an MLS liable for an FTC Act section 5 violation where the MLS policy reduced display prominence of listings a brokerage obtained via a legal, but disfavored, business model.[69] Likewise, a requirement that MLS participants use only a "standard" type of "For Sale" sign was held a section 1 violation by a federal district court.[70] Federal courts have also found plausible section 1 violations (1) where an MLS adopted a listing policy allegedly making it harder for real estate agents to move from one brokerage firm to another,[71] and (2) where MLS rules allegedly "prohibit[ed] any MLS participant . . . from using the email addresses of other MLS participants . . . in [the] MLS's . . . database" and prohibited "unsolicited electronic mail messages containing job recruitment notices or other advertisements."[72]

    Because of these holdings and from a commitment to the competition policies they embody, CMLS's members take pains to consider the business necessity of MLS rules that

---

[68] *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 289 (4th Cir. 2012). *See also* Brief for the United States as Amicus Curiae in Support of Plaintiffs–Appellees at 12, *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278 (Nos. 11-1538, 11-1539, 11-1540, 11-1541) ("The district court correctly held that Section 1 of the Sherman Act can apply to the challenged CMLS and HHMLS rules limiting price competition among its members and excluding new, aggressive competitors from participating in the MLSs.").

[69] *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 822 (6th Cir. 2011).

[70] *Cantor v. Multiple Listing Serv. of Dutchess Cnty., Inc.*, 568 F. Supp. 424, 430 (S.D.N.Y. 1983).

[71] *Compass, Inc. v. Real Est. Bd. of New York, Inc.*, No. 21-CV-2195 (AJN), 2022 WL 992628, at *2 (S.D.N.Y. Mar. 31, 2022), *reconsideration denied*, No. 21 CIV. 2195 (LGS), 2022 WL 2967566 (S.D.N.Y. July 27, 2022).

[72] *Multiple Listing Serv. of N. Ill., Inc. v. Amerihall of Ill., LLC*, No. 03 C 8934, 2004 WL 1656563, at *1 (N.D. Ill. July 22, 2004).

govern participating brokers and to tailor those rules narrowly to reach no more conduct than reasonably necessary.

### 3. DOJ's policy preference would require MLSs to impose restraints on brokers not necessary to advance MLSs' procompetitive purposes.

DOJ's policy preference is that this Court should impose "an injunction that *prohibits* offers of buyer-broker compensation by MLS PIN participants."[73] Prohibiting offers of compensation from brokers and sellers is a drastic imposition of MLS regulation on legal activities of listing brokers and sellers. DOJ offers no evidence that such a change is necessary to achieve procompetitive purposes. Furthermore, the SOI does not consider ways (perhaps today unimagined by DOJ, MLSs, and even brokers) that listing brokers might use offers of compensation to buyer brokers to spur *greater* price competition.

By contrast, as the analysis above and in the Johnson/Kheyfets Declaration shows, policies that mirror the Proposed Settlement Policies—making compensation optional and under the control and at the discretion of the seller and requiring greater efforts to disclose options to sellers—resulted in *lower* offers of compensation to buyer brokers in NWMLS, the very goal that the plaintiffs here and DOJ purport to be seeking. The Proposed Settlement Policies are thus likely to achieve significant procompetitive benefits without imposing the anticompetitive restraints DOJ requests.

## C. DOJ's policy preference has practical implications for consumers that DOJ does not address.

The residential real estate industry is of critical importance. The SOI's brief treatment of the likely consequences of its policy preference fails, however, to account for the complexity of the industry and for negative potential consequences that economists have identified. Further,

---

[73] SOI 20.

the SOI offers no evidence that DOJ has sought input from third-party industry participants, including mortgage banker associations; appraiser associations; the government-sponsored enterprises (GSEs) Fannie Mae and Freddie Mac, which purchase pools of conforming mortgages from lenders; the Federal Housing Administration (FHA); and the Department of Veterans Affairs (VA).[74] Meanwhile, the Proposed Settlement Policies mirror provisions in effect in Washington state for nearly five years without reports of negative consequences. This Court should prefer the proven track record of the Proposed Settlement Policies to the optimistic imaginaries of DOJ's policy preference.

DOJ would likely agree with CMLS on the importance of the real estate industry. As noted above, DOJ relies on the Barry study for the limited empirical support the SOI offers for its claims about the Proposed Settlement Policies.[75] That study notes the size and significance of the U.S. residential real estate market, the total value of which is in the "tens of trillions of dollars," of which "[m]illions [of units] . . . are sold each year, generating trillions of dollars for sellers."[76] It also notes that "for most Americans, their home is by far their largest asset," and it admits that "[f]ailed sales can be especially difficult for sellers, forcing them to pay mortgages on both their new and old properties, potentially for an extended period of time."[77]

In a single paragraph, however, the SOI blithely waives away any potential negative consequences of its policy preference on this critical industry:

> A change that makes it the buyer's responsibility to negotiate broker commissions directly with her buyer broker would not force buyers to pay those commissions out of pocket. While some buyers might choose to pay their buyer

---

[74] *See* Housing Finance Policy Center, Urban Institute, *Housing Finance at a Glance: A Monthly Chartbook* 8 (June 2023) (noting that Fannie Mae and Freddie Mac were responsible for 43% of the $291 billion in mortgage originations in 2022 Q1 and that FHA and VA accounted for 22.3%).

[75] SOI 13–14.

[76] Barry et al., *Et Tu*, at 8 (citations omitted).

[77] *Id.* (citations omitted).

> brokers out of pocket, other buyers might request in an offer that the seller pay a specified amount to the buyer broker from the proceeds of the home sale. *Thus, the current practice could continue, where the seller factors the commissions into the offer the seller is willing to accept.* If a buyer requests in an offer that the seller pay her buyer broker from the proceeds of the home sale, it would be straightforward for a seller to compare offers that include a request for the seller to pay the buyer's broker . . .  with offers that do not include such a request . . . . A seller only has to compare net dollar amounts. This type of "conditional" offer is already permitted under federal government lending programs. Those programs do not require buyers to come up with additional funds at closing in order to compensate their brokers in these types of "conditional" offers. Buyers therefore would not need to come up with additional funds at closing in order to compensate their brokers. Instead, they and other buyers would benefit from increased competition between buyer brokers.[78]

The paragraph contains a single citation, but not to support any of these claims.[79] Nevertheless, there is reason to believe the scenario DOJ imagines may not come true if DOJ's policy preference prevails. And even if DOJ's expectations are correct, many parties will have to act to make the assertions in this paragraph true. DOJ appears not to have considered the effect of its policy preference on them.

Importantly, DOJ assumes that the seller will pay the buyer's broker as part of the negotiated deal. DOJ offers no evidence for why that will be the case, and other scenarios are possible, and perhaps likely. For example, if a seller receives two offers that are equally financially satisfactory, one where the seller must pay the buyer's broker and one where the seller need not, a seller might choose to go with the "cleaner" or "simpler" offer, just as sellers today may prefer a cash offer to one that is contingent on financing.[80]

---

[78] SOI 21–22 (emphasis added).

[79] SOI 21 n.16 (citing data for the average home price in the MLS PIN market, which DOJ used for an example omitted from the block quotation).

[80] *See* Dana Anderson, *All-Cash Homebuyers Are Four Times More Likely to Win a Bidding War*, Redfin.com, Mar. 11, 2022, https://www.redfin.com/news/2021-bidding-war-strategies-all-cash/ [https://perma.cc/SBZ4-ATLE] (summarizing Redfin data showing all-cash offers improve chances of winning a "bidding war" by 334%).

If the seller will not pay, or if the buyer does not ask for payment for fear of making a less-desirable offer, the buyer has two choices: (a) pay their broker in cash at closing or (b) finance their broker's fee in a mortgage. A study by Schnare et al. considers these scenarios and possible impacts of DOJ's policy preference if it were to have national scope.[81] The Schnare study concludes "that changing the current compensation structure would suppress homebuying opportunities for large segments of the potential market, and that minorities, lower income households, and first-time home buyers who rely more heavily on agent services would suffer the most" and "that requiring buyers to pay their agents' fee directly would not necessarily produce the large reductions in commission rates that decoupling proponents have envisioned, particularly for first-time home buyers."[82] The Schnare study is not the only source of such concerns, either. Reporting on a settlement proposal in other suits that implements something similar to the DOJ policy preference, a Boston.com article discloses concerns of a Wharton School professor, an Urban Institute expert, and a mortgage company representative, among others.[83]

CMLS acknowledges that a large brokerage firm funded the Schnare study[84] and that the study's authors might thus be thought prone to motivated reasoning. Nevertheless, the

---

[81] Ann B. Schnare, Amy Crews Cutts & Vanessa G. Perry, Be Careful What You Ask For: The Economic Impact of Changing the Structure of Real Estate Agent Fees (May 2022) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4106600.

[82] *Id.* at 3.

[83] Ronda Kaysen &Rukmini Callimachi, *Could first-time home buyers lose out under new commission rules?*, Boston.com (Mar. 26, 2024 11:32 AM), https://www.boston.com/real-estate/home-buying/2024/03/26/could-new-commission-rules-hurt-firsttime-buyers/ [https://perma.cc/G64P-3PK3] [hereinafter Kaysen, *First-time buyers*] (reporting an observation of the founder of the Urban Institute's Housing Finance Policy Center that "[t]hey are ripping down the existing structure, but there is nothing in place" and noting that "[b]uyers did not have a seat at the [settlement] negotiating table").

[84] *Id.* at 1.

study's authors are well-trained,[85] it uses widely available data,[86] and CMLS is not aware of any evidence-backed rebuttal of it. The claims of the Schnare study and the concerns expressed by other industry participants warrant a rebuttal of similar quality, but the SOI does not even mention the potential harms to significant segments of homebuyers, including first-time, minority, and lower-income buyers.[87] Even the Barry study, which is careful to describe its methods and materials and acknowledges some of the potential harms identified by the Schnare study, attempts to dispel those concerns with a single citation to an unconventional broker's declaration about its anecdotal experiences in another lawsuit.[88]

The problems which may result from widespread adoption of DOJ's policy preference are not constrained to buyers *who might be able to finance* their brokers' fees. A considerable and important segment of the mortgage market, VA borrowers, *simply may not be able to finance broker fees at all*. Under U.S. Department of Veterans Affairs regulations, real estate broker fees are not listed among the closing costs that can be financed with a VA loan.[89]

---

[85] *Id.* at 2.

[86] *E.g., id.* at 8 n.10 (identifying the Urban Institute as a data source).

[87] SOI 20–22.

[88] Barry et al., *Et Tu*, at 88 (citing Decl. of Jack Ryan ¶ 1, *Moehrl v. Nat'l Ass'n of Realtors* (N.D. Ill. 2019) (No. 1:19-cv-01610), ECF No. 324-4 (including an anecdotal report by the CEO of brokerage REX—Real Estate Exchange, Inc.)). At the time of the declaration, REX was involved in litigation against the National Association of REALTORS®. *See* Am. Compl. for Injunctive Relief & for Damages, *REX—Real Est. Exch., Inc. v. Zillow, Inc.* (W.D. Wash. 2021) (No. 2:21-cv-00312), ECF No. 99. REX asserts that it was created "in 2015 to bring residential real estate into line with today's expectations by using AI and big data to push past the outmoded practices of traditional real estate brokers to provide a superior outcome for both buyers and sellers at one-third the cost." *About Us,* Rexchange.com, https://www.rexchange.com/about [https://perma.cc/J5YD-CKRM], last visited Mar. 26. 2023. It is unclear from REX's press how many transactions the company has done and whether its experiences are likely to be representative of real estate firms generally.

[89] 38 C.F.R. § 36.4313(a) (providing that "[n]o charge shall be made against, or paid by, the borrower incident to the making of a guaranteed or insured loan other than those expressly permitted under paragraph (d) or (e) of this section" but not including brokerage fees in paragraph (d) or (e)). *See also VA funding fee and loan closing costs*, U.S. Dep't of Veterans Affs., https://www.va.gov/housing-

To secure support for its policy preference, the Court might expect that DOJ would have reached out to the other parties in the real estate transaction—especially other federal-government-related entities—to secure their assurances that DOJ's policy preference will not disrupt transactions in one of the most important industries in the country, parties such as mortgage banker associations; appraiser associations; the GSEs; FHA; and VA. The SOI, however, cites no such communications, and CMLS is not aware of any public statements by any of these entities assuring that, if DOJ has its way, this critical industry will continue to function smoothly. This Court would be justified in concluding that it will not under DOJ's policy preference.

The Proposed Settlement Policies, however, "mirror" the policies adopted by NWMLS, one of which has been in operation for nearly five years, and the other for nearly two years.[90] CMLS is aware of no reports (made publicly or privately) of disruptions in the NWMLS market since the advent of the NWMLS 2019 rule changes. This Court should thus anticipate none here if it approves the Proposed Settlement.

## IV.   CONCLUSION

DOJ seeks to secure a major change in U.S. residential housing policy by commenting on a proposed antitrust settlement among private parties, instead of by an enforcement action of its own or by encouraging rulemaking by a federal agency empowered by statute to do so. The Court should decline to credit the SOI's arguments, given that DOJ lacks robust empirical

---

assistance/home-loans/funding-fee-and-closing-costs/ [https://perma.cc/AE4H-MZ59] (last visited Mar. 26, 2024) ("The seller must pay these closing costs (sometimes called seller's concessions): Commission for real estate professionals[;] Brokerage fee[;] Buyer broker fee . . . ."); Kaysen, *First-time buyers* (quoting a loan officer: "The rule 'is as crystal clear as it gets . . . Adjusting VA guidelines is not an easy thing to do.'").

[90] SOI 16.

evidence to support its policy preference, overlooks the anticompetitive nature of its policy preference, and does not have the institutional expertise to assess the effects of its policy preference on the real estate market.

Meanwhile, the NWMLS 2019 and 2022 rule changes have collectively resulted in an average savings of $1,000 in buyer-broker commission on each sale of an average-priced home in NWMLS. There is no evidence of disruption in the NWMLS market during the past five years resulting from the NWMLS rule changes. There is every reason to believe that the Proposed Settlement Policies will have a similar effect in the area covered by this suit and that the Proposed Settlement Policies will advance the procompetitive intentions of the plaintiffs and reward the class members with declining commission rates, all without the disruptive effects of unintended consequences that DOJ appears not to have considered.

April 5, 2024

Respectfully submitted,

*/s/ Justin J. Wolosz*

Justin J. Wolosz (BBO #643543)
Eric M. Gold (BBO #660393)
Max A. Jacobs  (BBO #707327)
**MANATT, PHELPS & PHILLIPS, LLP**
One Beacon Street
Boston, MA 02108
Telephone: 617-646-1443
jwolosz@manatt.com
egold@manatt.com
mjacobs@manatt.com

Mitchell A. Skinner
(*pro hac vice* application pending)
Brian N. Larson
(*pro hac vice* application pending)
**LARSON SKINNER, PLLC**
7595 Currell Blvd, #251336
St. Paul, MN  55125
Telephone:  612-424-8660
mskinner@larsonskinner.com
blarson@larsonskinner.com

*Counsel for Non-party Council of Multiple Listing Services*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on April 5, 2024, I caused a true and correct copy of the foregoing to be filed via the Court's ECF system, which will send notice to all counsel of record.

<u>*/s/ Justin J. Wolosz*</u>
Justin J. Wolosz