# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNIFER NOSALEK, ET AL., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MLS PROPERTY INFORMATION NETWORK, INC., ET AL.,<br><br>Defendants. | No. 1:20-cv-12244-PBS<br><br><br>CLASS ACTION |

---

## DEFENDANT MLS PROPERTY INFORMATION NETWORK, INC.'S RESPONSE TO THE STATEMENT OF INTEREST OF THE UNITED STATES

---

Jon M. Anderson
BBO No. 557962
BRENNAN SCUNGIO & KRESGE LLP
362 Broadway
Providence, RI  02909
(401) 453-2300
(401) 453-2345 fax
janderson@bskllp.com

J. Matthew Goodin (*pro hac vice*)
LOCKE LORD LLP
111 South Wacker Drive, Suite 4100
Chicago, IL  60606
(312) 443-0472
jmgoodin@lockelord.com

Chase T. Cobb (*pro hac vice* pending)
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
(214) 740-8000
chase.cobb@lockelord.com

***Attorneys for Defendant MLS
Property Information Network, Inc.***

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ...................................................................................................................1

II. BACKGROUND...................................................................................................................4

    A.    Multiple listing services are procompetitive and generate tremendous efficiencies. ...................................................................................................................4

    B.    Plaintiffs and MLS PIN have reached a settlement that would fully resolve the disputed antitrust conspiracy claim without compromising MLS PIN's role in promoting efficient real estate transactions. ........................................................6

        i.    MLS PIN implemented certain voluntary rule changes before the proposed settlement. .................................................................................7

        ii.    The proposed settlement would institute additional rule changes that promote transparency. .............................................................................7

    C.    DOJ opposes the proposed settlement with policy arguments that are contrary to antitrust law. ..................................................................................................8

III. ARGUMENT .....................................................................................................................10

    A.    An evaluation of the proposed class settlement does not require a mini-trial on fiercely disputed antitrust issues. ...................................................................10

    B.    The proposed settlement is a fair and reasonable compromise that addresses MLS PIN's alleged role in the challenged conduct. ........................................12

        i.    The proposed settlement resolves the disputed antitrust conspiracy claim; there is no requirement to go further and affirmatively ban offers of compensation. .............................................................................12

        ii.    DOJ's policy arguments against the proposed settlement fail on their own terms....................................................................................19

        iii.    DOJ's policy arguments speak to weaknesses in the underlying antitrust claim, not a weakness in the proposed settlement. ...................................22

        iv.    Nothing in the proposed settlement precludes DOJ from advancing policy objectives through other avenues. .................................................22

    C.    Both MLS PIN and home sellers have the right to publish free-market compensation offers under the First Amendment........................................23

    D.    DOJ's proposed ban on free-market compensation offers creates an antitrust problem where none existed. .........................................................................27

    E.    DOJ's proposed ban would remain flawed even if it applied only to commission offers on the MLS. .................................................................28

IV. CONCLUSION...................................................................................................................29

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                                    **Page(s)**

*44 Liquormart, Inc. v. Rhode Island*,
   517 U.S. 484 (1996)..........................................................................................23, 24, 26

*Alvord v. Cook*,
   54 N.E. 499 (Mass. 1899) ...........................................................................2, 6, 16

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ..............................................................................................25

*In re Blue Cross Blue Shield Antitrust Litig.*,
   85 F.4th 1070 (11th Cir. 2023) .......................................................................1, 11

*Burnett v. Nat'l Assoc. of Realtors*,
   No. 4:19-cv-00332-SRB, 2022 WL 17741708 (W.D. Mo. Dec. 16, 2022)......................13, 14

*Cal. Dental Ass'n v. F.T.C.*,
   526 U.S. 756 (1999) ...........................................................................................14

*Cantor v. Multiple Listing Serv. of Dutchess Cty., Inc.*,
   568 F. Supp. 424 (S.D.N.Y. 1983) ....................................................................27

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980) ...........................................................................................24

*City of Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993) ...........................................................................................24

*Compass, Inc. v. Real Est. Bd. of N.Y., Inc.*,
   No. 21-CV-2195 (AJN), 2022 WL 992628 (S.D.N.Y. Mar. 31, 2022) ...................................27

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984) ...........................................................................................13

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) .........................................................................2, 10

*Deere & Co. Repair Servs. Antitrust Litig. v. Deere & Co.*,
   No. 3:22-cv-50188 (N.D. Ill. July 19, 2023) ....................................................19

*Ed Peters Jewelry Co. v. C & J Jewelry Co.*,
   124 F.3d 252, 260 (1st Cir.1997)......................................................................22

*F.T.C. v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986).............................................................................................13

*ForSaleByOwner.com Corp. v. Zinnemann*,
  347 F. Supp. 2d 868 (E.D. Cal. 2004) ................................................................24

*Fraley v. Batman*,
  638 F. App'x 594 (9th Cir. 2016) ..........................................................................1

*Godson v. Eltman, Eltman, & Cooper, P.C.*,
  328 F.R.D. 35 (W.D.N.Y. 2018) ...........................................................................12

*Grace v. RE/MAX Holdings, Inc.*,
  No. 23-CV-06352, 2024 WL 2761188 (N.D. Cal. May 29, 2024) ..............2, 16, 29

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
  527 U.S. 173 (1999) ..............................................................................................24

*Greenspun v. Bogan*,
  492 F.2d 375 (1st Cir. 1974) ........................................................................1, 10, 12

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975) ...............................................................1, 10, 11, 14

*Huang v. Ma*,
  201 N.E.3d 713 (Mass. 2023) ...............................................................................16

*Hyland v. HomeServices of Am., Inc.*,
  771 F.3d 310 (6th Cir. 2014) ....................................................................14, 15, 22

*Isby v. Bayh*,
  75 F.3d 1191 (7th Cir. 1996) ...........................................................................1, 11

*Jennings v. Murphy*,
  90 N.E.2d 310 (Mass. 1950) ...........................................................................16, 17

*Klickads, Inc. v. Real Estate Bd. of N.Y., Inc.*,
  No. 04-8042-LBS, 2007 WL 2254721 (S.D.N.Y. Aug. 6, 2007) ......................4, 5

*Lee v. Life Ins. Co. of N. Am.*,
  829 F. Supp. 529 (D.R.I. 1993), *aff'd*, 23 F.3d 14 (1st Cir.1994) .........................12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ..............................................................................................14

*Linmark Assocs., Inc. v. Willingboro Tp.*,
  431 U.S. 85 (1977) ...........................................................................................25, 26

*Maple Flooring Ass'n. v. United States*,
  268 U.S. 563 (1925) ..............................................................................................16

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
    925 F.3d 1263 (D.C. Cir. 2019) ................................................................14

*Massachusetts v. Microsoft Corp.*,
    373 F.3d 1199 (D.C. Cir. 2004) ................................................................26

*In re Milken & Assocs. Sec. Litig.*,
    150 F.R.D. 46 (S.D.N.Y. 1993) ................................................................11

*Mkt. Force Inc. v. Wauwatosa Realty Co.*,
    906 F.2d 1167 (7th Cir. 1990) ................................................................22

*Moehrl v. Nat'l Ass'n of Realtors*,
    492 F. Supp. 3d 768 (N.D. Ill. 2020) ................................................6, 15, 16

*Monsarrat v. Newman*,
    28 F.4th 314 (1st Cir. 2022) ................................................................14

*Murphy v. Alpha Realty, Inc.*,
    No. 76 C 2446, 1978 WL 1451 (N.D. Ill. Dec. 7, 1978) ........................15, 16

*N. Falmouth Realty Corp. v. Rogers*,
    826 N.E.2d 794, 2005 WL 1106688 (Mass. App. Ct. 2005) ........................17

*Nat'l Ass'n of Realtors v. United States*,
    No. CV 21-2406 (TJK), 2023 WL 387572 (D.D.C. Jan. 25, 2023), *rev'd*, 97
    F.4th 951 (D.C. Cir. 2024) ................................................................7

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ................................................................3, 19

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    No. 22-842, 602 U.S. ----, 2024 WL 2751216 (U.S. May 30, 2024) ........................25

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
    435 U.S. 679 (1978) ................................................................8, 26, 28

*NCAA v. Alston*,
    594 U.S. 69 (2021) ................................................................13

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    533 F.3d 1 (1st Cir. 2008) ................................................................13

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    309 F.R.D. 107 (D. Mass. 2015), *aff'd*, 842 F.3d 34 (1st Cir. 2016)........................12, 13

*O'Riordan v. Long Island Bd. of Realtors, Inc.*,
    707 F. Supp. 111 (E.D.N.Y. 1988) ................................................................4, 13

iv

*Ohio v. Am. Express Co.*,
     585 U.S. 529 (2018) ..................................................................................................13

*Peel v. Att'y Disc. Comm.*,
     496 U.S. 91 (1990) ....................................................................................................26

*In re Pharm. Indus. Average Wholesale Price Litig.*,
     588 F.3d 24 (1st Cir. 2009) .......................................................................................10

*In re Pharma. Indus. Average Wholesale Price Litig.*,
     491 F. Supp. 2d 20, 85-86 (D. Mass. 2007) ..............................................................21

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
     173 F.3d 995 (6th Cir. 1999) ..........................................................................6, 15, 20

*Realcomp II, Ltd. v. F.T.C.*,
     635 F.3d 815 (6th Cir. 2011) .....................................................................................27

*Rex - Real Estate Exch., Inc. v. Zillow, Inc.*,
     No. C21-0312 TSZ, 2023 WL 5334389 (W.D. Wash. Aug. 18, 2023) .......................4

*Ricci v. Cellucci*,
     191 F.R.D. 3 (D. Mass. 2000) ....................................................................................20

*Robertson v. Nat'l Basketball Ass'n*,
     556 F.2d 682 (2d Cir. 1977) ............................................................................1, 11, 14

*Robertson v. Sea Pines Real Estate Cos.*,
     679 F.3d 278 (4th Cir. 2012) ...............................................................................13, 27

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
     870 F.2d 397 (7th Cir. 1989) .....................................................................................14

*Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*,
     786 F.2d 1400 (9th Cir. 1986) ...................................................................................22

*Supermarket of Homes v. San Fernando Valley Bd. of Realtors*,
     No. CV 80-1888 PAR, 1983 WL 2199 (C.D. Cal. Sept. 1, 1983), *aff'd*, 786
     F.2d 1400 (9th Cir. 1986) ................................................................................5, 15, 16

*Thompson v. W. States Med. Ctr.*,
     535 U.S. 357 (2002) ..................................................................................................24

*United States v. Citizens & S. Nat'l Bank*,
     422 U.S. 86 (1975) ..............................................................................................14, 16

*United States v. Nat'l Ass'n of Realtors*,
     No. 05 C 5140 (N.D. Ill. Nov. 18, 2008) ..................................................................18

*United States v. Realty Multi-List, Inc.*,
629 F.2d 1351 (5th Cir. 1980) ...................................................................4, 5, 13

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)........................................................................................25

*Venture Res. Grp., Inc. v. Greater N.J. Reg'l Multiple Listing Serv., Inc.*,
No. CIV. A. 95-0401 MLP, 1995 WL 866841 (D.N.J. Aug. 24, 1995) .................15

*Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*,
850 F.2d 803 (1st Cir. 1988)..............................................................................5

*White v. Nat'l Football League*,
822 F. Supp. 1389 (D. Minn. 1993).....................................................................2

*White v. R.M. Packer Co., Inc.*,
635 F.3d 571 (1st Cir. 2011) ............................................................................13

**Statutes and Rules**

47 U.S.C § 230..................................................................................................14

Colo. Rev. Stat. § 12-10-410(1) .........................................................................17

D.C. Code § 42-1703(f) .....................................................................................17

Del. Code tit. 24, § 2930 ...................................................................................17

Md. Code, Bus. Occ. & Prof § 17-534................................................................17

Minn. Stat. § 82.70 ...........................................................................................17

Sherman Antitrust Act (15 U.S.C. § 1 *et seq.*)........................................... *passim*

**Other Authorities**

38 C.F.R. § 36.4313(a)......................................................................................17

38 C.F.R. §§ 36.4313(d)-(e)...............................................................................17

First Amendment to the United States Constitution (U.S. CONST. amend. I)....................... *passim*

Brooklee Han, VA to Roll Out Temporary Fix to Buyer Agent Commission
Problems, HousingWire (Feb. 22, 2024, 3:04 PM),
***********.housingwire.com/articles/va-to-roll-out-temporary-fix-to-buyer-
agent-commission-problem/ ...........................................................................17

Brooklee Han, 'Worst Possible Outcome': Industry Experts Weigh in on DOJ's
    Desire to Decouple Commissions, HousingWire (Feb. 22, 2024, 3:04 PM),
    ***********.housingwire.com/articles/worst-possible-outcome-industry-
    experts-weigh-in-on-dojs-desire-to-decouple-commissions/................................................2, 20

DOJ & FTC, Competition in the Real Estate Brokerage Industry (Apr. 2007),
    ***********.ftc.gov/sites/default/files/documents/reports/competition-real-
    estate-brokerage-industry-report-federal-trade-commission-and-
    u.s.department-justice/v050015.pdf...........................................................................5, 8, 18

Executive Order on Promoting Competition in the American Economy, The
    White House (July 9, 2021), https://www.whitehouse.gov/briefing-
    room/presidential-actions/2021/07/09/executive-order-on-promoting-
    competition-in-the-american-economy/..................................................................................23

Jordan M. Berry et al., Et Tu, Agent? Commission-Based Steering in Residential
    Real Estate (2024),
    ********papers.ssrn.com/sol3/papers.cfm?abstract_id=4596391................................................19

L. Fang & D. Hayunga, The Impact of Real Estate Agents' Expertise on House
    Prices and TOM, 52 REAL ESTATE ECONOMICS 45 (2024),
    ********onlinelibrary.wiley.com/doi/full/10.1111/1540-6229.12466........................................5

N.J. Admin. Code § 11:5-6.2 ............................................................................................17

VA Funding Fee and Loan Closing Costs, U.S. Dep't of Veterans Affs. (Apr. 7,
    2023), https://www.va.gov/housingassistance/home-loans/funding-fee-and-
    closing-costs/...............................................................................................................17

VA PAMPHLET 26-7 at 8-10,
    ********benefits.va.gov/WARMS/docs/admin26/handbook/ChapterLendersHan
    bookChapter8.pdf.........................................................................................................18

MLS Property Information Network (MLS PIN) respectfully submits this response to the Statement of Interest submitted by the Department of Justice (DOJ) on behalf of the United States. (Dkt. #290).

## I. INTRODUCTION

Plaintiffs and MLS PIN have reached a fair and reasonable settlement that fully resolves the disputed antitrust claims Plaintiffs have asserted in this litigation. In evaluating the settlement, the Court need not hold a "trial [on] the merits." *See Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir. 1974). Yet that is effectively what DOJ seeks here in its Statement of Interest. DOJ never denies that courts should avoid deciding uncertain legal questions at the settlement stage. *See Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977). And DOJ even tacitly acknowledges that approving a class settlement does not require resolving good-faith disagreements as to whether the settlement perpetuates allegedly anticompetitive practices. *See* (Dkt. #290 at 18 n.14). To the contrary, a class settlement in an antitrust action should be rejected as anticompetitive only when it perpetuates obvious "per se" antitrust violations under previously decided cases. *See Robertson*, 556 F.2d at 686 (overruling objection that a proposed class settlement would perpetuate ten years of alleged anticompetitive practices, including an alleged anticompetitive compensation rule); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123–24 (8th Cir. 1975) (overruling objection that a proposed class settlement would perpetuate antitrust violations when those violations were not a "legal certainty").[1]

---

[1] *See also In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1089–90 (11th Cir. 2023) ("So long as the conduct perpetuated under a settlement agreement does not per se violate antitrust law, the settlement may be approved, even if the perpetuated conduct might not withstand scrutiny under the rule of reason."); *Fraley v. Batman*, 638 F. App'x 594, 597 (9th Cir. 2016) ("The [class] settlement does not clearly authorize continued violations of the law. When approving a settlement, a district court should avoid reaching the merits of the underlying dispute."); *Isby v. Bayh*, 75 F.3d 1191, 1197 (7th Cir. 1996) ("[W]e are mindful that the court must not decide unsettled legal questions [in evaluating a proposed class settlement]; any illegality or

DOJ nonetheless invites the Court to do precisely what many cases say it should not do. DOJ's core position appears to be that no settlement should be approved unless it affirmatively prohibits home sellers from offering compensation to buyer-side brokers—no matter whether the offer occurs on the MLS or off it (for example, on a broker's website). *See* (Dkt. #290 at 3, 20-22) (urging adoption of a new "MLS PIN rule" banning offers of compensation to buyer brokers). This proposal would presumably also mandate that MLS PIN enforce the prohibition on compensation offers since it is the only defendant to be bound by the settlement.

DOJ provides no authorities establishing that such a prohibition is required as a matter of antitrust law. And DOJ ignores many authorities—from federal cases to state statutes—*approving* the very practice it now seeks to prohibit through a settlement of civil litigation. *See, e.g., Grace v. RE/MAX Holdings, Inc.*, No. 23-CV-06352, 2024 WL 2761188, at *3–4 (N.D. Cal. May 29, 2024). Notably, the Massachusetts Supreme Judicial Court has recognized buyer-broker commissions for over one hundred years. *See Alvord v. Cook*, 54 N.E. 499, 507 (Mass. 1899). Not only are these practices approved; they are widely recognized as beneficial to consumers, particularly first-time home buyers and others at risk of exclusion from the housing market. It is little wonder that DOJ's position has been met with swift criticism by experts who say that it is the "worst possible outcome for millions of homebuyers." *See* Brooklee Han, *'Worst Possible Outcome': Industry Experts Weigh in on DOJ's Desire to Decouple Commissions*, HOUSINGWIRE

---

unconstitutionality must appear as a legal certainty on the face of the agreement [under previously decided cases] before a settlement can be rejected on this basis." (quotations omitted)); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("It cannot be overemphasized that neither the trial court in approving the [class] settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute."); *White v. Nat'l Football League*, 822 F. Supp. 1389, 1425 (D. Minn. 1993) (rejecting objections to a class action settlement in a case involving allegedly anticompetitive compensation rules because, "absent a full trial on the merits," it was unlikely the settlement agreement "would be deemed a per se violation").

(Fed. 22, 2024, 3:04 PM), https://www.housingwire.com/articles/worst-possible-outcome-industry-experts-weigh-in-on-dojs-desire-to-decouple-commissions/ (Ex. A).

Crucially, nothing in the proposed settlement between Plaintiffs and MLS PIN would limit DOJ's ability to pursue changes to real estate market practices, in Massachusetts or anywhere else, through legislative advocacy or administrative rulemaking. Indeed, the entirety of DOJ's Statement sounds in the realm of policy and should be addressed to those bodies responsible for crafting statutes and regulations: namely, Congress or the Federal Trade Commission. Courts are not in the business of "performing the cost-benefit analyses embodied in democratically adopted legislation"—and especially not by reference to "Mr. Herbert Spencer's social statistics." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) (quotations omitted). But that is all DOJ offers: policy pronouncements and statistical evidence of dubious credibility. DOJ's statistics fail to measure up; its economic analysis is not replicable, and therefore, little more than junk economics. By contrast, the amicus briefs submitted by the Council of Multiple Listing Services, (Dkt. #309), and the Northwest Multiple Listing Service, (Dkt. #308), provide compelling explanations for why DOJ's policy arguments fail on their own terms. Their briefs are fully adopted here.

DOJ's policy position not only goes far beyond what antitrust law requires; it also creates an antitrust problem for MLS PIN where none existed. MLS PIN cannot enter into an agreement to ban the publication of free-market compensation offers without offending the very antitrust principles DOJ claims to be protecting. To impose such a ban through a federal injunction would also suppress speech that is protected under the First Amendment. DOJ never denies that sellers have the right to compensate buyer brokers; it only advocates arbitrary restraints on the communication of compensation offers. But the payment of buyer-broker commissions has long

3

been legal under Massachusetts and federal law. This proposal to ban truthful and non-misleading speech made in furtherance of a lawful activity runs headlong into a string of Supreme Court cases recognizing that such bans cannot survive First Amendment scrutiny.

The Court should reject DOJ's policy arguments and instead advance transparency in the Massachusetts real estate market by approving the proposed settlement. Even if DOJ walked back its support for a total ban on free-market compensation offers and instead advanced a more measured proposal—for example, a ban on publishing compensation offers only on the MLS—it would remain true that DOJ's position goes far beyond the requirements of antitrust law and abridges MLS PIN's rights to publish compensation offers and to conduct lawful business in Massachusetts.

## II. BACKGROUND

### A. Multiple listing services are procompetitive and generate tremendous efficiencies.

Multiple listing services (MLSs) are widely recognized as procompetitive. *See, e.g.*, *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1367–68 (5th Cir. 1980); *Klickads, Inc. v. Real Estate Bd. of N.Y., Inc.*, No. 04-8042-LBS, 2007 WL 2254721, at *1 (S.D.N.Y. Aug. 6, 2007). Compared to the alternative of endlessly driving neighborhoods in search of for-sale signs, MLSs centralize up to hundreds of thousands of properties into a single database.[2] *See O'Riordan v. Long Island Bd. of Realtors, Inc.*, 707 F. Supp. 111, 115 (E.D.N.Y. 1988) ("The MLS functions like an exchange and provides wide dissemination of market information."). Selling brokers can list properties at a desired price to be sure that the listing will receive the widest possible audience. *Realty Multi-List, Inc.*, 629 F.2d at 1356, 1368. On the buying side, brokers can filter properties

---

[2] Even brokers like Zillow rely on MLS data to generate listings. *See, e.g.*, *Rex - Real Estate Exch., Inc. v. Zillow, Inc.*, No. C21-0312 TSZ, 2023 WL 5334389, at *2 (W.D. Wash. Aug. 18, 2023).

based on the buyer's desired criteria to quickly locate homes that will be the best fit. *Id.* These services generate tremendous efficiencies in the real estate industry. *See id.* (describing the "enormously procompetitive objectives" of MLSs); *cf. Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 806 (1st Cir. 1988) (describing the competitive pressures on brokers created by the introduction of an MLS in Lowell in the early 1980's).[3]

The hallmark of the MLS system is transparency. MLSs correct for market imperfections by allowing for maximum information to be exchanged between buyers and sellers. *Realty Multi-List, Inc.*, 629 F.2d at 1368. These services thus ensure that neither side will miss out on an ideal match based on geographical barriers or the time and expense that would otherwise be involved in driving every cul-de-sac or manually calling agents in search of the perfect home. *See id.* at 1356 ("The benefits offered by a multiple listing service are manifest . . . ." (citations omitted)); *Supermarket of Homes v. San Fernando Valley Bd. of Realtors*, No. CV 80-1888 PAR, 1983 WL 2199, at *7 (C.D. Cal. Sept. 1, 1983) ("The procompetitive benefits of the information exchange conducted through the MLS have been widely noted."), *aff'd*, 786 F.2d 1400 (9th Cir. 1986); *Klickads, Inc.*, 2007 WL 2254721, at *1 ("In short, an MLS has many procompetitive virtues.").[4]

---

[3] DOJ's theory that compensation should be a function of an agent's experience, (Dkt. #290 at 8–9), has been debunked. *See generally* L. Fang & D. Hayunga, *The Impact of Real Estate Agents' Expertise on House Prices and TOM*, 52 REAL ESTATE ECONOMICS 45 (2024), ********onlinelibrary.wiley.com/doi/full/10.1111/1540-6229.12466 ("Instead of the length of agents' license periods or recent transaction volumes, the results demonstrate that the important expertise category is agents' local market knowledge.").

[4] *See also* DOJ & FTC, COMPETITION IN THE REAL ESTATE BROKERAGE INDUSTRY at 12 (Apr. 2007), https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf ("[T]he MLS is an extraordinarily important resource for sellers, buyers and brokers.").

**B.** **Plaintiffs and MLS PIN have reached a settlement that would fully resolve the disputed antitrust conspiracy claim without compromising MLS PIN's role in promoting efficient real estate transactions.**

Almost nobody denies the procompetitive benefits of MLSs. The only dispute is whether certain rules and practices regarding brokerage commissions constitute an antitrust conspiracy. MLS PIN vehemently denies that its existing listing rules constitute antitrust violations. (Dkt. #156 ¶¶ 178-87). MLS PIN has nonetheless agreed to settle the case as a compromise. The proposed settlement would fully resolve the disputed antitrust conspiracy claim without undermining MLS PIN's role in facilitating efficient transactions between buyers and sellers in the Massachusetts real estate market.

It has been industry-standard practice for many years for brokers on both sides of a home sale to be paid commissions out of the final sales price. The selling side typically proposes an offer of compensation to the buyer broker at the same time as listing a property. Undeniably, sellers have the right to compensate buyer-side brokers. *See, e.g.*, *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1025 (6th Cir. 1999) ("[S]etting cooperative sales-commission rates is not price fixing."); *Alvord v. Cook*, 54 N.E. 499, 507 (Mass. 1899) (brokers may split commissions). Even though the practice of sellers offering compensation to buyer brokers is innocuous as a matter of antitrust law, it has come under scrutiny based on its relationship with other industry rules and practices. *Cf. Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 783 (N.D. Ill. 2020) (acknowledging that individual brokerage commission rules may "survive antitrust scrutiny by [themselves]"; what matters is how the various rules "work together").

MLS PIN firmly denies, however, that any combination of its rules constitute an antitrust conspiracy. Nonetheless, MLS PIN began voluntarily revising certain of its rules in 2021 to eliminate any theoretical link between it and the buyers and sellers responsible for setting real

estate brokerage commissions. And through the proposed settlement, MLS PIN has agreed to implement additional, substantial changes if the settlement is approved.

**i.     MLS PIN implemented certain voluntary rule changes before the proposed settlement.**

MLS PIN voluntarily adopted new rules in 2021 in response to ongoing litigation between DOJ and the National Association of Realtors (NAR). *See Nat'l Ass'n of Realtors v. United States*, No. CV 21-2406 (TJK), 2023 WL 387572, at *3–5 (D.D.C. Jan. 25, 2023), *rev'd*, 97 F.4th 951, 959 (D.C. Cir. 2024). MLS PIN was certainly not required to do so. MLS PIN is not affiliated with NAR. Nor is it bound by NAR's rules, policies, procedures, ethical guidelines, or handbooks.

Yet in the spirit of maintaining the highest standards and operating above the minimum requirements of the law, MLS PIN revised its rules to promote transparency, thereby addressing many of DOJ's concerns leveled at NAR. These rule changes not only prohibit buyer brokers from representing their services as free, but also require buyer brokers to disclose all compensation offers to their customers. Under these new rules, compensation offers must be disclosed to buyers in the same form as the compensation offers appear in the MLS PIN platform, an antidote to any alleged steering. Buyers, thus, can see offers of buyer-broker commissions in Massachusetts when they look at brokers' webpages, like Zillow. Buyer brokers are also prohibited from filtering MLS PIN listings based on those compensation offers. These voluntary changes provide essential context for evaluating the proposed settlement. DOJ never acknowledges them.

**ii.    The proposed settlement would institute additional rule changes that promote transparency.**

The proposed settlement provides for substantial rule changes on top of those already implemented voluntarily by MLS PIN. As a starting point, the proposed settlement would eliminate any requirement that sellers listing on the MLS PIN platform offer compensation to buyer brokers. In addition to eliminating any requirement of compensation offers, the proposed

settlement would also clarify who must decide to offer compensation: the seller instead of the seller's broker. The proposed settlement would also implement disclosure requirements to ensure that a seller is fully informed of the right to offer no compensation or to negotiate the amount of compensation. And these disclosure requirements would require a listing broker to certify that the seller was notified of two separate rights—to offer no compensation and to reject a buyer broker's request for compensation.

MLS PIN maintains that these three additional changes—(1) no required offer of compensation, (2) mandatory disclosure, and (3) mandatory certification—are unnecessary. But they undeniably address MLS PIN's alleged role in the conspiracy as a mere conduit between buyers and sellers. These changes fully resolve the disputed antitrust conspiracy claim presented in this litigation.

**C.     DOJ opposes the proposed settlement with policy arguments that are contrary to antitrust law.**

The one thing the proposed settlement does not do is implement new listing rules affirmatively *banning* sellers from offering compensation to buyer brokers. To do so would trip an antitrust violation according to Supreme Court precedent. MLS PIN cannot enter into an agreement to prohibit free-market compensation offers between private actors in the real estate industry. *See infra* Part III(D). Not only would such a prohibition be a *per se* violation of antitrust law, *cf. Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 693–96 (1978), but it also would contradict authorities expressly recognizing the legitimacy of sellers offering compensation to buyer brokers, including federal cases and longstanding Massachusetts common law. *See infra* Part III(B)(i). Even DOJ's own policy statements have previously recognized that sellers may offer compensation to buyer brokers on MLSs. *See, e.g.*, DOJ & FTC, COMPETITION IN THE REAL ESTATE BROKERAGE INDUSTRY at 12–13 (Apr. 2007),

\*\*\*\*\*\*\*\*\*\*\*.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf. Such offers are a practical necessity for many first-time buyers and others who cannot afford to pay commissions out of pocket. *See infra* Part III(B)(ii).

Notwithstanding these authorities, DOJ's core position here is that a settlement cannot be approved as fair and reasonable unless it affirmatively prohibits sellers from offering compensation to buyer brokers. *See* (Dkt. #290 at 1–3, 12–14, 20–22). DOJ proposes an alternative injunction mandating a new "MLS PIN [listing] rule" not only prohibiting free-market compensation offers, but also requiring MLS PIN (by all appearances) to enforce that rule—even against member brokers offering compensation *off* the MLS. (Dkt. #290 at 20); *see also* (Dkt. #290 at 3) ("Instead, the parties could propose an injunction that would *prohibit* sellers from making commission offers to buyer brokers at all." (emphasis in original)); (Dkt. #327 at 13:20–21) ("We believe offers of compensation should not be made anywhere, but certainly not on the MLS . . . ."). DOJ's proposal would require buyers and sellers to negotiate commissions separately with their respective brokers in the first instance. *See* (Dkt. #290 at 21) (it would be the "buyer's responsibility to negotiate broker commissions directly with her broker"); (Dkt. #290 at 22) ("[R]emoving sellers and their brokers from the determination of buyer-broker compensation would help address the anticompetitive conduct alleged in the complaint."). Only after the parties have separately negotiated commissions could a buyer then request payment for its broker's commission as part of an offer. (Dkt. #290 at 21–22). By all appearances, the seller would never have the right to initiate an offer of compensation under DOJ's proposal. *See* (Dkt. #290 at 20–22).

DOJ tacitly recognizes that buyers and sellers each have contractual rights to compensate the opposing party's brokers if they wish. *E.g.*, (Dkt. #290 at 21–22). DOJ's proposal even recognizes that it is at least sometimes beneficial to do so. (Dkt. #290 at 21–22). But DOJ nevertheless seeks to impose arbitrary restraints on the dissemination of compensation offers and the parties authorized to initiate compensation offers in such a way that smacks of a policy reform—not the terms of a proposed injunction. DOJ's proposal is not tailored in any way to the allegations of this private antitrust dispute. Tellingly, DOJ provides no on-point legal authorities establishing that a complete prohibition on sellers offering compensation to buyers is allowed under antitrust law—much less that it is required to resolve the disputed antitrust conspiracy claim between Plaintiff and MLS PIN.

## III. ARGUMENT

### A. An evaluation of the proposed class settlement does not require a mini-trial on fiercely disputed antitrust issues.

A class settlement can only be approved when it is fair and reasonable to the class members. *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 32 (1st Cir. 2009). But this standard does not require the Court to hold a mini-trial on the case's disputed issues. *See Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir. 1974) ("A district court, in reviewing a settlement proposal, need not engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial."); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("[T]he trial judge ought not try the case in the [class] settlement hearings"). To the contrary, "the very purpose of a compromise is to avoid the delay and expense of [] a trial." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975) (quotations omitted); *see also Cotton*, 559 F.2d at 1330 ("[C]ompromise is the essence of a settlement.").

In keeping with this principle, courts consistently refuse to decide uncertain antitrust questions at the settlement stage. *See, e.g.*, *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) ("[A] court in approving a [class] settlement should not in effect try the case by deciding unsettled legal questions." (citations omitted)); *see also Isby v. Bayh*, 75 F.3d 1191, 1197 (7th Cir. 1996) ("[W]e are mindful that the court must not decide unsettled legal questions [in evaluating a proposed class settlement]." (quotations omitted)). This aligns with "overriding public interest" favoring the approval of class settlements. *In re Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 & n.6 (S.D.N.Y. 1993) ("[T]he law favors and encourages the settlement of class action suits.") (quotations omitted).

Even when a party objects to a settlement as illegal or as perpetuating anticompetitive practices, the objection will be disregarded unless the illegality or anticompetitive practices can be established with certainty. *Grunin*, 513 F.2d at 123–24; *Robertson*, 556 F.2d at 686.[5] In the antitrust context, the objecting party must establish that the proposed settlement would advance practices so obviously anticompetitive that they would constitute *per se* violations under previously decided cases. *See In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1089-90 (11th Cir. 2023). That a proposed class settlement could "perpetuate[] conduct" that would "not withstand scrutiny under the rule of reason" is no bar to its approval. *Id.*

In *Robertson*, for example, the court dismissed concerns that a proposed class settlement would perpetuate ten years of allegedly anticompetitive practices, including an alleged anticompetitive compensation rule. 556 F.2d at 686. Without wading into the merits, the court approved the class settlement as an exercise in judicial restraint and under the principle that an evaluation of a proposed settlement should not require a trial on disputed questions. *Id.*; *see also*

---

[5] *See also supra* n. 1 (collecting cases).

*Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 54 (W.D.N.Y. 2018) ("The court's task, then, is simply to decide whether the settlement agreement *as written* is fair, reasonable, and adequate, not whether the parties or the court could conceivably have come up with a 'better' agreement." (citations omitted) (emphasis in original)).

**B.      The proposed settlement is a fair and reasonable compromise that addresses MLS PIN's alleged role in the challenged conduct.**

Should the case advance to trial on the merits, MLS PIN is convinced it would ultimately prevail. MLS PIN is a two-sided platform used by buyers and sellers that facilitates efficient exchanges in the real estate market. MLS PIN has not conspired with any other actors to restrain trade. MLS PIN nonetheless agreed to settle the case as a compromise. *See Greenspun*, 492 F.2d at 381 ("[A]ny settlement is the result of a compromise—each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion."). The proposed settlement fully resolves the disputed antitrust conspiracy claim and fits the issues presented in Plaintiff's Complaint. In any event, DOJ's policy arguments fail on their own terms and speak only to defects in the underlying claim against MLS PIN. Nothing in the proposed settlement would prevent DOJ from advancing its policy objectives through rulemaking or legislative advocacy.

**i.      The proposed settlement resolves the disputed antitrust conspiracy claim; there is no requirement to go further and affirmatively ban offers of compensation.**

DOJ never so much as references the elements of an antitrust conspiracy claim in its Statement of Interest. That is a good place to start in the evaluation of an antitrust settlement. The plaintiff must establish not only an unreasonable restraint on trade, but also that the restraint arises from a contract, combination, or conspiracy. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 309 F.R.D. 107, 141 (D. Mass. 2015), *aff'd*, 842 F.3d 34 (1st Cir. 2016) (citing *Lee v. Life Ins. Co.*

*of N. Am.*, 829 F. Supp. 529, 535 (D.R.I. 1993), *aff'd*, 23 F.3d 14 (1st Cir.1994)). The plaintiff must also establish standing to challenge the restraint and a relationship to interstate commerce. *See id.*; *see also White v. R.M. Packer Co., Inc.*, 635 F.3d 571, 575 (1st Cir. 2011); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 533 F.3d 1, 3–4 (1st Cir. 2008).

Because MLSs are widely recognized as procompetitive and as generating tremendous efficiencies in real estate transactions, a rule-of-reason analysis applies to their rules and operations, as opposed to the stricter *per se* standard. *See Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 290 (4th Cir. 2012) ("Because trade associations may be protective of consumer interests and not just inimical to them, the cooperative actions of MLS members are not per se unreasonable."); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1368-69 (5th Cir. 1980) (refusing to apply the *per se* standard considering that MLSs accomplish "enormously procompetitive objectives"); *O'Riordan v. Long Island Bd. of Realtors, Inc.*, 707 F. Supp. 111, 115 (E.D.N.Y. 1988) ("[T]here appears no federal case in which a court has applied a *per se* analysis to an MLS."); *see also F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986) ("[W]e have been slow to condemn rules adopted by professional associations as unreasonable *per se* . . . .").[6]

---

[6] *But see Burnett v. Nat'l Assoc. of Realtors*, No. 4:19-cv-00332-SRB, 2022 WL 17741708, at *9–10 (W.D. Mo. Dec. 16, 2022) (adopting a *per se* analysis of a buyer-broker compensation rule). Contrary to *Burnett*, nearly all joint ventures, including multiple listing services, are subject to the rule of reason entailing "a fact-specific assessment of market power and market structure" aimed at assessing the challenged restraint's "actual effect on competition"—especially its capacity to reduce output and increase price. *NCAA v. Alston*, 594 U.S. 69, 88 (2021) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018)) (internal quotation omitted); *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Other combinations, such as . . . joint ventures, . . . hold the promise of increasing a firm's efficiency and enabling it to compete more effectively. Accordingly, such combinations are judged under a rule of reason."). Likewise, the rules of trade associations have traditionally been measured against the rule of reason. *See, e.g.*, *Ind. Fed'n of Dentists*, 476 U.S. at 458. By contrast, no Court of Appeals, let alone the Court of Appeals for the First Circuit, has adopted the novel *per se* theory adopted in

DOJ focuses entirely on the question of whether the proposed settlement would allow the alleged anticompetitive conduct to continue. But this is exactly the kind of question the Court need not entertain in evaluating a proposed antitrust settlement. *See Grunin*, 513 F.2d at 123–24; *Robertson*, 556 F.2d at 686; *supra* Part III(A). That is especially so given that DOJ never advances beyond that question to explain how the proposed settlement would perpetuate a conspiracy under the remaining elements of an antitrust claim—especially the requirement of an agreement. *See Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014) ("[T]he existence of an agreement is the hallmark of a Section 1 Sherman Act claim." (citations omitted)).

It is hard to imagine how the rules in the proposed settlement could constitute an agreement since they eliminate for MLS PIN any theoretical involvement in setting real estate commissions. An interactive web platform cannot be held responsible for information that is merely posted on it. *See Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267–72 (D.C. Cir. 2019) (affirming dismissal of Sherman Act claims preempted by 47 U.S.C § 230); *cf. Monsarrat v. Newman*, 28 F.4th 314, 318 (1st Cir. 2022) (invoking 47 U.S.C. § 230 in a libel case); *see also Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 397 (7th Cir. 1989) ("There can be no restraint of trade without a restraint."). And even if MLS PIN could be held responsible for information posted on its platform, the mere "dissemination of price information"—like the compensation offers here—"is not itself a per se violation of the Sherman Act," *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975), "[a]bsent an agreement to adhere to particular

---

*Burnett*. "Where . . . the circumstances of the restriction are somewhat complex, assumption alone will not do." *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 775 n.12 (1999). This Court cannot "predict with confidence that [the restraint] would be invalidated in all or almost all instances." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007). *Burnett*, therefore, affords no basis for jettisoning this settlement.

price schedules." *Supermarket of Homes v. San Fernando Valley Bd. of Realtors*, No. CV 80-1888 PAR, 1983 WL 2199, at *7 (C.D. Cal. Sept. 1, 1983), *aff'd*, 786 F.2d 1400 (9th Cir. 1986).

It is simply not the case that antitrust law requires an MLS to **affirmatively prohibit** sellers from offering compensation to buyer brokers. Yet DOJ's core position here is that any proposed settlement must do exactly that to be fair and reasonable. *See* (Dkt. #290 at 1–3, 12–14, 20–22). DOJ ignores that scores of federal cases have already confirmed the legitimacy of the practice it now seeks to prohibit. So too have state laws, federal statutes and regulations, and the DOJ's own prior policy positions. DOJ provides no on-point authorities to the contrary.

***Federal Cases.*** Federal cases consistently recognize that merely "setting cooperative sales-commission rates is not price fixing." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1025 (6th Cir. 1999)). To the contrary, compensation offers serve as lawful "incentives for non-listing agents to show [a] listed property." *See id.* To simply offer such an incentive—on the MLS or through another medium—is not a coordinated restraint on trade in violation of the Sherman Act. *See Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 320–22 (6th Cir. 2014) (affirming district court's conclusion that offering compensation to buyer brokers as "incentive[s]" was consistent with a "perfectly competitive market"); *Supermarket of Homes*, 1983 WL 2199, at *7 ("[T]he circulation of commission rates in [an] MLS" without more "does not violate the antitrust laws").[7]

_____

[7] *See also Murphy v. Alpha Realty, Inc.*, No. 76 C 2446, 1978 WL 1451, at *4 (N.D. Ill. Dec. 7, 1978) (the "practice of exchanging information concerning commission rates and the divisions of those commissions" through an MLS did not constitute price fixing); *Venture Res. Grp., Inc. v. Greater N.J. Reg'l Multiple Listing Serv., Inc.*, No. CIV. A. 95-0401 MLP, 1995 WL 866841, at *3 (D.N.J. Aug. 24, 1995) (it ultimately benefits the public for realtors to share listing information and "cooperate in the sale of real estate" through a MLS).

In the *Moehrl* action pending in the Northern District of Illinois, the court called *Supermarket of Homes* and *Murphy* "inapposite" as to the question of whether a NAR mandatory compensation rule constituted an antitrust conspiracy. *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 786 (N.D. Ill. 2020). The reason was that both cases were decided before promulgation of the relevant rule and before the industry had shifted away from the subagency

This principle that allowing free-market compensation offers does not constitute an antitrust conspiracy was recently confirmed in *Grace v. RE/MAX Holdings, Inc.*, No. 23-CV-06352, 2024 WL 2761188, at *3–4 (N.D. Cal. May 29, 2024). The court found that, "definitionally," MLS rules are not unlawful agreements to restrain trade when, "on their face," they merely permit compensation offers or facilitate them—but do not "mandate[]" them. *Id.* at 3–4. It made no difference that other forces could be at "at work to maintain the broker compensation scheme in its current form," because those forces did not "flow[] from the language" of the challenged rules. *Id.* at 4. The court dismissed the claims against the MLS defendant at the pleadings stage, *id.* at 3–4, 5, in what amounts to a striking repudiation of DOJ's position here that free-market compensation offers must be affirmatively banned. That position is unsupported under any standard. It is certainly not proved to a legal certainty to justify denial of a private settlement. And in fact, the courts have repeatedly rejected DOJ's position.

*Massachusetts Law.* The practice of home sellers offering compensation to buyer brokers has been approved not only by a number of federal courts, but also under Massachusetts common law for over a century. *See Jennings v. Murphy*, 90 N.E.2d 310, 313 (Mass. 1950); *Alvord v. Cook*, 54 N.E. 499, 501 (Mass. 1899); *cf. Huang v. Ma*, 201 N.E.3d 713, 719 & n.10 (Mass. 2023)

---

system in which all brokers ultimately represented the seller. *Id.* Setting the merits of this distinction aside, it does not call into question the broad principle that merely offering compensation on an MLS—without any attendant agreements or "price schedules"—is lawful. *See Supermarket of Homes*, 1983 WL 2199, at *7; *Murphy*, 1978 WL 1451, at *4 (rejecting claim of a de facto fee schedule). Neither *Supermarket of Homes* nor *Murphy* articulated this principle based on the idiosyncrasies of the subagency system. To the contrary, both cases articulated that principle as a natural extension of a well-established rule: that "the exchange of price information among competitors," without more, "is not a per se violation of the antitrust laws." *See Supermarket of Homes*, 1983 WL 2199, at *7 (citing *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975); *Maple Flooring Ass'n. v. United States*, 268 U.S. 563, 578–86 (1925)); *Murphy*, 1978 WL 1451, at *4 ("Not every exchange of price information between competitors constitutes an unlawful restraint of trade, even if the exchange is done by agreement.").

(awarding broker commissions based on a percentage of the sales price). The only limitation is that compensation offers cannot violate the duty of fidelity owed by agent to principal.[8] *Jennings*, 90 N.E.2d at 313. "Brokerage contracts by their very nature entail a high risk of noncompensation. It is not at all uncommon for a broker to perform services for which he is not compensated." *N. Falmouth Realty Corp. v. Rogers*, 826 N.E.2d 794, 2005 WL 1106688, at *1 (Mass. App. Ct. 2005) (citations omitted, cleaned up).

  ***Federal Statutes and Regulations.*** Federal statutes and regulations sometimes authorize—or even require—the same practice. Loans guaranteed by the Department of Veterans Affairs, for example, strictly limit the charges that "shall be made against, or paid by, the borrower." 38 C.F.R. § 36.4313(a). Excluded from the list of permissible charges are broker fees. *Id.* §§ 36.4313(d)–(e). The seller therefore, as opposed to the veteran borrower, "must pay" the "buyer broker fee" in addition to other closing costs, which are referred to as "seller's concessions."[9] *VA Funding Fee and Loan Closing Costs*, U.S. DEP'T OF VETERANS AFFS. (Apr. 7, 2023),

---

[8] Other states have codified the common law to the same end. A Colorado statute provides that in "any real estate transaction, the broker's compensation may be paid by the seller, the buyer, the landlord, the tenant, a third party, or by the sharing or splitting of a commission or compensation between brokers." COLO. REV. STAT. § 12-10-410(1). And a Minnesota statute says the same thing: "The seller may, in the listing agreement, authorize the seller's broker to disburse part of the broker's compensation to other brokers, including the buyer's brokers solely representing the buyer." MINN. STAT. § 82.70 (Subd. 4). These statutes are not anomalies but instead speak to a nationwide pattern of authorization for the practices DOJ seeks to outlaw here as a condition on the parties' ability to resolve this private lawsuit. *See, e.g.*, DEL. CODE tit. 24, § 2930; MD. CODE, BUS. OCC. & PROF § 17-534; N.J. ADMIN. CODE § 11:5-6.2; D.C. CODE § 42-1703(f).

[9] The VA has signaled that it will temporarily loosen this requirement of sellers paying buyer-broker commissions. *See* Brooklee Han, *VA to Roll Out Temporary Fix to Buyer Agent Commission Problems*, HOUSINGWIRE (Feb. 22, 2024, 3:04 PM), \*\*\*\*\*\*\*\*\*\*\*.housingwire.com/articles/va-to-roll-out-temporary-fix-to-buyer-agent-commission-problem/ (Ex. D). This temporary change is just that—temporary. And it does not address the underlying concern that prohibiting sellers from paying buyer-broker commissions would impose undue hardship on veterans.

**********.va.gov/housingassistance/home-loans/funding-fee-and-closing-costs/; see also VA

PAMPHLET 26-7 at 8-10, https://benefits.va.gov/WARMS/docs/admin26/handbook/ChapterLende

rsHanbookChapter8.pdf ("Fees or commissions charged by a real estate agent or broker in

connection with a VA loan may **not** be charged to or paid by the veteran-purchaser." (emphasis in

original)). DOJ does not seem to have contemplated how its position aligns with federal law or the

unintended consequences imposed on those most in need of affordable housing, like veterans or

first-time buyers.

      ***Prior DOJ Positions.*** DOJ's arguments against free-market compensation offers are also

a stark reversal from its own previous policy and legal positions. For example, DOJ previously

acknowledged the tremendous benefits of sellers offering commissions "up-front" in the MLS

platform. This system achieves both transparency and efficiency:

> [B]rokers using the MLS reduce the costs of matching buyers and
> sellers and can market their service to a large set of potential clients.
> Further, **by stating up-front the compensation being offered to a**
> **cooperating broker, the MLS can reduce the costs associated**
> **with listing brokers having to negotiate separately with each**
> **potential cooperating broker**. As a result, the use of an MLS can
> substantially reduce transaction costs.

DOJ & FTC, COMPETITION IN THE REAL ESTATE BROKERAGE INDUSTRY at 12–13 (Apr. 2007),

**********.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-

industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.    (footnotes

omitted) (emphasis added).

      DOJ also previously advocated for a federal injunction that allowed for MLS participation

to be limited to brokers and agents who "actively endeavor[ed] to make or accept offers of

cooperation and compensation with respect to properties of the type that are listed on the MLS."

*See* Final Judgment, *United States v. Nat'l Ass'n of Realtors*, No. 05 C 5140, at *1, 9, 25–26

(N.D. Ill. Nov. 18, 2008) (ECF No. 248). This proposed injunction, which was adopted as a final

judgment by the United States District Court for the Northern District of Illinois, *id.*, is flatly inconsistent with the proposed injunction DOJ advances here.[10] *Id.*

　　*Lack of Contrary Authorities.* Against these authorities recognizing the legitimacy of free-market compensation offers between sellers and buyer brokers, DOJ provides no on-point support for its own position. Tellingly, DOJ resorts to one-sided allegations not from court opinions, but instead from pleadings in recently filed cases. (Dkt. #290 at 19). DOJ also cites to secondary sources such as a draft research paper published by the Center for Law and Social Science (CLSS) at USC Gould School of Law. (Dkt. #290 at 14, 17, 20 & nn. 10, 15). But even these sources proposing sweeping policy reforms do not necessarily countenance accomplishing those reforms through private injunctions. The CLSS draft paper, for example, contemplates "regulatory or legislative intervention" to be accomplished through "[p]olicymakers"—not the courts. *See* JORDAN M. BERRY ET AL., ET TU, AGENT? COMMISSION-BASED STEERING IN RESIDENTIAL REAL ESTATE 92–93 (2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4596391.

### ii.　DOJ's policy arguments against the proposed settlement fail on their own terms.

　　DOJ seems to forget that policy decisions are left to Congress and administrative agencies. Courts are not in the business of performing the "cost-benefit analyses embodied in democratically adopted legislation"—and especially not by reference to "Mr. Herbert Spencer's social statistics." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) (quotations omitted); *see also*

---

[10] These are but two examples in a pattern of DOJ inconsistency on the question of real estate brokerage commissions. DOJ's inability to hold a consistent position means that its Statement should be given no weight in evaluating the parties' settlement. *See, e.g.*, *Deere & Co. Repair Servs. Antitrust Litig. v. Deere & Co.*, No. 3:22-cv-50188 (N.D. Ill. July 19, 2023) (Dkt. #141) (Ex. E) ("What, if any, weight should the Court give to the Department of Justice's statement of interest, particularly given that it appears the Department of Justice has flipped on this position repeatedly? . . . The Court understands that elections have consequences (or as they say in cook County, a new broom sweeps clean) so why should the United States' *current* position hold any particular weight?" (emphasis in original)).

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1000 (6th Cir. 1999) ("Manifestly, the judiciary is ill-suited to evaluate directly the efficiency of business practices."). Yet DOJ invites the Court to reject a private, arms-length settlement in a civil lawsuit by relying on statistical evidence and policy arguments of dubious credibility.[11] It should come as no surprise that DOJ's position was met with immediate criticism from experts describing it as the "worst possible outcome for millions of homebuyers." *See* Brooklee Han, 'Worst Possible Outcome': Industry Experts Weigh in on DOJ's Desire to Decouple Commissions, HOUSINGWIRE (Feb. 22, 2024, 3:04 PM), https://www.housingwire.com/articles/worst-possible-outcome-industry-experts-weigh-in-on-dojs-desire-to-decouple-commissions/ (Ex. A) (quoting Steve Murray, the co-founder of RealTrends Consulting).

DOJ's policy position fails on its own terms for all the reasons explained in the compelling amicus briefs submitted by the Council of Multiple Listing Services (CMLS) and the Northwest Multiple Listing Service (NWMLS). (Dkt. #308, #309). MLS PIN adopts these briefs in full. Although DOJ repeatedly complains that the proposed settlement will have no practical consequence, that argument is based on discredited empirical evidence. *See* (Dkt. #309 at 8–14). DOJ grounds its position that the settlement will not have a practical effect on secondary sources and a purported expert declaration evaluating recent NWMLS rule changes. The secondary sources include unpublished papers, blogs, podcasts, lobbyist press releases, and other materials of no demonstrated credibility. (Dkt. #309 at 6) (summarizing DOJ's supporting materials). None of DOJ's sources offer rigorous or peer-reviewed analysis evaluating the NWMLS rule changes along

---

[11] DOJ should also not be demanding an injunction going beyond the requirements of the Sherman Act to pre-empt longstanding Massachusetts common law where that injunction will impact unrepresented buyers and brokers. *See Ricci v. Cellucci*, 191 F.R.D. 3, 13 (D. Mass. 2000) (court reviewing class action settlement should consider effect on third parties).

the key dimensions that would actually matter: namely, commission rates from before implementation compared to after or gross home prices and time on market.

DOJ's purported expert declaration of Erik A. Schmalbach suffers the critical defect of comparing commission rates from the period following the NWMLS changes to commission rates in entirely different metropolitan areas: including rates from more than a decade ago. That defect may sound innocuous in the abstract. But it is no different from treating one individual with a weight loss drug and judging the results based solely on an after-the-fact comparison with "thirty people of different weights, activity levels, health quality, and age" who did not take the drug. (Dkt. 309 at 11 n.47); *see also* (Dkt. #309-1 ¶¶ 22–25). This defect is cogently exposed in the expert declaration of John H. Johnson, IV and Michael Kheyfets (Johnson & Kheyfets Declaration), attached to the CMLS amicus brief. (Dkt. #309-1 ¶¶ 19–25, 33–40).

The Johnson & Kheyfets Declaration also shows that basic aspects of the DOJ Declaration remain a complete mystery. *See* (Dkt. #309-1 ¶ 30). For example, the DOJ Declaration does not disclose any data about average prices or commissions. (Dkt. #309-1 ¶ 28). It also appears that the DOJ Declaration based its analysis on a single broker. (Dkt. #309-1 ¶ 29). But DOJ does not even establish that the single broker's experience is representative of others in the industry. (Dkt. #309-1 ¶ 29–30). It is not even clear which markets or how many transactions DOJ analyzed in reaching its conclusions. (Dkt. #309-1 ¶¶ 28–29). And DOJ has refused to produce the data undergirding the Schmalbach Declaration on grounds of confidentiality under the Antitrust Civil Process Act. *See* Ex. B (MLS PIN's request for the data); Ex. C (DOJ's response). Whatever the merits of this confidentiality claim may be, it does not change that the Declaration's findings are unsubstantiated and, therefore, should be rejected. *See In re Pharma. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 85–86 (D. Mass. 2007) ("[T]he court may reject testimony for which the data relied

upon is flawed or the methodology used is 'internally inconsistent or unreliable.'" (quoting *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 260 (1st Cir.1997)).

### iii.   DOJ's policy arguments speak to weaknesses in the underlying antitrust claim, not a weakness in the proposed settlement.

Even if DOJ is correct that the proposed settlement would have no practical impact, that outcome would speak only to a weakness in the underlying antitrust conspiracy claim. Defendants have argued from the beginning of this case that there is no causal relationship between MLS PIN's rules and the alleged steering practices described in the complaint. *E.g.*, (Dkt. #38). As evidence, Defendants have pointed to the fact that commissions are customarily charged above what MLS PIN's listing rules would require. *E.g.*, (Dkt. #38 at 1); *see also Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318–22 (6th Cir. 2014) (finding no conspiracy to fix brokerage commission rates where the rates charged were consistent with permissible competition); *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1407 (9th Cir. 1986) (same); *Mkt. Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1173–74 (7th Cir. 1990) (finding that the possibility of independent action excluded an antitrust conspiracy claim in a case involving real estate brokers).

Far from denying this fact, DOJ repeatedly acknowledges its truth. (Dkt. #290 at 2, 13–14). DOJ cannot concede this lack of a causal relationship between the relevant rules and the alleged anticompetitive steering practices and at the same time decry those rules as an antitrust conspiracy. In this way, all of DOJ's arguments against the efficacy of the proposed rule changes actually show that MLS PIN's rules do not contribute to an antitrust conspiracy in the first place.

### iv.   Nothing in the proposed settlement precludes DOJ from advancing policy objectives through other avenues.

The proposed settlement fully preserves DOJ's and any other federal agency's ability to advance policy objectives through other appropriate mechanisms, including legislative advocacy

or rulemaking. The FTC has already been directed to consider developing rules addressing brokerage commissions. *See Executive Order on Promoting Competition in the American Economy*, THE WHITE HOUSE (July 9, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/07/09/executive-order-on-promoting-competition-in-the-american-economy/ (encouraging FTC to consider rulemaking in the area of "unfair tying practices or exclusionary practices in the brokerage or listing of real estate"). That of course is the appropriate forum for resolving the policy concerns.

The proposed settlement also expressly excludes federal governmental entities or instrumentalities from the settlement class, which further protects DOJ's efforts to address any anticompetitive real estate practices. DOJ acknowledges this carveout in the Statement of Interest, yet says it remains unsatisfied. (Dkt. #290 at 9 n.6). As to why this carveout is insufficient, DOJ provides no explanation. DOJ mentions horror stories of brokers threatening other brokers who have attempted to lower commission rates. To the extent these coercive practices are occurring, nothing in the proposed settlement would prevent DOJ from investigating and resolving those concerns that have nothing to do with MLS PIN as a listing service.

## C.   Both MLS PIN and home sellers have the right to publish free-market compensation offers under the First Amendment.

DOJ's policy argument that the proposed settlement is not fair and reasonable unless it affirmatively bans free-market compensation offers should be rejected for the additional reason that the communication it seeks to prohibit is protected under the First Amendment. Crucially, DOJ never denies that sellers can compensate buyer brokers in the free market; to the contrary, DOJ confirms the legitimacy of that practice and instead seeks only to ban sellers and their brokers from transmitting compensation offers. This is a textbook regulation of speech akin to the advertising ban struck down in *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 (1996). *See*

23

*also ForSaleByOwner.com Corp. v. Zinnemann*, 347 F. Supp. 2d 868, 870, 878–89 (E.D. Cal. 2004) (for-sale-by-owner listing service "unquestionably ha[d] a speech interest in disseminating real estate information through its website").

"If the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson v. W. States Med. Ctr.,* 535 U.S. 357, 373 (2002). Advertisements of real estate for sale are commercial speech. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 412, 430 (1993). *44 Liquormart* confirmed the general principle that total speech bans will rarely be upheld when the regulated speech is truthful, non-misleading, and concerns lawful products or activities. 517 U.S. at 503–04; *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 176 (1999) (federal ban on lottery and casino advertisements could not constitutionally be enforced in Louisiana—"where such gambling is legal").

In *44 Liquormart*, the Court applied that principle to safeguard the publication of liquor prices in a newspaper. 517 U.S. at 489. The same principle applies here to protect the publication of lawful commission offers in a listing service. The analogy is particularly apt given that the relevant MLS PIN listing data (unlike data from some other listing services), *i.e.*, offers of buyer-broker commissions, is publicly available just like information in a newspaper. *See supra* Part II(B)(i). That MLS PIN is an intermediary between buyers and sellers does not make its speech any less worthy of protection. *See Discovery Network*, 507 U.S. at 412–13, 430 (applying commercial speech protections to publisher of a free magazine with "listings and photographs of available residential properties"); *Greater New Orleans*, 527 U.S. at 176, 180 (same as to association of broadcasters and its members); *see also Zinnemann*, 347 F. Supp. 2d at 870, 878–89. So too, DOJ cannot "coerce a private party"—like MLS PIN—"to punish or suppress" speech

from third parties—like home sellers—simply because it disfavors that speech from a policy perspective. *See Nat'l Rifle Ass'n of Am. v. Vullo*, No. 22-842, 602 U.S. ----, 2024 WL 2751216, at *8 (U.S. May 30, 2024) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–69 (1963)).

Indeed, as an intermediary between buyers and sellers in the Massachusetts real estate market, MLS PIN plays a crucial role in promoting the "free flow of commercial information." *See Linmark Assocs., Inc. v. Willingboro Tp.*, 431 U.S. 85, 92 (1977) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 763–64 (1976)). The importance of that role "is in no way lessened by the fact that the subject of the commercial information here is realty rather than [a hot-button topic like] abortions or drugs." *Id.* To the contrary, the Supreme Court recognizes that those "desiring to sell their homes are just as interested in communicating that fact as are sellers of other goods and services." *Id.* And those seeking to purchase homes "are no less interested in receiving information about available property than are purchasers of other commodities." *Id.* The Supreme Court has therefore rejected attempts to limit the exchange of information between home buyers and home sellers even when doing so would serve "important governmental objective[s]." *Id.* at 95.

In *Linmark*, for example, the Supreme Court struck down a municipal ordinance banning "For Sale" signs even though the ordinance was enacted to prevent "flight of white homeowners from a racially integrated community." *Id.* at 86–87. It made no difference that the ordinance addressed only "one mode of communication" and left open various alternative channels. *Id.* at 93–94. Nor did it make a difference that the process of setting out signs and fielding responses to them is often accomplished through agents or brokers instead of through buyers and sellers directly. *See e.g.*, *id.* at 89 (discussing projected effects of the ordinance from the perspective of real estate agents). What mattered was that in 1970s America the "For Sale" sign was a primary method of

25

connecting buyers and sellers and constituted speech worthy of full protection under the First Amendment. *Id.* at 93. That was especially so given that the municipality could accomplish the same governmental objectives through less restrictive means, such as by educating buyers and sellers. *Id.* at 97–98.

What was true of for-sale signs in the decade of the 1970s is true of MLSs today. These services are an indispensable tool for communicating sales information between home buyers and home sellers. And compensation information is no less deserving of protection than any other dimension of a home sale. The Court should therefore reject DOJ's attempt to "keep people in the dark for what the government perceives to be their own good," *44 Liquormart*, 517 U.S. at 503, and instead allow broker compensation information to be freely exchanged in an open and transparent system.[12]

---

[12] There is little doubt that DOJ will cite *National Society of Professional Engineers v. United States* for the proposition that the limitation on MLS PIN's speech is "a necessary and . . . unavoidable consequence of the [antitrust] violation." 435 U.S. 679, 697 (1978). DOJ's argument falls down, however, on two grounds.

First, this is a settlement of private litigation. In contrast to the defendants in *Engineers*, MLS PIN has not been found to have violated the antitrust laws. And MLS PIN maintains that it has not. (Dkt. #156 ¶¶ 178–87).

Second, and alternatively, even if MLS PIN was found to have violated the antitrust laws, the speech-based remedy sought by DOJ is "broader than reasonably necessary to prevent the perceived evil." *See Peel v. Att'y Disc. Comm.*, 496 U.S. 91, 107–08 (1990); *see also, e.g.*, *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1216–34 (D.C. Cir. 2004) (rejecting remedies sought by state attorney generals that went beyond the antitrust violation). DOJ has "failed to make a showing that a more limited speech regulation would not have adequately served the State's interest." *44 Liquormart*, 517 U.S. at 500. Any argument by DOJ is belied by the settlement that DOJ has previously proposed in the NAR litigation, *see supra* Part II(B)(i), that the disclosure of offers of buyer broker compensation directly to consumers was the antidote to steering. MLS PIN voluntarily adopted the DOJ proposal and changed its rules to require all of its participants to disclose offers of buyer broker compensation directly to consumers on public facing websites. *See infra* Part II(B)(i). The settlement before this Court takes that rule change even further by eliminating any requirement of compensation offers and implementing disclosure and certification requirements. *See infra* Part II(B)(ii).

**D.      DOJ's proposed ban on free-market compensation offers creates an antitrust problem where none existed.**

A private association like MLS PIN cannot ban (or, rather, be compelled by the government to ban) home sellers from offering compensation to buyer brokers in the free market. That is a blatant restraint on trade much more severe than other MLS rules that have been struck down as anticompetitive.

In a notable example, an MLS was found to be in violation of the Sherman Act because it required all members to use the same yard signs instead of the branded signs of their respective agencies. *See Cantor v. Multiple Listing Serv. of Dutchess Cty., Inc.*, 568 F. Supp. 424, 431–32 (S.D.N.Y. 1983). Although the requirement applied uniformly to all members and allegedly produced advantages in the local real estate market, it was struck down nonetheless as "impair[ing] [member] freedom to conduct their businesses as they [saw] fit." *Id.* at 430. Other cases have found antitrust violations (or at least plausible antitrust violations) when MLSs adopted rules discouraging lawful, but disfavored, business models. *See, e.g.*, *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 822, 836 (6th Cir. 2011); *Compass, Inc. v. Real Est. Bd. of N.Y., Inc.*, No. 21-CV-2195 (AJN), 2022 WL 992628, at *2, *10 (S.D.N.Y. Mar. 31, 2022). Although MLS listing rules "dismantl[e] information and communication barriers"—and thus "bring significant advantages to the market"—these same rules can run afoul of the Sherman Act when they prohibit lawful business practices for reasons other than the MLS's procompetitive objectives. *See Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 286 (4th Cir. 2012).

If an MLS cannot prohibit its members from using their preferred yard signs without running afoul of the Sherman Act, it certainly cannot go considerably further and ban both its members and their customers from offering commissions to buyer brokers. Those commission offers would remain perfectly lawful under the DOJ proposal; they would only be prohibited

among MLS members as a requirement of accessing the platform. DOJ's attempts to coerce a private joint venture to prohibit otherwise lawful offers of compensation flouts the very antitrust principles DOJ claims to be protecting.

DOJ's policy arguments supporting its proposal are the same that were rejected in *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978). In that case, a private association of engineers (as opposed to real estate brokers) attempted to ban its members from negotiating compensation until after an engineer had been selected for a project. *Id.* at 681–86. That is no different from DOJ's attempt to ban commission negotiations until after a real estate transaction has commenced. Just like DOJ here, the engineers argued that such a ban on the initial exchange of pricing information would promote a host of policy objectives and overcome ethical concerns with engineers submitting improper bids. *Id.* at 684–85, 693–94. Without denying the legitimacy of these objectives or concerns, the Court nonetheless found that the ban constituted an antitrust conspiracy in plain violation of the Sherman Act. *Id.* at 693–96. The Court emphasized that policy arguments are appropriately addressed to Congress and not resolved through antitrust claims. *See id.* at 689–92 ("That kind of argument is properly addressed to Congress . . . .").

**E.    DOJ's proposed ban would remain flawed even if it applied only to commission offers on the MLS.**

DOJ has made its position clear that it wants seller offers of compensation removed from the market entirely—not just from the MLS. *See, e.g.*, (Dkt. #290 at 1–3, 12–14, 20–22); (Dkt. #327 at 13:20–21). But even if DOJ walked back that extreme position, it would still go far beyond what is required to resolve this private litigation. MLS PIN is not the NAR. It does not have the same rules, policies, or handbooks. And it had already reached a settlement of this case long before NAR reached a settlement of its cases. This settlement involves one non-NAR affiliated MLS that has not been found guilty of any wrongdoing. The NAR settlement involves

scores of defendants (brokers and MLSs in addition to NAR) facing billions of dollars in potential liabilities. Both settlements are practical compromises in different litigation and should be evaluated as such. The goal is not perfection or to resolve disputed policy issues on a national basis; it is to achieve a fair and reasonable outcome based on the facts of the case and the risks and burdens of advancing to trial.

It is not an antitrust conspiracy—under any standard—merely to publish compensation offers on an MLS. *See supra* Part III(B); *Grace v. RE/MAX Holdings, Inc.*, No. 23-CV-06352, 2024 WL 2761188, at *3–4 (N.D. Cal. May 29, 2024). And that practice certainly does not constitute a conspiracy under the legal certainty standard that applies to the evaluation of this private settlement. *See supra* Part III(A). MLS PIN has the right to conduct lawful business in Massachusetts and to publish the speech of its members. The Court should protect those rights— and preserve MLS PIN's role in promoting efficiency and transparency in the Massachusetts real estate market—by approving the proposed settlement.

## IV. CONCLUSION

For the foregoing reasons, the Court should reject the arguments made in the Statement of Interest submitted by DOJ.

Respectfully submitted,

_/s/ Jon M. Anderson_

Jon M. Anderson
BBO No. 557962
BRENNAN SCUNGIO & KRESGE LLP
362 Broadway
Providence, RI  02909
(401) 453-2300
(401) 453-2345 fax
janderson@bskllp.com

J. Matthew Goodin (_pro hac vice_)
LOCKE LORD LLP
111 South Wacker Drive
Suite 4100
Chicago, IL  60606
(312) 443-0472
jmgoodin@lockelord.com

Chase T. Cobb (_pro hac vice_ pending)
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
(214) 740-8000
chase.cobb@lockelord.com

**_Attorneys for Defendant MLS_**
**_Property Information Network, Inc._**

## CERTIFICATE OF SERVICE

I certify that this response was served on all counsel of record through the Court's electronic filing system on June 10, 2024.

_/s/ Jon M. Anderson_

Jon M. Anderson