# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNIFER NOSALEK, ET AL., individually and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>vs.<br><br>MLS PROPERTY INFORMATION NETWORK, INC., ET AL.,<br><br>　　　　　　Defendants. | No. 1:20-cv-12244-PBS<br><br><br><br><br>CLASS ACTION |

## DEFENDANT MLS PIN'S SUPPLEMENTAL BRIEF IN SUPPORT OF PRELIMINARY APPROVAL OF THE CLASS SETTLEMENT

Jon M. Anderson
BBO No. 557962
BRENNAN SCUNGIO & KRESGE LLP
362 Broadway
Providence, RI  02909
(401) 453-2300
(401) 453-2345 fax
janderson@bskllp.com

J. Matthew Goodin (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Drive, Suite 4100
Chicago, IL  60606
(312) 443-0472
matt.goodin@troutman.com

Chase T. Cobb (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
(214) 740-8000
chase.cobb@troutman.com

***Attorneys for Defendant MLS Property Information Network, Inc.***

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ...........................................................................................................1

II. BACKGROUND..............................................................................................................2

    A. The MLS PIN platform is procompetitive and generates tremendous efficiencies in the Massachusetts real estate market. ............................................................................2

    B. The proposed settlement addresses and fully resolves the narrow allegations against MLS PIN; to go further would risk compromising MLS PIN's role in promoting efficient and transparent real estate transactions..................................................................................3

    C. The proposed settlement does not eliminate free-market compensation offers because to do so would be bad for home buyers, create an antitrust problem in its own right, and restrict commercial speech in violation of the First Amendment. ........................................6

III. DISCUSSION ..................................................................................................................7

    A. The proposed settlement is a fair and reasonable compromise that deserves preliminary approval..............................................................................................................7

    B. The fairness of the proposed settlement is not called into question by recent developments in the NAR litigation..................................................................................12

IV. CONCLUSION ..............................................................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                                                                                             **Page(s)**

*44 Liquormart, Inc. v. Rhode Island*,
   517 U.S. 484 (1996) ........................................................................................................... 10

*Burnett v. Nat'l Assoc. of Realtors*,
   No. 4:19-CV-332 (W.D. Mo.) ................................................................................ 7, 11, 14

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ............................................................................................................ 2

*Cantor v. Multiple Listing Serv. of Dutchess Cty., Inc.*,
   568 F. Supp. 424 (S.D.N.Y. 1983) ..................................................................................... 11

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980) .......................................................................................................... 10

*ForSaleByOwner.com Corp. v. Zinnemann*,
   347 F. Supp. 2d 868 (E.D. Cal. 2004) ............................................................................... 10

*Grace v. RE/MAX Holdings, Inc.*,
   No. 23-CV-06352, 2024 WL 2761188 (N.D. Cal. May 29, 2024) ............................. 1, 4, 8, 3

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
   527 U.S. 173 (1999) .......................................................................................................... 10

*Greenspun v. Bogan*,
   492 F.2d 375 (1st Cir. 1974) ................................................................................................ 7

*Grunin v. Int'l House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) ............................................................................................ 7, 8

*Klickads, Inc. v. Real Estate Bd. of N.Y., Inc.*,
   No. 04-8042-LBS, 2007 WL 2254721 (S.D.N.Y. Aug. 6, 2007) ......................................... 2

*Prob. Court of Warwick ex rel. Lawton v. Bank of Am., N.A.*,
   813 F. Supp. 2d 277 (D.R.I. 2011) .................................................................................... 12

*Linmark Assocs., Inc. v. Willingboro Tp.*,
   431 U.S. 85 (1977) ............................................................................................................ 10

*Moehrl v. Nat'l Ass'n of Realtors*,
   492 F. Supp. 3d 768 (N.D. Ill. 2020) ................................................................................... 4

*National Society of Professional Engineers v. United States*,
   435 U.S. 679 (1978) .......................................................................................................... 11

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
　173 F.3d 995 (6th Cir. 1999) ............................................................................. 4, 8

*Reppert v. Marvin Lumber & Cedar Co.*,
　359 F.3d 53 (1st Cir. 2004) .................................................................................. 8

*Robertson v. Nat'l Basketball Ass'n*
　556 F.2d 682 (2d Cir. 1977) ................................................................................. 8

*United States v. Realty Multi-List, Inc.*,
　629 F.2d 1351 (5th Cir. 1980) ........................................................................... 2, 3

*Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*,
　850 F.2d 803 (1st Cir. 1988) ................................................................................. 2

**Constitution**

U.S. Const. amend I ................................................................................................. *passim*

Sherman Antitrust Act (15 U.S.C. § 1 *et seq.*) ....................................................... *passim*

**Other Authorities**

*Decouple Commissions*, HOUSINGWIRE (Fed. 22, 2024, 3:04 PM),
　***********.housingwire.com/articles/worst-possible-outcome-industry-
　experts-weigh-in-on-dojs-desire-to-decouple-commissions/ ............................... 6, 9

DOJ & FTC, COMPETITION IN THE REAL ESTATE BROKERAGE INDUSTRY (Apr.
　2007), https://www.ftc.gov/sites/default/files/documents/reports/competition-
　real-estate-brokerage-industry-report-federal-trade-commission-and-
　u.s.department-justice/v050015.pdf .................................................................. 3, 13

Melissa Stewart, *Buyer Beware: Who Is Paying the Home Buyer's Real Estate
　Agent?*, 30 U. MIA. BUS. L. REV. 73 (2021) ................................................... 4, 9, 12

Pursuant to this Court's June 24, 2024 Order (Dkt. #339), Defendant MLS Property Information Network (MLS PIN) respectfully submits this supplemental brief in support of preliminary approval of the parties' class settlement.

## I. INTRODUCTION

Settlements are about striking a fair and reasonable compromise between competing positions. The proposed settlement here does exactly that by providing not only valuable monetary relief to the class members, but also injunctive relief in the form of substantial rule and practice changes impacting the MLS PIN platform. To institute these rule changes is to fully resolve the antitrust claims asserted against MLS PIN in this litigation while preserving its unique role as the efficient intermediary between buyers and sellers in the Massachusetts real estate market. To go any further is to handicap many buyers in that market, restrict commercial speech in violation of the First Amendment, and create an antitrust problem where none existed before. Crucially, certain of the practices retained under the settlement are the same practices that have been upheld against attack time and again under both state and federal law. The legitimacy of those practices was confirmed most recently in a federal decision dismissing claims similar to those presented here against MLS PIN. *See Grace v. RE/MAX Holdings, Inc.*, No. 23-CV-06352, 2024 WL 2761188, at *3–4 (N.D. Cal. May 29, 2024). The Court should preliminarily approve the proposed settlement and, in doing so, bring this four-year dispute closer to a conclusion that is long overdue.

MLS PIN has already explained the principal grounds for approving the settlement in its Response to the Statement of Interest of the United States (MLS PIN Response). *See* (Dkt. #333). Rather than repeat prior briefing, MLS PIN fully incorporates the MLS PIN Response here and offers only a summary of its key points.[1] MLS PIN also addresses recent developments in the

---

[1] Even though the MLS PIN Response addressed an earlier version of the class settlement, its main points also support the Third Amended Settlement Agreement. In addition to incorporating

1

litigation involving the National Association of Realtors (NAR) and explains why those developments have no bearing on the proposed settlement in this separate action.

## II. BACKGROUND

### A. The MLS PIN platform is procompetitive and generates tremendous efficiencies in the Massachusetts real estate market.

MLS PIN plays a critical role in facilitating the sale of residential real estate in Massachusetts. As a Multiple Listing Service (MLS), MLS PIN promotes efficiency in the Massachusetts real estate market by centralizing hundreds of thousands of property listings on a single platform. *See United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1367–68 (5th Cir. 1980); *Klickads, Inc. v. Real Estate Bd. of N.Y., Inc.*, No. 04-8042-LBS, 2007 WL 2254721, at *1 (S.D.N.Y. Aug. 6, 2007); *cf. Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 805 (1st Cir. 1988) (describing the procompetitive impact of a predecessor MLS to MLS PIN in Massachusetts). The MLS PIN platform allows buyer brokers to seamlessly sort through properties in search of an ideal match for their clients. *See Realty Multi-List, Inc.*, 629 F.2d at 1356, 1368. And in turn, sellers and their brokers can list properties and be sure the listings receive the widest possible audience. *See id.* Almost nobody denies the many procompetitive benefits of MLSs, especially their role in overcoming geographic barriers and market imperfections. *See id.* at 1367–68.

Without denying these substantial benefits, Plaintiffs challenge discrete MLS PIN listing rules allegedly governing the way brokerage-commission information is shared on the MLS PIN platform; to the extent they are a restraint of trade, they are analyzed under the rule of reason, not the *per se* rule. *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 778 (1999); *see also Realty Multi-*

---

the MLS PIN Response, MLS PIN also incorporates the compelling amici briefs submitted by the Council of Multiple Listing Services (CMLS) and the Northwest Multiple Listing Service (NWMLS) in response to the Statement of Interest. *See* (Dkt. #308, #309).

*List, Inc.*, 629 F.2d at 1368–69 (refusing to apply the *per se* standard considering that MLSs accomplish "enormously procompetitive objectives"). MLS PIN vehemently denies that any of its rules or procedures are part of any price-fixing conspiracy. But in the spirit of compromise, MLS PIN has agreed to change the very rules referenced in the complaint and in such a way as to fully resolve Plaintiffs' claims.

### B. The proposed settlement addresses and fully resolves the narrow allegations against MLS PIN; to go further would risk compromising MLS PIN's role in promoting efficient and transparent real estate transactions.

It is impossible to evaluate the rule changes in the proposed settlement without understanding how they fit into the broader history of residential real-estate commissions. For many decades, it has been industry standard practice for brokers on both sides of a home sale to be paid commissions at closing from the final sale proceeds. This practice of compensating brokers on the back end of the transaction arises in large part from practical necessity: many people, especially first-time home buyers, would be excluded from the housing market if they were required to pay broker commissions out of pocket. Even though commissions are paid on the back end, commission terms are often set on the front end with sellers (or selling brokers) making initial compensation offers to buyer brokers at the same time as listing a property. This practice of sharing compensation offers at the outset of the transaction also arises largely from necessity: everybody benefits from upfront transparency as to how brokers will be paid. This upfront transparency "reduce[s] the costs associated with listing brokers having to negotiate separately with each potential cooperating broker." DOJ & FTC, COMPETITION IN THE REAL ESTATE BROKERAGE INDUSTRY at 12–13 (Apr. 2007), https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf (footnotes omitted). And "[a]s a result, the use of an MLS can substantially reduce transaction costs." *Id.*

3

These practices of sellers offering compensation to buyers and their brokers—and displaying those offers as a term of the listing on an MLS—are innocuous as a matter of antitrust law. *See, e.g., Grace v. RE/MAX Holdings, Inc.*, No. 23-CV-06352, 2024 WL 2761188, at *3–4 (N.D. Cal. May 29, 2024); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1025 (6th Cir. 1999) ("[S]etting cooperative sales-commission rates is not price fixing."); Melissa Stewart, *Buyer Beware: Who Is Paying the Home Buyer's Real Estate Agent?*, 30 U. MIA. BUS. L. REV. 73, 74 (2021) (explaining "why having sellers pay the buyer-broker commission is beneficial and supported from an antitrust, economic, and equitable perspective").

Even though these commission practices are innocuous as a matter of antitrust law, they have come under scrutiny based on their relationship with common MLS listing rules. *Cf. Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 783 (N.D. Ill. 2020) (acknowledging that individual brokerage commission rules may "survive antitrust scrutiny by [themselves]"; what matters is how the various rules "work together"). For the most part, these challenged MLS listing rules merely reflect what is already industry practice; they do not cause industry practices. For example, many MLSs historically required initial compensation offers at the time a property was listed—even if the offer was only one penny. That sellers and selling brokers typically offered compensation above this one-penny threshold shows that the threshold is not what is causing the commission offers to be made in the first place.

Since these rules merely reflect industry practice, it is a mystery how they amount to a conspiracy or how they cause anyone damage. The mystery is especially baffling as to MLS PIN given that its set of rules is different from those of many other MLSs throughout the country. MLS PIN is not associated with the National Association of Realtors (NAR). And MLS PIN is not bound by NAR's rules, policies, procedures, ethical guidelines, or handbooks.

Even so, MLS PIN has agreed to settle this case as a compromise under terms set forth in the Third Amended Settlement Agreement. The proposed settlement eliminates any theoretical link between MLS PIN and anyone responsible for determining brokerage commissions in the Massachusetts real estate market. For starters, the proposed settlement eliminates any requirement that sellers (or seller brokers) offer compensation to buyer brokers, at any level, as a condition of listing on the MLS PIN platform. *See* Third Amended Settlement Agreement Ex. 3a, § 5.0. Instead, the decision to offer compensation—or not—is left entirely to the seller. In fact, following an inquiry from the Court at the May 21, 2024, status conference, (Dkt. #327 at 21:17–25), MLS PIN proactively updated its platform so that sellers, and only sellers, can *already* list properties with no offers of compensation to buyers or buyer brokers. To further ensure that compensation decisions are left to the seller, the settlement would also implement both a mandatory disclosure rule and a mandatory certification rule. *See* Third Amended Settlement Agreement Ex. 3a, § 1.0(c). The disclosure rule would ensure that the seller is aware of the right to offer no compensation or to negotiate compensation. The certification rule would require the selling broker to certify compliance with the disclosure rule. Taken together, these three changes—(1) no required offer of compensation, (2) mandatory disclosure, and (3) mandatory certification—resolve all there is to resolve in this dispute.

The proposed settlement also complements voluntary rule changes MLS PIN previously implemented in 2021. These voluntary rule changes provide essential context for evaluating the proposed settlement. Among other things, the voluntary changes promote transparency on the buying side of the transaction in the same way that the proposed settlement promotes transparency on the selling side. For example, buyer brokers must disclose all compensation offers to their clients and cannot represent their services as free. Moreover, buyer brokers must disclose those

compensation offers in the same form and substance as they appear on the MLS platform. MLS PIN makes its listings available to certain public portals to provide further transparency about compensation offers in those listings.[2] Crucially, MLS PIN rules prohibit buyer brokers from filtering properties based on compensation offers. This safeguards against buyer brokers steering their customers based on seller's compensation offers, or lack thereof. These voluntary changes would combine with the proposed settlement to establish an efficient and transparent system for the transfer of compensation offers between buyers and sellers.

### C. The proposed settlement does not eliminate free-market compensation offers because to do so would be bad for home buyers, create an antitrust problem in its own right, and restrict commercial speech in violation of the First Amendment.

The one thing the proposed settlement does *not* do is prohibit sellers from making compensation offers to buyers or their brokers. To do so would be the "worst possible outcome for millions of homebuyers," according to experts. *See* Brooklee Han, *'Worst Possible Outcome': Industry Experts Weigh in on DOJ's Desire to Decouple Commissions*, HOUSINGWIRE (Fed. 22, 2024, 3:04 PM), https://www.housingwire.com/articles/worst-possible-outcome-industry-experts-weigh-in-on-dojs-desire-to-decouple-commissions/. Brokers provide a valuable service and have to be paid somehow. And if they are not paid out of the final sale proceeds through a transparent and efficient exchange of compensation information, their services will be beyond the reach of many purchasers. *See id.* A complete prohibition of compensation offers would also contradict state and federal authorities recognizing the legitimacy of those offers, create an antitrust problem where none existed, and restrict commercial speech that is entitled to First Amendment protection. *See infra* Part III(A). DOJ nonetheless made its position clear, in its opposition to a previous

---

[2] As explained in the MLS PIN Response, Zillow is among the parties who are provided access to full listings on MLS PIN, including any compensation information. Although Zillow previously displayed compensation offers on its website, and MLS PIN continues to provide that information to Zillow, Zillow does not appear to be displaying that information currently.

settlement, that no settlement can be fair and reasonable short of a wholesale prohibition on compensation offers *enforceable by MLS PIN. See* (Dkt. #290 at 3, 20–22) (urging adoption of a new "MLS PIN rule" banning offers of compensation to buyer brokers). Notably, in its Statement of Interest regarding the NAR settlement, DOJ did not take this position despite acknowledging that the settlement "expressly allows offers of compensation to continue and for them to be posted publicly" so long as they are not on the MLS. *See* Statement of Interest of U.S., *Burnett v. Nat'l Ass'n of Realtors*, No. 4:19-cv-00332-SRB (W.D. Mo.), (Dkt. #1603). If DOJ nevertheless maintains its position here that offers of compensation should be banned or the settlement should not be approved, the Court should reject it.

## III. DISCUSSION

### A. The proposed settlement is a fair and reasonable compromise that deserves preliminary approval.

The proposed settlement is a fair and reasonable compromise. It deserves to be approved under any standard. And it certainly deserves to be approved under the legal-certainty standard that applies to the evaluation of antitrust class settlements. MLS PIN already explained the principal grounds for approving the settlement in the MLS PIN Response. *See* (Dkt. #333). MLS PIN also explained why going beyond the proposed settlement—and affirmatively banning free-market compensation offers—would be not only unnecessary, but also counterproductive and likely illegal. For the Court's convenience, MLS PIN summarizes the key points from that Response here:

**i. An evaluation of the proposed settlement does not require a mini-trial on fiercely disputed issues.** As an initial matter, evaluating a proposed settlement does not require a "trial [on] the merits." *See Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir. 1974). To the contrary, "the very purpose of a compromise is to avoid the delay and expense of [] a trial." *Grunin v. Int'l House*

*of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975) (quotations omitted). In the antitrust context, that means a class settlement should be rejected as itself anticompetitive only when it perpetuates obvious "per se" antitrust violations under previously decided cases. *See Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) (overruling objection that a proposed class settlement would perpetuate ten years of alleged anticompetitive practices, including an alleged anticompetitive compensation rule); *Grunin*, 513 F.2d at 123–24 (overruling objection that a proposed class settlement would perpetuate antitrust violations when those violations were not a "legal certainty"); MLS PIN Resp. 1, 10–12 & n. 1.

**ii. The proposed settlement fully resolves the claims against MLS PIN; there is no requirement to ban free-market compensation officers, which are widely recognized as legitimate.** The proposed settlement fully resolves the disputed antitrust conspiracy claim arising out of the facts presented in Plaintiffs' Complaint. *See Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 57–59 (1st Cir. 2004). It is simply not the case that an MLS must prevent sellers from making initial compensation offers for its listing rules to survive antitrust scrutiny. Just recently, a federal district court dismissed claims against an MLS defendant strikingly similar to those asserted here. *See Grace v. RE/MAX Holdings, Inc.*, No. 23-CV-06352, 2024 WL 2761188, at *3–4 (N.D. Cal. May 29, 2024). The court confirmed that MLS rules are not unlawful agreements to restrain trade when they merely permit compensation offers or facilitate them—but do not "mandate[]" them. *Id.* at 3–4. Many other federal courts have reached the same or similar conclusions. *See, e.g., Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1025 (6th Cir. 1999) ("[S]etting cooperative sales-commission rates is not price fixing."); MLS PIN Resp. 12–16. The legitimacy of free-market compensation offers has also been recognized under Massachusetts common law for over a century. *See* MLS PIN Resp. 16–17. Many states authorize free-market

compensation offers by statute. *See id.* 16 n.9. Even DOJ's own policy positions and prior briefing have acknowledged the tremendous benefits of sellers offering commissions "up-front" in the MLS platform. *See id.* 18–19. That is why some federal regulations and statutes authorize—or even require—sellers to pay buyer-broker fees as so-called "seller's concessions." *See id.* 17–18.

**iii. To eliminate free-market compensation offers would harm homebuyers.** Many buyers, especially first-time buyers, would be excluded from the housing market if forced to pay broker commissions out of pocket. That is why initial compensation offers play such an important role in promoting affordable housing: they provide an efficient and transparent way for buyer brokers to be paid out of the final sale proceeds. *See* Melissa Stewart, *Buyer Beware: Who Is Paying the Home Buyer's Real Estate Agent?*, 30 U. MIA. BUS. L. REV. 73, 97 (2021) (warning that rule changes similar to those proposed by DOJ "could significantly adversely affect the real estate industry" and "harm buyers"). It should come as no surprise that DOJ's position advocating the flat elimination of initial compensation offers was met with swift industry criticism describing it as the "worst possible outcome for millions of homebuyers." *See* Brooklee Han, *'Worst Possible Outcome': Industry Experts Weigh in on DOJ's Desire to Decouple Commissions*, HOUSINGWIRE (Fed. 22, 2024, 3:04 PM), https://www.housingwire.com/articles/worst-possible-outcome-industry-experts-weigh-in-on-dojs-desire-to-decouple-commissions/; MLS PIN Resp. 2–3, 19–21.

**iv. To prohibit free-market compensation offers would restrict commercial speech that is entitled to First Amendment protection.** Free-market compensation offers are also entitled to protection as commercial speech under the First Amendment, an issue not addressed in the NAR post-judgment settlement. Nobody can seriously deny that sellers have the right to compensate buyer brokers in the free market; to the contrary, DOJ and others have consistently confirmed the legitimacy of that practice and have instead sought to ban only the *initial*

transmission of compensation offers when a property is listed. But this is a textbook regulation of speech akin to those that have been struck down in other cases. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 (1996). *See also ForSaleByOwner.com Corp. v. Zinnemann*, 347 F. Supp. 2d 868, 870, 878–89 (E.D. Cal. 2004) (for-sale-by-owner listing service "unquestionably ha[d] a speech interest in disseminating real estate information through its website"); MLS PIN Resp. 23–26. Total speech bans will rarely be upheld when the regulated speech is truthful, non-misleading, and concerns lawful products or activities. *44 Liquormart*, 517 U.S. at 503–04; *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 176 (1999); *Linmark Assocs., Inc. v. Willingboro Tp.*, 431 U.S. 85, 86–87, 92–98 (1977).

In *44 Liquormart*, the Court applied that principle to safeguard the publication of liquor prices in a newspaper. *See* 517 U.S. at 489. And in *Linmark*, the Court applied that principle to safeguard "For Sale" signs in the residential real estate market. *See* 431 U.S. at 86–87. It made no difference that the signs were one method among many to advertise property, that the signs facilitated a social ill (white flight), or that the process of setting signs and fielding responses to them was generally accomplished through agents and brokers instead of buyers and sellers directly. *See id.* at 86–87, 93–98. The same principles from *44 Liquormart* and *Linmark* apply here to protect the publication of lawful commission offers in an MLS—especially since the proposed settlement would ensure that decisions about offering compensation are left to sellers themselves, not their brokers.

**v. To eliminate free-market compensation offers would create an antitrust problem where none exists.** DOJ's desired ban on initial compensation offers does not appear to be limited to those made on the MLS; to the contrary, the suggested ban would appear to extend to any initial

compensation offers, no matter where they are made—although, as noted above, DOJ did not express this view in its Statement of Interest concerning the NAR settlement. *Compare* (Dkt. #290 at 3, 20–22) (urging adoption of a new "MLS PIN rule" banning "sellers from making commission offers to buyer brokers at all"), *with* Statement of Interest of U.S., *Burnett v. Nat'l Assoc. of Realtors*, No. 4:19-CV-332 (W.D. Mo.), (Dkt. #1603) (taking no similar position). But a private enterprise like MLS PIN cannot ban (or, rather, be compelled by the government to ban) home sellers from offering compensation to buyer brokers in the free market. That is a blatant restraint on trade much more severe than other MLS rules that have been struck down as anticompetitive.

For example, if an MLS cannot prohibit its subscribers from using their preferred yard signs without running afoul of the Sherman Act, *see Cantor v. Multiple Listing Serv. of Dutchess Cty., Inc.*, 568 F. Supp. 424, 431–32 (S.D.N.Y. 1983), it certainly cannot go considerably further and ban both its subscribers and their customers from offering commissions to buyer brokers. *See* MLS PIN Resp. 27–28. The truth of that lesson is born out in *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978). In that case, the Court struck down an attempt from a private association of engineers (as opposed to real estate brokers) to ban compensation negotiations until after an engineer had been selected for a project. *Id.* at 681–86. That is no different from DOJ's attempt here to use a private MLS to ban commission negotiations until after a real estate transaction has reached a certain arbitrary stage.

### vi. Arguments against the proposed settlement speak to weaknesses in the underlying antitrust claim.

DOJ has complained that the proposed settlement will not have a practical consequence. Even if DOJ were correct, that would speak only to the weakness of underlying antitrust claim. Defendants have been arguing from the beginning of this case that there is no causal connection between MLS PIN's listing rules and the steering practices described in the

complaint.[3] *See e.g.*, (Dkt. #38). Far from denying this fact, DOJ consistently reinforces it by pointing out that sellers typically offer compensation above what MLS rules would require. (Dkt. #290 at 2, 13–14). DOJ points to this fact as evidence that changing those rules will have no real-world impact; what DOJ misses is that this lack of real-world connection between MLS rules and the harms described in the complaint is exactly why there can be no antitrust liability in the first place. Nothing in the proposed settlement prevents DOJ from pursuing broader policy changes through legislative reform or rulemaking. *See* MLS PIN Resp. at 22–23.

### B. The fairness of the proposed settlement is not called into question by recent developments in the NAR litigation.

The widely publicized NAR settlement does not affect the settlement proposed here. MLS PIN is not the NAR. It does not have the same set of rules, policies, or handbooks. And, importantly, it had already reached a settlement of this case long before NAR reached its settlement. This settlement involves one non-NAR affiliated MLS that has not been found liable for any wrongdoing and was not forced to negotiate under the specter of an existential, ten-figure judgement. The NAR settlement involved defendants facing billions of dollars in potential liabilities based on a jury verdict. Both settlements are practical compromises, reached under very different circumstances and in different litigation, and should be evaluated as such.

---

[3] Plaintiffs have never articulated any theory by which MLS PIN, as an intermediary, can be held responsible for buyer brokers steering customers based on compensation offers. If steering is occurring, that sounds in the realm of fiduciary duties and not antitrust law. *See* Melissa Stewart, *Buyer Beware: Who Is Paying the Home Buyers Real Estate Agent?*, 30 U. MIA. BUS. L. REV. 73, 96 (2021) (concluding that under antitrust law broker-compensation rules cannot be treated as the cause of any alleged steering: steering would violate fiduciary duties); *cf. Prob. Court of Warwick ex rel. Lawton v. Bank of Am., N.A.*, 813 F. Supp. 2d 277, 330 (D.R.I. 2011) ("This claim fails because it ignores a central tenet of causation analysis—namely, that a third-party's intentional wrong is usually considered unforeseeable and a superseding cause which relieves the original tortfeasor of liability.").

Notably, the NAR settlement does not prohibit sellers or even seller brokers from making initial offers of compensation to buyer brokers when listing properties for sale. The NAR settlement merely moves initial compensation offers off the MLS. The proposed settlement here does not move initial compensation offers off the MLS, but as explained above, it is not an antitrust conspiracy—under any standard—merely to publish compensation offers on an MLS. *See supra* Part III(A)(ii); *Grace v. RE/MAX Holdings, Inc.*, No. 23-CV-06352, 2024 WL 2761188, at *3–4 (N.D. Cal. May 29, 2024). Publishing those offers certainly does not constitute a conspiracy under the legal-certainty standard that applies to the evaluation of this private settlement. *See supra* Part III(A)(i). Quite to the contrary, even DOJ has previously acknowledged that buyers and sellers alike benefit from "up-front" transparency as to what brokers will be paid:

> [B]rokers using the MLS reduce the costs of matching buyers and sellers and can market their service to a large set of potential clients. Further, **by stating up-front the compensation being offered to a cooperating broker, the MLS can reduce the costs associated with listing brokers having to negotiate separately with each potential cooperating broker. As a result, the use of an MLS can substantially reduce transaction costs.**

DOJ & FTC, COMPETITION IN THE REAL ESTATE BROKERAGE INDUSTRY at 12–13 (Apr. 2007), ***********.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf. (footnotes omitted) (emphasis added).

By preserving that up-front transparency, the proposed settlement here actually does *more* for consumers than does the NAR settlement. That is especially so given the proposed settlement's additional safeguards to ensure that the matter of making and negotiating compensation offers is left entirely to sellers themselves—not their brokers. These safeguards include a seller's right to decide whether a compensation offer should be made (or not) and to be informed of that right. These safeguards also bolster MLS PIN's previously implemented voluntary rule changes, which

13

already require buyers to be informed of compensation offers (in the same form those offers appear on the MLS) and already prohibit buyer brokers from filtering properties based on the compensation offered.

MLS PIN has the right to conduct lawful business in Massachusetts and to transmit compensation offers from sellers to buyers. Sellers indisputably have the right to make those compensation offers, which makes the publication of those offers protected commercial speech. *See supra* Part III(A)(iv).

Finally, MLS PIN is not the only "non-REALTOR MLS"[4] that chose not to opt into the NAR settlement. For example, the Northwest Multiple Listing Service made the same decision for the reasons explained in its compelling amicus brief, which is adopted here. (Dkt. #308); *see also* (Dkt. #309) (amicus brief from the Council of Multiple Listing Services). Contrary to DOJ's unsupported assertion in the parties' Joint Statement in June 2024 that "most" MLSs had opted into the NAR settlement, (Dkt. #338 at 8), in fact, only 15 "non-REALTOR MLSs" ultimately did. *See* Declaration of Steve W. Berman in Support of Plaintiff's Motion for Final Approval of Settlements with the National Association of Realtors, HomeServices Defendants, and Opt-In Entities ¶ 11, *Burnett v. Nat'l Assoc. of Realtors*, No. 4:19-CV-332 (W.D. Mo.), (Dkt. #1595-2). While it is difficult to determine the exact number of MLSs that are *not* REALTOR MLSs, based on a reasonable investigation, the number appears to be no less than forty across the country.

---

[4] While "REALTOR MLS" was expressly defined in the NAR Settlement Agreement, "non-REALTOR MLS" was not. *See* Corrected Settlement Agreement ¶ 11, *Burnett v. Nat'l Assoc. of Realtors*, No. 4:19-CV-332 (W.D. Mo.), (Dkt. #1458-1). Based on the definition of REALTOR MLS, non-REALTOR MLS would include any MLS that is *not*: "(a) any separately incorporated multiple listing service that is owned exclusively by one or more REALTOR® Member Boards as of the Execution Date (and not in whole or part by any non-Member Board Person); or (b) any other multiple listing service that is not separately incorporated from and is operated exclusively by a Member Board." *Id.*

Fifteen is certainly not "most" of forty. In any event, DOJ's implication that MLS PIN is alone, or nearly so, in choosing not to join the NAR settlement is not factually correct even if it were relevant to the Court's evaluation of the proposed settlement agreement here.

## IV. CONCLUSION

For the foregoing reasons, the Court should preliminarily approve the Third Amended Settlement Agreement.

Respectfully submitted,

*/s/ Jon M. Anderson*
Jon M. Anderson
BBO No. 557962
BRENNAN SCUNGIO & KRESGE LLP
362 Broadway
Providence, RI 02909
(401) 453-2300
(401) 453-2345 fax
janderson@bskllp.com

J. Matthew Goodin (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Drive
Suite 4100
Chicago, IL 60606
(312) 443-0472
matt.goodin@troutman.com

Chase T. Cobb (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
(214) 740-8000
chase.cobb@troutman.com

**Attorneys for Defendant MLS Property Information Network, Inc.**

**CERTIFICATE OF SERVICE**

I certify that this response was served on all counsel of record through the Court's electronic filing system on January 17, 2025.

/s/ *Jon M. Anderson*
Jon M. Anderson